**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>SHARON MAHN,<br><br>                        Debtor. | <u>**FOR PUBLICATION**</u><br><br>Chapter 7<br><br>Case No. 22-11466 (MG) |
| MAJOR, LINDSEY & AFRICA, LLC,<br><br>                        Plaintiff,<br><br>        v.<br><br>SHARON MAHN,<br><br>                        Defendant. | Adv. Pro. Case<br>No. 24-02822 (MG) |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND**
**DENYING IN PART MOTION TO DISMISS**

*A P P E A R A N C E S :*

Starr & Starr, PLLC
*Attorneys for Defendant Sharon Mahn*
260 Madison Avenue
17th Floor
New York, NY 10016-2401
By:    Stephen Z. Starr, Esq.

SMITH GAMBRELL & RUSSELL LLP
*Attorneys for Plaintiff Major, Lindsey & Africa, LLC*
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606-6677
By:    Elizabeth L. Janczak, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is debtor Sharon Mahn's ("Debtor" or "Mahn") motion to

dismiss ("Motion" or "MTD," ECF Doc. ## 15, 16) the complaint ("Complaint," ECF Doc. # 1)

filed against her by Major, Lindsay & Africa, LLC ("MLA").  MLA filed a response

("Response," ECF Doc. # 21), and Mahn filed a reply (ECF Doc. # 22).  Argument on the

Motion was heard on February 5, 2025.  For the reasons explained below, the Motion is

**GRANTED IN PART** and **DENIED IN PART.**

## I.    BACKGROUND

Sharon Mahn is a former commercial litigator and legal recruiter who was hired by MLA

to work as a Managing Director.  She worked as a legal recruiter for MLA for four years.  (Ex. 2

to the Complaint at 2.)

The dispute between Mahn and MLA arose from Mahn's behavior during her time at

MLA.  While an MLA employee, Mahn had access to MLA's database containing confidential,

nonpublic information.  (Complaint ¶ 14.)  The terms of Mahn's employment contract contained

express language identifying this database information as "confidential" and/or a "trade secret."

(*Id.* ¶ 15.)  MLA terminated Mahn in 2009 for disclosing MLA's proprietary information to a

competitor firm in violation of her employment agreement.  (*Id.* ¶ 16.)  Both sides commenced

arbitration in front of an AAA panel in 2010.  (*Id.* ¶ 17.)  MLA asserted claims against Mahn

including breach of the employment agreement, violations of Mahn's duty of loyalty, breach of

fiduciary duty, misappropriation of confidential information and trade secrets, and unfair

competition.

The arbitration, which lasted from May 29 through June 1, 2012, was "highly

contentious" and featured seven witnesses (including Mahn) and over 200 exhibits.  (*Id.* ¶¶ 1,

18.)  The arbitrator found that, within weeks of joining MLA, Mahn began to disseminate

confidential information to MLA's competitors.  (Ex. 2 to the Complaint at 2.)  The arbitrator

found that Mahn "breached the clear and express terms of the Employment Agreement," which

barred her from divulging information about MLA candidates to competitors as this information

was explicitly designated confidential and/or a trade secret.  (*Id.* at 5.)  During the course of her

employment, Mahn divulged information from MLA's computerized database containing such

information to MLA's competitors, and was paid kickbacks from the competitors.  This behavior

stretched over four years.  (*Id.* at 5–6.)  The arbitrator also found that Mahn had breached her

fiduciary duty and her duty of loyalty to MLA by enabling placement commissions that might

have gone to MLA to be paid to competitors instead.  (*Id.* at 6–7.)  The arbitrator found that her

behavior was "at minimum, overwhelmingly shocking in its scope, duration, and tone.  She was

stealing her employer's assets or property consisting of confidential information and trade

secrets, as well as its business good will, while secretly divulging the same to MLA's

competitors, and receiving financial 'kickbacks' after placements by these competitors."  (*Id.* at

7.)  This behavior occurred while Mahn was accepting a salary and commissions from MLA.

(*Id.*)

On May 7, 2013, the arbitrator issued a partial final award in MLA's favor, determining

that Mahn had breached her employment and arbitration agreement, along with her duty of

loyalty and fiduciary duty owed to MLA, by misappropriating MLA's confidential information

and trade secrets.  (Complaint ¶ 19; Ex. 2 to the Complaint.)  The arbitrator concluded that "[t]he

scope, depth and audacity of [Mahn's] divulging of confidential information and trade secrets are

enormous and would shock the conscience of any reasonable person."  (Ex. 2 to the Complaint at

3.)  On October 22, 2013, the arbitrator issued a second final interim award which, among other

things, denied Mahn's motion to reconsider and granted MLA's motion to reconsider awarding it

reasonable attorneys' fees and costs. (Complaint ¶ 26.) On July 9, 2014, the arbitrator issued a

final opinion and award which awarded MLA (1) $1,767,626 in damages with interest accruing

at a rate of 9% per annum, and (2) $945,765.39 in attorneys' fees and costs. (*Id.* ¶ 27.)

Mahn unsuccessfully appealed the arbitral award to the New York Supreme Court. (*Id.* ¶

1.) On May 26, 2015, the New York Supreme Court for New York County entered an order

confirming MLA's final arbitration award and granting judgment in favor of MLA in the amount

of $2,863,760.67 (the "Judgment"). (*Id.* ¶ 29.)

MLA alleges that it pursued collection efforts against Mahn for years until, on the eve of

the deposition of her father and "just prior to MLA obtaining turnover of Mahn's retirement

account," she filed for bankruptcy. (*Id.* ¶ 2.) On November 4, 2022, Mahn filed a voluntary

petition pursuant to Chapter 7 of the Code (*In re Mahn*, case no. 22-11466). On April 7, 2023,

MLA filed a proof of claim against Mahn for $4,766,788.63 based on the Judgment. (*Id.* ¶ 32.)

MLA filed this Complaint on July 5, 2024. (ECF Doc. # 1.)

In Count I, MLA argues that Mahn's debt to MLA is not dischargeable under 11 U.S.C. §

523(a)(4), which states that the Code "does not discharge an individual debtor from any debt . . .

for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." (*Id.* ¶

35.) It frames the arbitral award as based on "embezzlement" of MLA's property, since the

arbitrator found that Mahn used her access to MLA's database of proprietary information for

improper and unauthorized purposes (to divulge MLA's confidential trade secrets to its

competitors for her own financial benefit). (*Id.* ¶¶ 37–42.) In the alternative to embezzlement,

MLA argues that the arbitral award is based on "larceny" due to Mahn's "actually or

constructively t[aking] property away from MLA without its consent and against its will." (*Id.* ¶

4

44.)  MLA also claims that Mahn's debt to MLA was incurred on account of defalcation while
acting in a fiduciary capacity.  (*Id.* ¶¶ 51–63.)

In Count II, MLA argues that Mahn's debt is not dischargeable under 11 U.S.C. §
523(a)(6), which bars the discharge under chapter 7 of any debt "for willful and malicious injury
by the debtor to another entity or to the property of another entity[.]"  (*Id.* ¶ 65.)  MLA frames
Mahn's actions as willfully and maliciously causing injury because Mahn "knowingly and
intentionally divulged MLA's confidential information and trade secrets to MLA's competitors,
as well as profited from her inappropriate behavior, which actions were wrongful and in
violation of duties she owed to MLA under her Employment Agreement and applicable law."
(*Id.* ¶ 68.)

Mahn moved to dismiss the adversary complaint against her.  In her view, the Complaint
fails to establish that she engaged in fraud or defalcation while acting in a fiduciary capacity,
embezzlement, or larceny.  (MTD at 3.)  She claims that she did not have a fiduciary relationship
with MLA since she was its employee, not lawyer, and hence cannot have committed
defalcation, which is predicated on a breach of a fiduciary duty which a mere employee does not
owe to its employer.  (*Id.* at 4-7.)  Next, she argues that there was no embezzlement or larceny
because what Mahn passed to MLA's competitors was not its property, but its corporate
opportunities.  (*Id.* at 7-9.)  Finally, she argues that she did not cause "malicious injury" to MLA
as she did not act with the requisite level of malice.  (*Id.* at 10-11.)

MLA responded by pointing to the arbitrator's ruling, and arguing that each of the counts
in its Complaint is based on that ruling.  Specifically, the arbitrator found that Mahn "divulged
information from MLA's computerized Recruit database containing the names of active
candidates and other non-public information, such as candidates' personal e-mail addresses, cell

5

phone numbers, interest in named law firms, past interviews and results, estimated books of

portable billables/hourly billables, clients, family member information, and details on

specialties." (Reply at 2.) MLA points to allegations that Mahn was a managing director of

MLA, expressly acknowledged in her employment agreement that she was in a position of trust

and confidence within MLA, was entrusted with confidential and proprietary information, and

acknowledged that she owed a fiduciary duty to MLA as a managing director to argue that there

are sufficient allegations in the Complaint supporting a finding of a fiduciary duty owing from

Mahn to MLA. (*Id.* at 4.) Per MLA, she was not a "mere employee" but instead had special

access to the information which she misappropriated. (*Id.* at 5.) MLA also argues that Mahn is

barred from contesting that she acted in a fiduciary capacity with respect to MLA, since the

arbitrator already found that she did. (*Id.*) MLA claims that intangible property is treated by

New York law as identical to physical property, in that they can both underlie an embezzlement

or larceny claim. (*Id.* at 6-7.) And again, since the arbitrator's ruling in favor of MLA on the

unfair competition claim necessarily required a finding that Mahn misappropriated MLA"s

property, the issue of whether property was involved was already decided in the arbitration and

should not be overturned; Mahn is collaterally estopped from arguing otherwise. (*Id.* at 8.)

Finally, MLA argues that the Complaint sufficiently alleged that Mahn acted maliciously. (*Id.*at

9-10.)

## II.  <u>LEGAL STANDARD</u>

### A.  **Motion to Dismiss**

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." To survive a Rule 12(b)(6)

motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal

quotation marks omitted).  Courts deciding motions to dismiss must draw all reasonable

inferences in favor of the nonmoving party and must limit their review to facts and allegations

contained in (1) the complaint, (2) documents either incorporated into the complaint by reference

or attached as exhibits, and (3) matters of which the court may take judicial notice. *Blue Tree*

*Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d

Cir.2004); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002).  The court also

considers documents not attached to the complaint or incorporated by reference, but "upon which

[the complaint] solely relies and which [are] integral to the complaint." *Roth v. Jennings*, 489

F.3d 499, 509 (2d Cir.2007) (internal quotation marks omitted; emphasis in original) (quoting

*Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991)); *see also Kalin v.*

*Xanboo, Inc.*, No. 04 Civ. 5931(RJS), 2009 WL 928279, at *8 (S.D.N.Y. Mar.30, 2009)

(Sullivan, J.); *Grubin v. Rattet (In re Food Mgmt. Group, LLC)*, 380 B.R. 677, 690

(Bankr.S.D.N.Y.2008) (holding that a court may consider documents that have "not been

incorporated by reference where the complaint relies heavily upon its terms and effect, which

renders the document integral to the complaint") (internal quotation omitted).

Following the Supreme Court's decision in *Ashcroft v. Iqbal*, courts use a two-prong

approach when considering a motion to dismiss. *See, e.g.*, *Weston v. Optima Commc'ns Sys.,*

*Inc.*, No. 09 Civ. 3732(DC), 2009 WL 3200653, at *2 (S.D.N.Y. Oct.7, 2009) (Chin, J.)

(acknowledging a "two-pronged" approach to deciding motions to dismiss); *S. Ill. Laborers' and*

*Employers Health and Welfare Fund v. Pfizer, Inc.*, No. 08 CV 5175(KMW), 2009 WL

3151807, at *3 (S.D.N.Y. Sept.30, 2009) (Wood, J.) (same); *Inst. for Dev. of Earth Awareness v.*

*People for the Ethical Treatment of Animals*, No. 08 Civ. 6195(PKC), 2009 WL 2850230, at *3

7

(S.D.N.Y. Aug. 28, 2009) (Castel, J.) (same).  First, the court must accept all factual allegations

in the complaint as true, discounting legal conclusions clothed in factual garb.  *Iqbal*, 556 U.S. at

678–79; *Boykin v. KeyCorp*, 521 F.3d 202, 204 (2d Cir.2008); *Spool v. World Child Int'l*

*Adoption Agency*, 520 F.3d 178, 183 (2d Cir.2008).  Second, the court must determine if these

well-pleaded factual allegations "plausibly suggest an entitlement to relief."  *Iqbal*, 556 U.S. at

681.

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at

679.  A claim is plausible when the factual allegations permit "the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* at 663.  Meeting the

plausibility standard requires a complaint to plead facts that show "more than a sheer possibility

that a defendant has acted unlawfully."  *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

557 (2007)).  A complaint that only pleads facts that are "merely consistent with a defendant's

liability" does not meet the plausibility requirement.  *Id.* (quoting *Twombly*, 550 U.S. at 557)

(quotation marks omitted).  "A pleading that offers labels and conclusions or a formulaic

recitation of the elements of a cause of action will not do."  *Id.* (quoting Twombly, 550 U.S. at

555 (internal quotation marks omitted)).  "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice."  *Id.* (citation omitted).  "The

pleadings must create the possibility of a right to relief that is more than speculative."  *Spool*,

520 F.3d at 183 (citation omitted).

The Court's responsibility is to "assess the legal feasibility of the complaint, not to assay

the weight of the evidence which might be offered in support thereof."  *Liu v. Credit Suisse First*

*Bos. Corp. (In re Initial Pub. Offering Sec. Litig.)*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005)

(internal quotation makers and citation omitted); *see also Koppel v. 4987 Corp.*, 167 F.3d 125,

133 (2d Cir. 1999) (plaintiff need only allege, not prove, sufficient facts to survive a motion to

dismiss).  Dismissal is only warranted where it appears beyond doubt that the plaintiff can prove

no sets of facts in support of her claim which would entitle her to relief.  *See Maxwell Commun.*

*Corp. Pub. Ltd. Co. v. Societe Generale (In re Maxwell Commun. Corp. Pub. Ltd. Co.)*, 93 F.3d

1036, 1044 (2d Cir. 1996).

### B.  Collateral Estoppel

Collateral estoppel, or issue preclusion, forecloses relitigation of factual matters that have

previously been litigated and decided.  *Parklane Hosiery Co. Inc. v. Shore*, 439 U.S. 322, 337

(1979).  The Supreme Court held that the doctrine applies in nondischargeability proceedings in

*Grogan v. Garner*, 498 U.S. 279, 285 n.11 (1991) ("We now clarify that collateral estoppel

principles do indeed apply in discharge exception proceedings pursuant to § 523(a).").  However,

"[b]ecause a judgment of non-dischargeability undermines a debtor's fresh start," *In re*

*Gucciardo*, 577 B.R. 23, 32 (Bankr. E.D.N.Y. 2017),

> [i]n giving collateral estoppel effect to a pre-petition judgment in a non-dischargeability
> action, the bankruptcy court must be able, based upon the findings made in the pre-
> petition judgment, to make an independent determination that the elements of § 523(a)
> have been satisfied. In other words, the bankruptcy court must be able to identify clear
> and specific findings in the pre-petition judgment which correlate to, and are decisive as
> to, the elements to be proven in the § 523(a) cause of action.

*In re Wisell*, 494 B.R. 23, 35 (Bankr. E.D.N.Y. 2011).

Collateral estoppel is also applicable to factual findings made in arbitration proceedings.

*See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985) (acknowledging that courts

may give preclusive effect to arbitration proceedings to protect federal interests); *see also Munoz*

*v. Boyard (In re Boyard)*, 538 B.R. 645, 653 (Bankr. E.D.N.Y. 2015) (confirmation of an

arbitration award is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court") (internal citation omitted).

Since the final judgment confirming the arbitral award in this case was issued by a New York court, the full faith and credit statute, 28 U.S.C. § 1738, requires that the Court adopt New York's rules for collateral estoppel in this case because the earlier forum was a state court. *See Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 93 (2d Cir. 2005) ("Because the Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to accord state judgments the same preclusive effect those judgments would have in the courts of the rendering state, New York preclusion law applies."); *In re Boyard*, 538 B.R. 645, 652 (Bankr. E.D.N.Y. 2015) (applying Florida's law of preclusion when arbitral award was confirmed by Floridian court); *Wharton v, Shiver (In re Shiver)*, 396 B.R. 110, 119 (Bankr. S.D.N.Y. 2008) (concluding that state law determines preclusive effect of state court judgment).

New York uses a two-step analysis in applying collateral estoppel. First, there must be an identity of issue which has necessarily been decided in the prior action and is determinative in the present action; and second, there must have been a full and fair opportunity to litigate in the prior action. *See Schwartz v. Public Administrator*, 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 960, 246 N.E.2d 725, 729 (1969); *see also Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 65 (2d Cir. 2007) (setting out two-step test for collateral estoppel, requiring that "(1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action"). "[F]or a question to have been actually litigated so as to satisfy the identity requirement, it must have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." *Evans v. Ottimo*, 469 F.3d 278, 282 (2d Cir. 2006)

(internal citation omitted).  Considering the difficulty in determining the identity of issues

between prior judgments and subsequent dischargeability actions, "[a]ny reasonable doubt as to

what was decided by a prior judgment . . . should be resolved against using it as an estoppel."

*Sarasota CCM, Inc. v. Kuncman (In re Kuncman)*, 454 B.R. 276, 284 (Bankr. E.D.N.Y. 2011)

(internal citation omitted).

## III. DISCUSSION

### A.  Count I

Count I invokes section 523(a)(4) of the Code, which excepts from discharge a debt for

"fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C.

§ 523(a)(4).  Mahn argues that MLA did not sufficiently allege defalcation while acting in a

fiduciary capacity, embezzlement, or larceny.

#### 1.  Defalcation while acting in a fiduciary capacity

 "To sustain a cause of action for fraud or defalcation under [section] 523(a)(4), the

plaintiff must first establish that the debtor acted while in a fiduciary capacity."  *Zohlman v.*

*Zoldan*, 226 B.R. 767, 772 (S.D.N.Y. 1998).  "The mere existence of a fiduciary relationship is

not sufficient to deny dischargeability under section 523(a)(4)."  *Id.* at 87.  Rather, the court must

find that the defendant "was 'acting in a fiduciary capacity' with respect to the particular conduct

giving rise to the liability which is claimed to be non-dischargeable."  *Id*. (emphasis in original).

The meaning of "fiduciary" in this context is a matter of federal law, and the term

"fiduciary capacity" is narrowly construed.  *See id.* at 772; *see also Sandak v. Dobrayel (In re*

*Dobrayel)*, 287 B.R. 3, 14 (Bankr. S.D.N.Y. 2002) ("The meaning of 'fiduciary capacity' under

Federal laws is more restricted than under the more general common law or state definitions.");

11

*In re West*, 339 B.R. 557, 566 (Bankr. E.D.N.Y. 2006) ("Whether a debtor acts in a fiduciary

capacity under § 523(a)(4) is a question of federal bankruptcy law.").

One type of fiduciary relationship contemplated by section 523(a)(4) is that created by

"an express trust, technical trust, or statutorily imposed trust." *Mirarchi v. Nofer (In re Nofer)*,

514 B.R. 346, 353 (Bankr. E.D.N.Y. 2014).  However, the Second Circuit has held that parties

may stand in a fiduciary relationship for purposes of § 523(a)(4), despite the lack of a technical

or express trust.  *See Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183

F.3d 162, 168–70 (2d Cir.1999); *In re Tashlitsky*, 492 B.R. 640, 645 (Bankr. E.D.N.Y. 2013)

("Although a fiduciary relationship under § 523(a)(4) is usually limited to the trust relationships

noted above, other relationships may, in limited circumstances, also be within the scope of §

523(a)(4)."); *Shearson Lehman Hutton v. Schulman (In re Schulman)*, 196 B.R. 688, 697

(Bankr.S.D.N.Y.1996) ("[T]he 'technical or express' trust requirement is not limited to trusts

that arise by virtue of a formal trust agreement or statute imposing an express trust, but includes

relationships in which 'technical trust type' obligations are imposed pursuant to a statute or

common law").  Fiduciary relationships which fall within the scope of section 523(a)(4) are

characterized by "a difference in knowledge or power between the fiduciary and principal which

gives the former a position of ascendancy over the latter," and include but are not limited to

relationships created by express, technical, or statutory trusts.  *In re Hayes*, 183 F.3d 162, 167

(2d Cir. 1999) (internal citation omitted); *see also In re West*, 339 B.R. 557, 568 (Bankr.

E.D.N.Y. 2006) ("[T]he fiduciary connection arising from a technical or express trust does not

exhaust the universe of fiduciary relationships that fall within the ambit of § 523(a)(4) . . . .  The

fiduciary requirement of § 523(a)(4) may also include relationships in which trust-type

relationships are forged under state statutory or common law . . . .  [A] wide gap in knowledge or

power . . . is what often distinguishes a fiduciary relationship under § 523(a)(4) from one that

falls outside its scope.") (cleaned up) (collecting cases); *In re Heinemann*, No. 19-35692, 2022

WL 17408094, at *3 (Bankr. S.D.N.Y. Dec. 2, 2022) ("The Second Circuit has found that the

application of Section 523(a)(4) is "not limited to express trusts," rather, the exception applies

where there is "a difference in knowledge or power between fiduciary and principal which ...

gives the former a position of ascendancy over the latter."); *In re Rosenfeld*, 543 B.R. 60, 74

(Bankr. S.D.N.Y. 2015) ("[A]lthough case law frequently refers to the need for an 'express' or

'technical' trust to bring section 523(a)(4) into play, the Second Circuit has found this to be too

restrictive a standard, and has held that parties may stand in a fiduciary relationship despite the

absence of an 'express' or 'technical' trust."); *Matter of Marchiando*, 13 F.3d 1111, 1116 (7th

Cir. 1994) (concluding that fiduciary relationships that fall within the scope of § 523(a)(4) are

those which "involve a difference in knowledge or power between fiduciary and principal which

. . . gives the former a position of ascendancy over the latter . . . .  The fiduciary may know much

more by reason of professional status, or the relation may be one that requires the principal to

repose a special confidence in the fiduciary . . . .  These are all situations in which one party to

the relation is incapable of monitoring the other's performance of his undertaking, and therefore

the law does not treat the relation as a relation at arm's length between equals.").  In short,

"[a]bsent the characteristics of a formal trust relationship, *or* a situation where the debtor holds a

'position of ascendancy,' . . . courts have declined to find a fiduciary relationship under §

523(a)(4) even when a written agreement purports to create a trust relationship." *In re

Tashlitsky*, 492 B.R. 640, 647 (Bankr. E.D.N.Y. 2013).

        The requisite fiduciary relationship needed for § 523(a)(4) has been found, for example,

in an attorney-client relationship (*Hayes*, 183 F.3d at 162), because of the informational

imbalance between the parties and the special trust placed in the attorney by the client; in the

relationship between a severely injured individual and the person who cared for her, lent her

money, and otherwise took care of her financial affairs when she was in a compromised state (In

re Fox, No. 13-30321 (JAM), 2017 WL 564499, at *3-4 (Bankr. D. Conn. Feb. 10, 2017)); in the

duty owed by a corporate officer or director to shareholders (*In re Nofer*, 514 B.R. 346, 354

(Bankr. E.D.N.Y. 2014)); in the duties partners to a partnership owe each other due to the trust-

like nature of a partnership under New York State law (*Zohlman*, 226 B.R. at 774); and in the

duty owed by a managing member and chief executive officer of a limited liability company to

other members (*Currie v. Sanchez (In re Sanchez)*, 2016 WL 5376189, at *4, 2016 Bankr.

LEXIS 3481 (Bankr. S.D.N.Y. Sept. 26, 2016)).  However, case law in this Circuit is clear that a

mere employment relationship does not give rise to the fiduciary obligations contemplated by

section 523(a)(4) of the Code.  *In re Yoshida*, 435 B.R. 102, 109 (Bankr. E.D.N.Y. 2010)

(collecting cases); *In re Tashlitsky*, 492 B.R. 640, 646 (Bankr. E.D.N.Y. 2013) (stating that "no

fiduciary relationship" of the kind contemplated by section 523(a)(4) "arises *solely* from an

agency or employer-employee relationship") (collecting cases); *In re Schulman*, 196 B.R. at 698

("The mere allegation that Schulman was Shearson's employee is insufficient to establish the

requisite fiduciary duty under the [Code].");  *In re Rosenfeld*, 543 B.R. 60, 75 (Bankr. S.D.N.Y.

2015) (stating that "it is plain that an employee owes no fiduciary duty to an employer," as the

term is meant by section 523(a)(4) of the Code).  Nor does the elevation of an employee to a

managerial position bring into being a fiduciary relationship within the purview of § 523(a)(4).

*See Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 698–99 (Bankr. S.D.N.Y. 1998)

(holding that management level employee responsible for evaluating contractor bids and against

14

whom a state court judgment was obtained for breach of fiduciary duty of loyalty and
commercial bribery was not acting in a fiduciary capacity within meaning of § 523(a)(4)).

"If the defendant was acting in a fiduciary capacity, courts then examine whether the acts
undertaken constitute fraud or defalcation under section 523(a)(4)." *In re Deutsch*, 575 B.R.
590, 600–01 (Bankr. S.D.N.Y. 2017).  Defalcation has been defined as a "misappropriation or
failure to account" and "requires a showing of conscious misbehavior or extreme recklessness."
*Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 68 (2d Cir. 2007).  "Mere negligence, without
some element of intentional wrongdoing, breach of fiduciary duty or other identifiable
misconduct, does not constitute a 'defalcation' within the meaning of section 523(a)(4)." *In re
Scheller*, 265 B.R. at 53 (citation omitted).  Yet, a defalcation "need not rise to the level of fraud,
embezzlement, or misappropriation." *Id*.  The Supreme Court has held that defalcation requires
"a culpable state of mind" and "where the conduct at issue does not involve bad faith, moral
turpitude, or other immoral conduct, the term requires an intentional wrong." *Bullock v.
BankChampaign, N.A.*, 569 U.S. 267, 273 (2013).

Mahn challenges the applicability of section 523(a)(4) of the Code on the grounds that
she was not in the kind of fiduciary relationship with MLA contemplated by the Code and its use
of "defalcation."  The Court agrees that MLA has not sufficiently pleaded facts supporting a
finding that Mahn and MLA were in the right kind of fiduciary relationship.

Mahn is explicitly identified as an "at-will employee" in her employment contract.  (Ex. 1
to the Complaint at 4.)  The arbitrator also identified her as such.  (Ex. 2 to the Complaint at 2.)
It is true that she was given the title of "managing director," along with special access to trade
secrets and proprietary information of MLA's.  (Complaint ¶¶ 14-15, 38-39, 52-54.)  And it is
clear, from the pattern of behavior she exhibited during her four years of employment with

MLA, that MLA was not able to adequately monitor her performance, and that MLA did not know the malfeasance she was engaged in.  However, these facts alone are insufficient to support a finding of a fiduciary relationship of the kind contemplated by the Code.  If a mere inability to monitor moved a standard employer-employee relationship into the realm of section 523(a)(4) fiduciary relationships, much of the caselaw holding that employer-employee relationships do *not* qualify would be invalid, as it is difficult to imagine an employer with more than a handful of employees which can monitor all the actions of its employees.  The principal-agent problem is inherent, to some extent, in nearly all agency relationships, yet the law is clear that bare agency relationships are insufficient under section 523(a)(4), indicating that this more run-of-the-mill informational asymmetry is *not* the kind of knowledge gap the Code is concerned with.  *See In re Tahlitsky*, 492 B.R. at 646 ("[N]o fiduciary relationship arises solely from an agency . . . relationship.") (collecting cases).  As for access to confidential and proprietary information, MLA has not pointed to, nor has this Court been able to find, any caselaw suggesting that such access rights turn an otherwise ordinary employer-employee relationship into a trust-like fiduciary relationship, and so holding would undermine clear caselaw in this Circuit.  (Indeed, this Court has not been able to find any case in this Circuit where *any* mere employer-employee relationship was elevated to a section 524(a)(4) fiduciary relationship, no matter the facts of the case.)  MLA has not articulated any "formal trust relationship" in which its proprietary information could be considered a trust *res*.  Nor has it explained how Mahn, as an at-will employee entrusted with certain elevated responsibilities but not with those of an LLC member, corporate director, or anything beyond that of a management-level employee, was in a position of "ascendancy" over MLA akin to that of an attorney, a conservator, or any other fiduciary

recognized by this Circuit's caselaw.  The Court accordingly finds that MLA has failed to adequately plead facts to support defalcation while acting in a fiduciary capacity.

Moreover, collateral estoppel does not apply here, and MLA cannot rely on the arbitrator's finding that Mahn breached her fiduciary duty to MLA to support its argument that the "right" kind of fiduciary relationship existed.  While the arbitrator found that Mahn had breached her fiduciary duties owing to MLA as an employee under New York law (Ex. 2 to the Complaint at 6 (citing *Hadden v. Consolidated Edison*, 45 N.Y. 2d 466, 470 (1978)), she did not find that Mahn committed defalcation, nor did she find a trust relationship between Mahn and MLA – she did not have to, in order to resolve the questions before her.  Nor did the arbitrator find that Mahn had an informational advantage over MLA "by reason of her professional status," that MLA placed "special confidence in" Mahn, or that the two parties were otherwise not in a "relation at arm's length between equals."  *Marchiando*, 13 F.3d at 1116.  (*See id.* at 6-9.)  As discussed above, the fiduciary relationships between employees and employers created by state law are not the kinds of fiduciary relationships which can support a finding of defalcation while acting in a fiduciary capacity pursuant to section 523(a)(4) of the Code.  Because New York law on collateral estoppel only bars relitigation of *identical* issues, this Court cannot premise a ruling on defalcation solely on the arbitrator's finding of a breach of fiduciary duty owed by an employee to her employer.  (*See* Ex. 2 to the Complaint at 6 (framing Mahn's fiduciary duty as that owed by an employee to an employer).)

The Court therefore **DISMISSES** Count I insofar as it pleads defalcation while acting in a fiduciary capacity.

2.  Embezzlement

Next, Mahn argues in the alternative that there was no "embezzlement" because no "property" was involved, only corporate opportunities.  (MTD at 7-8.)  "The question of what constitutes embezzlement or larceny within the meaning of § 523(a)(4) is a question of federal law."  *In re Scheller*, 265 B.R. at 53.  "Federal common law defines embezzlement as the 'fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'"  *In re Sesum*, 662 B.R. 840, 847 (Bankr. S.D.N.Y. 2024) (citing *In re Bevilacqua*, 53 B.R. 331, 333 (Bankr. S.D.N.Y. 1985)).  "To successfully plead that a claim is non-dischargeable under section 523(a)(4) due to embezzlement, a creditor must prove: (1) that the creditor entrusted his property to the debtor; (2) that the debtor appropriated the property for a purpose other than that for which it was entrusted; and (3) the circumstances indicate that the debtor acted with fraudulent intent or deceit."  *Id.* (cleaned up).

Elements one and two require the existence of property.  Despite MLA's argument to the contrary, the arbitrator did not explicitly and squarely determine that the definition of property, as defined by New York law, was at issue in the case; there is no indication in the record presently before the Court that the presence of "property" as defined in New York was raised by the pleadings or otherwise placed in issue and actually determined at the arbitration.  (*See* Complaint Ex. 2 at 14-15 (unfair competition claim hinged on the existence of a "*benefit or property right belonging to another*"), 24 (no clear finding that property rights as defined by New York law were at issue).)   Therefore, the Court must look at the Complaint to see whether it adequately alleges embezzlement, including alleging that MLA entrusted its *property* to Mahn.

Courts in the Second Circuit look to state law when determining what constitutes property for purposes of an embezzlement claim.  *See Gasson v. Premier Cap., LLC*, 43 F.4th

37, 41–42 (2d Cir. 2022).  "Under New York law, intangible property with any similarity to its physical counterpart is considered property."  *In re Sesum*, 662 B.R. at 847; *see also Spa World Corp. v. Lipschik*, No. 09-CV-1711, 2010 WL 11632681, at *7, 17 (E.D.N.Y. Sept. 9, 2010) (holding that customer documents and records that could be deleted from a computer system are property under New York state law); *Salonclick LLC v. SuperEgo Mgmt. LLC*, No. 16 Civ. 2555, 2017 WL 239379, at *4 (S.D.N.Y. Jan. 18, 2017) (finding an exception to the rule that intangible property alone is insufficient to satisfy the definition of property where the rightful owner of the intangible property is prevented from creating or enjoying a legally recognizable and protectable property interest in his idea).  "Generally, under New York law, trade secrets are treated as intangible property . . . .  Cases in this circuit, applying New York law, have made it clear that for intangible property to constitute property for a claim of embezzlement, the intangible property must have some tangible form.  This requirement similarly applies to trade secrets."  *In re Sesum*, 662 B.R. at 848-49 (collecting cases).  Intangible property "stored on [a] computer but likely shared in some tangible, documentary form" is considered "property" under New York law.  *Kraus USA, Inc. v. Magarik*, No. 17-CV-6541, 2020 WL 2415670, at *11 (S.D.N.Y. May 12, 2020); *see also People v. Aleynikov*, 31 N.Y.3d 383, 403, 104 N.E.3d 687 (2018) (holding that a source code was property when copied onto a physical medium such as a hard drive).

MLA has sufficiently alleged that Mahn misappropriated "property" as defined by New York law by pointing to her misuse of information on MLA's "computerized database of active candidate information."  (Complaint ¶ 38.)  From the face of the Complaint, it appears that Mahn misused more than mere corporate opportunities.  The Court finds that MLA sufficiently pleaded embezzlement.

3. <u>Larceny</u>

Mahn also objects to Count I on the grounds that MLA did not adequately plead larceny, relying again on her argument that no "property" was at stake. Under federal law in this Circuit, "[l]arceny is the (1) wrongful taking of (2) property (3) of another (4) without the owner's consent (5) with intent to convert the property." *In re Scheller*, 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001). As discussed above, the Court finds that MLA sufficiently alleged that "property" as defined by New York law was at stake, and so finds that MLA sufficiently pleaded larceny.

**B. Count II**

Section 523(a)(6) of the Bankruptcy Code provides that a discharge under section 727 of the Bankruptcy Code does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). Put another way, in contrast to section 523(a)(2)(A), injuries inflicted negligently or recklessly are an insufficient basis to deny a debtor a discharge under the statute. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61, 64 (1998) (holding that the conduct must be "willful," and analogizing willfulness with words such as "voluntary" and "intentional" as used in tort law; the word "willful" indicates "a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury"). While sections 523(a)(2)(A) and 523(a)(6) are distinct, the Supreme Court has recognized that "overlap appears inevitable" between the two sections, and the Court has declined to create an "artificial definition of actual fraud merely to avoid narrow redundancies in § 523 that appear unavoidable." *See Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 364 (2016) (internal citations and quotation marks omitted).

"The terms willful and malicious are separate elements, and both elements must be satisfied." *Soliman v. Vyshedsky (In re Soliman)*, 539 B.R. 692, 698 (Bankr. S.D.N.Y. 2015) (internal citation and quotation marks omitted).  "To establish that a debtor acted willfully under section 523(a)(6), the plaintiff must demonstrate that the injury in question was a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Geiger*, 523 U.S. at 61–62.  Negligence and recklessness are insufficient under section 523(a)(6).  *See In re Soliman*, 539 B.R. at 699.  Rather, this section incorporates the common law meaning of willful, which is established when "[an] actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." RESTATEMENT (SECOND) OF TORTS § 8A (1965).  Thus, the debtor must engage in conduct where he actually intends to injure the party or engages in conduct where the consequences are "substantially certain" to result therefrom.  *See In re Soliman*, 539 B.R. at 699.

To establish that a debtor acted maliciously, the plaintiff must prove that the debtor's act was "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir. 1996); *see also Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) ("The injury caused by the debtor must also be malicious, meaning wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will.") (internal citation and quotation marks omitted).  In determining whether a debtor acted maliciously, courts will consider the totality of the circumstances.  *Id*. at 88 (stating that "[i]mplied malice may be demonstrated 'by the acts and conduct of the debtor in the context of [the] surrounding circumstances'" (quoting *First Nat'l Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d 664, 668 (4th Cir. 1995))).  Malice is implied when "anyone of reasonable intelligence knows that the act in question is contrary to commonly

21

accepted duties in the ordinary relationships among people, and injurious to another." *In re Stelluti*, 167 B.R. at 33 (internal quotation marks omitted). "[T]he statutory element of maliciousness will be found by imputation where the debtor has breached a duty to the plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff, and, most important, [ ] under some aggravating circumstance such as to warrant denial of discharge." *Bundy American Corp. v. Blankfort (In re Blankfort)*, 217 B.R. 138, 144 (Bankr. S.D.N.Y. 1998). "Typically implied malice is found where the behavior is of a type that the court cannot justify on any level . . . . Where the debtor is motivated by some potential profit or gain, however, malice will only be implied where there is additional, aggravating conduct on the part of the debtor to warrant an inference of actual malice." *In re Rosenfeld*, 543 B.R. 60, 76 (Bankr. S.D.N.Y. 2015) (citing *In re Luppino*, 221 B.R. at 700); *see also In re Orly*, No. 15-11650(JLG), 2016 WL 4376947, at *6 (Bankr. S.D.N.Y. Aug. 10, 2016) ("As a general rule, an intentional breach of statutory duties by a debtor, whose conduct is clearly motivated by the prospect of financial gain, is not sufficient alone to imply malice . . . . Plaintiffs must also allege that there was some aggravating circumstances evidencing conduct by the Debtor so reprehensible as to warrant denial of the 'fresh start' to which the 'honest but unfortunate' debtor would normally be entitled under the Bankruptcy Code.") (cleaned up). That additional, aggravating conduct in the presence of a profit motive can look like "conduct which is certain or almost certain to cause financial harm to the creditor," so long as the debtor also knows "that he or she is violating the creditor[']s legal rights," *In re Orly*, 2016 WL 4376947, at *7 (internal citation omitted).

Mahn's willfulness is not contested, and the Court finds that MLA adequately pleaded willfulness.

Mahn claims that there was no "malicious injury" because she was motivated solely by "potential profit or gain," and MLA did not allege additional aggravating conduct. (MTD at 10-11.) The Court disagrees and finds that MLA adequately pleaded facts indicating that Mahn acted at least in part in order to inflict injury on the company, and was aware that she was violating MLA's rights. The Complaint alleges that Mahn "was aware her involvement with outside competitors was improper and that Mahn took care to ensure that her actions were not discovered." (Complaint ¶ 24.) The arbitral award specifies that Mahn's emails to MLA's competitors "contained admissions that she was violating her [employment] Agreement," and that Mahn "coached the competitors on how to sever [a] candidate's relationship with MLA" and "continually encouraged [competitors] to place MLA's candidates before MLA did." (Ex. 2 to the Complaint at 5-8.) For 12(b)(6) purposes, the Court finds that MLA has met its burden. The presence of malice is a question of fact, not one fit for resolution on a motion to dismiss when the Complaint alleges sufficient facts. Mahn's motion to dismiss Count II is **DENIED.**

## IV.    CONCLUSION

For the foregoing reasons, Mahn's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS SO ORDERED.** A separate Scheduling Order will also be entered.

Dated:    February 10, 2025
          New York, New York

*Martin Glenn*

MARTIN GLENN
Chief United States Bankruptcy Judge