**U NITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>SHARON MAHN,<br><br>Debtor. | **FOR PUBLICATION**<br><br>Chapter 7<br><br>Case No. 22-11466 (MG) |
| MAJOR, LINDSEY & AFRICA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SHARON MAHN,<br><br>Defendant. | Adv. Pro. Case<br>No. 24-02822 (MG) |

**MEMORANDUM OPINION AND ORDER GRANTING MAJOR, LINDSEY & AFRICA'S
MOTION FOR SUMMARY JUDGMENT DENYING THE DEBTOR A DISCHARGE**

*A P P E A R A N C E S :*

SMITH GAMBRELL & RUSSELL LLP
*Attorneys for Plaintiff Major, Lindsey & Africa, LLC*
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606-6677
By:    Elizabeth L. Janczak, Esq.

HAMILTON, BROOK, SMITH & REYNOLDS, P.C.
*Attorney for Defendant Sharon Mahn*
55 Old Bedford Road, Suite 200
Lincoln, Massachusetts 01773
By:    Brian T. Moriarty, Esq.

STARR & STARR, PLLC
*Attorney for Defendant Sharon Mahn*
260 Madison Ave., Fl. 17
New York, New York 10016
By:    Stephen Z. Starr, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

This is a denial of discharge adversary proceeding. The plaintiff—Major Lindsey &
Africa LLC ("Plaintiff" or "MLA")—obtained an arbitration award against a former employee—
defendant Sharon Mahn ("Debtor," "Defendant," or "Mahn")—which was confirmed by the
New York Supreme Court and then affirmed by the Appellate Division. For the reasons
explained in this Opinion, the Court denies Mahn a discharge except for one part of judgment for
attorneys' fees on a breach of contract claim.

On May 7, 2013, an arbitrator found that defendant Mahn disseminated the trade secrets
of her former employer, MLA, to its competitors and profited from her improper disclosures, and
in so doing, breached her employment agreement, violated her duty of loyalty, breached her
fiduciary duties, misappropriated trade secrets, and engaged in unfair competition. (ECF Doc. #
46, Ex. F.) The arbitrator ordered that Mahn disgorge $1,767,626 to MLA, representing her
earnings from MLA for the duration of her disloyalty (which covered the entire period of her
employment with MLA) and payments received from MLA's competitors, plus post-judgment
interest at 9% on that amount; in addition, she ordered that Mahn pay MLA's litigation costs of
$945,765.39. (*Id.* Ex. H.) The New York Supreme Court for New York County entered an order
confirming MLA's final arbitration award and granting judgment in favor of MLA in the amount
of $2,863,760.67 on May 26, 2015, and the New York Supreme Court Appellate Division, First
Department confirmed MLA's final arbitration award in March of 2018. *See Major, Lindsey &*
*Africa, LLC v. Sharon Mahn (In re Mahn)*, 666 B.R. 883, 889 (Bankr. S.D.N.Y. 2025). To date,
MLA has not received a penny from Mahn.

Mahn filed for bankruptcy in November of 2022 (*see* ECF Doc. # 1, case no. 22-11466).
MLA commenced an adversary proceeding against Mahn on July 5, 2024 (ECF Doc. # 1),

2

seeking a denial of discharge of the amounts the arbitrator determined Mahn owes MLA

pursuant to sections 523(a)(4) and 523(a)(6) of the Code.  (ECF Doc. # 1.)  MLA initially argued

that Mahn either embezzled MLA's property, that her debt arose from larceny of MLA's

property, or that Mahn engaged in defalcation while acting in a fiduciary capacity (in addition to

arguing for nondischargeability under section 523(a)(6)).  (*Id.* at 7–10).  The Court dismissed

MLA's defalcation theory on a motion to dismiss, but permitted MLA to proceed on its other

theories.  *See generally In re Sharon Mahn*, 666 B.R. 883.

Both parties have now filed cross-motions seeking summary judgment in their favor

("MLA SJ," ECF Doc. # 44[1]; "Mahn SJ," ECF Doc. # 47[2]), as well as oppositions to each

other's summary judgment motions ("MLA Opp.," ECF Doc. # 54; "Mahn Opp.," ECF Doc. #

56).  For the following reasons, the Court **GRANTS** in part and **DENIES** in part MLA's motion

for summary judgment, and **DENIES** Mahn's motion for summary judgment in full.

## I.    BACKGROUND

### A.  Facts

The parties stipulated in this adversary proceeding to the admissibility of documents used

in the underlying arbitration; specifically, the parties agreed that "[a]ny and all hearing exhibits:

(a) submitted by a party to the arbitrator during the Arbitration or any New York State court

proceeding to confirm or object to the award from the Arbitration; (b) cited or referenced by the

arbitrator in any written opinion or partial or final award in the Arbitration; or (c) cited by a party

to the arbitrator in any post-Arbitration hearing briefs or motions seeking a partial or final award

in the Arbitration, are deemed to be authentic and genuine copies and, upon presentation or

---

[1]    MLA accompanied its motion for summary judgment with a statement of material facts ("MLA SOMF," ECF Doc. # 45).  Mahn filed a counterstatement of material facts (ECF Doc. # 57).
[2]    Mahn accompanied her motion for summary judgment with a statement of material facts.  ("Mahn SOMF," ECF Doc. # 48.)  MLA filed a response to the Mahn SOMF.  (ECF Doc. # 55.)

motion, are agreed to be admissible in any trial in the matter unless disallowed by the court."
(ECF Doc. # 50 at 2.)  The parties also agreed to the admissibility of all witness testimony
presented at the arbitration and the deposition testimony of Alan Miles, subject to confidentiality
designations.  (*Id.*)

The following facts are drawn from the arbitral awards in the underlying arbitration,
unless otherwise noted.  (*See* ECF Doc. # 46, Exs. F ("Partial Final Award"), H ("Final
Award").)

Mahn, a former commercial litigator and legal recruiter, was hired by MLA in October
2005.  (Partial Final Award at 2.)  She signed an employment agreement on October 19, 2005,
which contained a confidentiality provision identifying the information MLA and Mahn agreed
to regard as "confidential" and/or a "trade secret" and thus agreed not to disclose.  (*Id.* at 2, 5.)
Specifically, the contract provided that "all non-public, confidential information concerning
MLA candidates, including but not limited to candidates' non-public background information,
career history, desire to explore other career opportunities, willingness to talk with another
employer, and other non-public information about this candidate" was "confidential" and/or a
"trade secret."  (*Id.* at 5.)  The confidentiality provision also states that Mahn's "[p]osition with
MLA places (her) in a position of trust and confidence and affords (her) access to trade secrets
and other confidential and proprietary information of MLA and its candidates and clients, the
intent of this section is to preserve and protect MLA's confidential information, trade secrets,
and intellectual property, and that of its candidates and clients."  (*Id.*)  Mahn testified that she
understood all of the terms of her employment agreement, including this confidentiality
provision, and that she fully understood the meaning of all categories of "confidential
information" or "trade secret" protected information.  (*Id.*; *see also* ECF Doc. # 46, Ex. 2

("Mahn Dep. Tr," transcript of deposition of Mahn, May 20, 2025) at 38:8–19 ("Q: This is a

confidentiality paragraph that was a condition of your Employment Agreement, correct? . . . A:

Correct. Q: Under this paragraph, you knew that you were required to maintain the

confidentiality of MLA's proprietary information and trade secrets, correct? . . . A: Yes."),

39:9–13 ("Q: So, you knew you were required to maintain confidentiality with respect to MLA's

candidates and clients, correct? . . . A: Yes.").)  Mahn also received MLA's employee

handbook, which contained confidentiality policies regarding the safeguarding of confidential

information and trade secrets obtained during her employment and the prohibition on divulging

such information.  (*Id.*)  MLA maintained this confidential client and candidate information on a

computerized database (the "Recruit database").  (*Id.* at 6.)  Mahn knew that the Recruit database

was password-protected and that the information in it was the confidential client and candidate

data gathered and input by MLA's recruiters, a fact she was reminded of on multiple occasions.

(ECF Doc. # 46, Ex. 3 (arbitration hearing transcript) at 336:21–337:17.)  MLA entrusted Mahn

with access to the Recruit database.  (*Id.* at 338:15–17.)

 Within weeks of joining MLA, Mahn began to send MLA's confidential information to

MLA's competitors, with the expectation that she would be paid part of the placement fee if any

of MLA's candidates were placed by its competitors.  (Partial Final Award at 2–3.)  She would

first forward confidential information to her personal Hotmail account and then send it along to

competitors.  She continued this behavior until MLA terminated her employment in November

of 2008.  (*Id.* at 3.)  The emails she produced in discovery in that arbitration, and a portion of

which MLA has submitted to this Court (*see* ECF Doc. # 46), demonstrate that Mahn knew she

was in violation of her duties, both contractual and fiduciary, to MLA; that she intended to divert

MLA's candidates to its competitors; and that she made efforts to ensure MLA's recruiters

would not place their candidates due to competitors' interference.  For example, in April of 2007, she wrote to a non-MLA recruiter, Mairi MacLean, about a candidate looking to move, saying about the candidate, "I had to give my MLA contact, but YOU should email or call [candidate] directly . . . .  You WILL get a retainer – just don't mention my name.  I love you, but I don't want to get thrown out of my firm as a turncoat!!  H aha!  :)"  (ECF Doc. # 46, Ex. D.10.)  Later in that same email thread, she explained to the competitor that the candidate "is my contact but of course, you have to act as if this came up out of nowhere!  He [the candidate] said he wanted to meet with MLA and said off the cuff that they would probably meet with another recruiter as well . . . but again, just don't mention me!  We are smooth operations on the sly!  Ha ha!  :)"  In January of 2008, she wrote to MLA competitor Josh Kagan, "Oh my God!!!  This makes my entire night!!!!!  I can screw over one of my jerky colleagues and REALLY HELP [name redacted]!!!! . . . can you draft an email for her and send it to me first . . . .  Act like SHE gave you the number some time ago (she will never remember) and so tha tyou [sic] have it in writing."  (ECF Doc. # 45, Ex. D.2.)  Separately, in September of 2008, Mahn told Kagan that he should "out" a candidate "and say word is on the street that he is working with MLA.  taht [sic] would make him stop working with MLA.. .yes, I am evil!"  (*Id.* at Ex. D.5.)  Also in September of 2008, she instructed Kagan to contact one of MLA's candidates before one of MLA's own recruiters could—specifically, while the MLA recruiter was in the hospital.  (*See id.* at Ex. D.3 ("Ask him [the candidate] to work with you [Kagan] exclusively! . . . CONTACT HIM NOW WHILE LARRY [MLA recruiter] IS STILL IN THE HOSPITAL!!!!"); Mahn Dep. Tr. at 119:18-20 (identifying this "Larry" as an MLA recruiter).)  And again that month, she told Kagan, in relation to a particular candidate, to "try the other firms . . . get EVERY FIRM IN WRITING so that MLA won't get it!!!!"  (*Id.* at Ex. D.6.)  Her emails also demonstrate a

significant degree of animus towards MLA. (*See, e.g.*, *id.* at Ex. D.4, email from Mahn to Kagan

on September 16, 2008 ("okay!!!!  MOVE HIM!!! i [expletive redacted] HATE MLA!!!!"); *id.* at

Ex. D.11 (". . . glad I can identify good candidates for others.  Hope others continue to follow

and stalk the information that I have in the database and can make money from my leads . . . .  i

HATE this place.  let's just use it and make a TON of money!!!!!")  These are just a few

examples of emails provided to the Court in this proceeding, and a fraction of the "dozens upon

dozens" reviewed by the arbitrator.  (Partial Final Award at 3.)  The arbitrator noted that the

"scope, depth and audacity of her divulging of confidential information and trade secrets are

enormous and would shock the conscience of any reasonable person"—commentary which this

Court does not rely on to reach its conclusions, but with which it concurs.[3]

Mahn took steps to cover her tracks.  In an email to Kagan, she wrote that she had to be

"really careful" and was "chang[ing] the password to [her] account and mak[ing] sure [she]

change[d] it every 72 days" because her colleague at MLA was "making accusations against"

her, writing, "He [the colleague] thinks I know too much and that I am leaking info."  (*Id.*)

Following complaints from other MLA recruiters that Mahn might be divulging confidential

information, Mahn's boss "directed the IT department to check [Mahn's] account, and a

representative reported that Mahn had sent a number of emails to her home Hotmail account."

(*Id.*)  Upon being confronted, Mahn denied disseminating information, saying that she "would

never give out any information of ours," and she "took offense" at the accusations.  (*Id.*)  MLA

---

[3]    Mahn contends that MLA, in its description of her behavior, left out important context, namely that Mahn
was going through a difficult period in her life and used her emails to vent to friends.  (*See, e.g.*, ECF Doc. # 57 at
16–17, 19, 22–27 (referring to deposition testimony in which Mahn attempted to explain away her "turncoat"
remark in an email as "a joke" and "something British," pointed out that she only used a pseudonym when calling a
candidate "twice," claimed that MLA benefited from her behavior, and claimed that she was "just 'venting'" in
emails to competitors).)  While the Court finds that the language Mahn used in these emails speaks for itself, it also
notes that Mahn had an opportunity to present this counter-narrative to the arbitrator, but either failed to do so or
failed to convince the arbitrator.  (*See* Partial Final Award at 16, 20–22 (finding that Mahn's testimony and claims
lacked credibility on multiple points), 24 (noting "Mahn's total lack of credibility as a witness").)

issued a warning to Mahn and all other MLA recruiters concerning the prohibition on sending

Recruit database information to a personal email address.  (*Id.*)  Later, Mahn's boss again heard

complaints about Mahn divulging information, and again asked the IT department to search and

copy Mahn's emails.  (*Id.*)  It was only then, in November of 2009, that MLA discovered two

instances of Mahn's forwarding confidential information to competitors.  (*Id.* at 3–4.)  When

confronted, Mahn first "denied any forwarding of information to competitors," but when shown

copies of her emails, she admitted to sending the confidential information—though she

maintained that an email sent in January of 2009 was the first instance of this behavior.  (*Id.* at

4.)  MLA then fired Mahn.  (*Id.*)

     MLA commenced arbitration against Mahn in 2010 for claims relating to allegations that

Mahn disclosed MLA's confidential information and trade secrets to MLA's competitors.  MLA

also commenced suit against Mahn in federal court under the Computer Fraud and Abuse Act

and for civil RICO claims; the CFAA claim was dismissed, and MLA withdrew its RICO claim.

(Partial Final Award at 4.)  MLA later reasserted its civil RICO claim in the arbitration, but this

claim was dismissed.  (*Id.*)

     Mahn was represented by counsel in the arbitration including in preparing and submitting

her answering statement to the arbitration demand, at her deposition, at the arbitration hearing,

and in post-hearing briefing; she also had the opportunity to depose other witnesses and call

witnesses at the arbitration.  (Mahn Dep. Tr. 31:25–32:21.)  The arbitration itself took place from

May 29 through June 1, 2012.  (Mahn SOMF ¶ 73.)  In Mahn's post-hearing brief, she asserted

an unclean hands defense, arguing that MLA itself used information stolen from a competitor's

server, violated its own policies, stole Mahn's contacts, and had knowledge of Mahn's conduct

but ignored it because Mahn made money for MLA.  (ECF Doc. # 45, Ex. E (Mahn's post-hearing brief).)

On May 7, 2013, the arbitrator issued a Partial Final Award in MLA's favor finding that Mahn misappropriated trade secrets, engaged in unfair competition, and breached her duty of loyalty.  (*See generally* Partial Final Award.)  The arbitrator also awarded MLA an equitable accounting.  (*Id.* at 23–24.)  The arbitrator also denied Mahn's counterclaims and affirmative defenses.  (*Id.* at 19–22.)

The arbitrator awarded disgorgement of "all the compensation and commissions paid to Mahn during her time of employment with MLA" pursuant to the "faithless servant" doctrine (*id.* at 25), as well as attorneys' fees and costs for the conduct of the arbitration, according to the controlling language in the employment agreement providing that the prevailing party is entitled to fees and costs.  (ECF Doc. # 46, Ex. H ("Final Award") at 12.)  The arbitrator ultimately declined to grant a punitive damages award to MLA, noting that the grant of punitive damages is discretionary, that punitive damages in this context would not deter non-parties as the arbitration was confidential, and that the damage award already granted to MLA (over $2 million in salary and commissions disgorged by Mahn and contractual attorneys' fees and costs) was sufficient to make MLA whole for its losses.  (*Id.* at 10–11.)  The Final Award broke down the damages as follows:

- $1,535,338: disgorgement of commissions and salary paid by MLA to Mahn during her employment
- $232,288: disgorgement of payments Mahn admitted to receiving from MLA's competitors during her employment
- Post-judgment interest at 9% on the above amounts
- $945,765.39 in litigation costs which Mahn owed to MLA pursuant to a provision in her employment agreement

(*Id.* at 24–25.)  (Because of a provision in the employment agreement which prohibited arbitration costs from being awarded to the prevailing party, the arbitrator required MLA to bear the bulk of the costs of the arbitration.  (*Id.* at 22–25.))

B.  **Adversary Proceeding**

Mahn filed under chapter 7 after several years of MLA pursuing its collection efforts, and only days after MLA obtained turnover of Mahn's retirement account. (MLA SOMF ¶¶ 99–100.) On July 5, 2024, MLA filed a complaint in this case asserting two counts: (i) Count I seeks a determination that MLA's debt is non-dischargeable under section 523(a)(4) of the Bankruptcy Code as a debt which arose from Mahn's embezzlement, larceny, and/or defalcation while acting in a fiduciary capacity; and (ii) Count II seeks a determination that MLA's debt is non-dischargeable under section 523(a)(6) as a debt for willful and malicious injury by Mahn to MLA.  (ECF Doc. # 1.)  As noted, the Court dismissed the defalcation argument but allowed the rest of MLA's complaint to proceed; MLA now asserts its larceny argument in the alternative to its embezzlement argument (*see* MLA MSJ at 6 n.2).  In her amended answer to the Complaint (ECF Doc. # 26), Mahn asserted several affirmative defenses: failure to state a claim for relief, failure to establish a *prima facie* case under sections 523(a)(4) and 523(a)(6), unclean hands, ratification, laches, equitable estoppel, good faith (on Mahn's part), and failure to mitigate (on MLA's part).  (ECF Doc. # 26.)  At Mahn's deposition in this case, Mahn testified that her unclean hands defense is based on her contentions that MLA knew of Mahn's actions and condoned them, that another MLA recruiter had stolen his prior employer's confidential information and used it while at MLA, and that MLA broke contracts with its clients; she admitted that she raised each of the above arguments in the arbitration.  (Mahn Dep. Tr. at

267:14–24, 276:7–17, 292:19–24, 294:12–16, 299:21–3, 300:4–9.)  As stated *supra*, the arbitrator rejected Mahn's unclean hands argument.

### C.  MLA Motion for Summary Judgment; Mahn Opposition

MLA argues that the undisputed facts in this case show that Mahn's actions constitute embezzlement under section 523(a)(4) of the Bankruptcy Code and that her debt to MLA was the product of willful and malicious injury under section 523(a)(6) of the Bankruptcy Code.  (MLA MSJ at 1–2.)  It argues it is entitled to summary judgment on both counts of its Complaint because: (1) the arbitrator's findings have preclusive effect and meet the standards of Bankruptcy Code sections 523(a)(4) and (a)(6); and (2) even if those findings did not exist, the undisputed facts submitted in the Arbitration and presented here establish that MLA is entitled to judgment as a matter of law.  MLA also seeks summary judgment on Mahn's affirmative defenses, arguing that they were previously litigated, are legally improper, and lack evidentiary support.  (*Id.* at 5.)

Section 523(a)(4) of the Code applies to debts owed by individual debtors that arose from embezzlement or larceny.  MLA argues that, under federal common law, Mahn's actions constitute embezzlement because they meet every element: (1) the creditor entrusted its property to the debtor; (2) the debtor appropriated the property for a purpose other than that for which it was entrusted; and (3) the circumstances indicate that the debtor acted with fraudulent intent or deceit.  (*Id.* at 6.)  MLA claims that the arbitrator's findings already determined the questions of (1) whether Mahn was entrusted with MLA's property (*id.* at 7–8) and (2) whether Mahn appropriated MLA's property for an unauthorized purpose (*id.* at 10–11), because the arbitrator already decided in MLA's favor on its misappropriation claim, which contains those elements; Mahn is therefore barred by collateral estoppel from arguing otherwise.  MLA also argues that, regardless of the arbitrator's findings, the undisputed facts of the case support those two findings.

(*Id.* at 8–11.)  Next, MLA argues that the circumstances show that Mahn acted with fraudulent intent or deceit with respect to her misappropriation of MLA's property, pointing to the arbitrator's "explicit factual findings" she made in deciding for MLA on its claims for breach of the duty of loyalty and for unfair competition (*id.* at 12–13) and by rejecting Mahn's unclean hands affirmative defense (*id.* at 14).  In the alternative, MLA also points to the evidence it presents in this case (*id.* at 14–16).

Section 523(a)(6) of the Code provides, in relevant part, that "a discharge . . . does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  Per MLA, the three elements a creditor must establish to make this showing are: (1) the debtor acted willfully; (2) the debtor acted maliciously; and (3) the debtor's willful and malicious actions caused injury to the creditor or its property.  (MLA MSJ at 16.)  Again, MLA argues that the arbitrator's findings establish that Mahn acted willfully (by ruling against her on MLA's unfair competition claim, *id.* at 17) and maliciously (by ruling against her on the unfair competition and fiduciary duty claims, *id.* at 19-20), and that her actions caused injury to MLA (*id.* at 22–23); it also argues that the uncontested facts support these findings (*id.* at 17–18, 21–23).

Finally, MLA argues that all of Mahn's affirmative defenses should be rejected as a matter of law.  Her unclean hands defense is barred by claim and/or issue preclusion, as the arbitrator contemplated and rejected this argument already (*id.* at 23); the arbitrator also rejected her ratification and good faith defenses (*id.* at 24).  Her laches defense makes no sense in the context of a dischargeability action, as MLA could not have brought the present claims before Mahn filed for bankruptcy; her equitable estoppel defense is similarly nonsensical, and her mitigation defense, even if valid, does not affect dischargeability.  (*Id.*)

Mahn filed an opposition to MLA's motion for summary judgment ("Mahn Opp.," ECF Doc. # 56).[4]  It largely parallels her motion for summary judgment (discussed *infra*): she argues that MLA litigated a claim of misappropriation in the arbitration, not fraud, and thus MLA has not yet proven fraudulent intent, which it must prove in order to show embezzlement under section 523(a)(4) of the Code.  (*Id.* at 2; *see also id.* at 16–18.)  She claims that none of the findings the arbitrator made "encompass fraud, embezzlement, malicious injury or willful injury."  (*Id.* at 8.)  Because of a provision in the final arbitral award stating that "all claims and counterclaims submitted in this arbitration" which are not "expressly granted" "are hereby denied," "MLA cannot expand the Final Award to include claims" grounded in fraud.  (*Id.* at 12.) Mahn takes it one step further by contending that, for the arbitral award to be nondischargeable, it "must be based on a tort or other claims that has the exact same elements of a Section 523 claim."  Mahn also attacks MLA's statement of undisputed material facts, claiming MLA left out important context.  (*Id.* at 9–11, 18–19.)  She advances an argument that the arbitrator rejected: that "her relationship with competitors was a method that brought her and MLA lots of leads from these competitors."  (*Id.* at 19.)  She also claims that the property she misappropriated is not, in fact, property under applicable law, despite the arbitrator's findings to the contrary; she argues that "[n]othing in the record shows that any of the award contains any property that could ever been [sic] embezzled under New Yok [sic] law."  (*Id.* at 20–21.)  Mahn also argues that after the arbitration, MLA sought a damages award based on its claim that Mahn "engaged in malicious and willful injury" (i.e., sought punitive damages), but the arbitrator did not grant punitive damages, so MLA is collaterally estopped from arguing malicious and willful injury; furthermore, she argues that "[t]here is no mention of maliciousness or willful intent to injury

---

[4]    Mahn supports her opposition with a declaration (ECF Doc. # 56 at 30) and an additional counterstatement of material facts (ECF Doc. # 59).

[sic] in MLA's proffer of proof." (*Id.* at 4, 22.) Mahn emphasizes that parts of the total final

award of the arbitrator are based on rights afforded to MLA pursuant to a contract—specifically,

the legal fees which are based "exclusively on contract rights," and thus should be dischargeable.

(*Id.* at 8.) Finally, Mahn insists that she is entitled to rely on her affirmative defenses, focusing

on her unclean hands defense; she claims that collateral estoppel "does not apply" to them

"because these defenses are not part of Section 523 and there was no final decision [by the

arbitrator] that the affirmative defenses must be dismissed." (*Id.* at 24–25.)

### D. Mahn Motion for Summary Judgment

Mahn moves for summary judgment in her favor[5] and seeks an order: (1) directing that

Mahn's debt to MLA is dischargeable, (2) denying MLA's claims under section 543 of the Code

with prejudice, and (3) dismissing the adversary proceeding with prejudice in Mahn's favor. Her

argument is that none of the arbitrated claims "included the claim elements of fraud,

embezzlement, larceny or malicious conduct" needed to find a debt nondischargeable under

sections 523(a)(4) and (a)(6). (Mahn MSJ at 2.) Mahn also argues that, "with respect to a debt

that has been reduced to a judgment, . . . the legal basis for the debt must include the grounds

excepted under Section 523 for the statute to apply." (*Id.* at 3; *see also id.* at 9.) Since (as noted

above) the arbitral award states that "[a]ll claims not expressly granted herein are hereby denied"

and MLA "did raise claims related to fraud" (referring to the withdrawn civil RICO suit) "and at

the very least knew it could attempt to litigate claims of fraudulent conduct against Mahn, but . . .

made a tactical decision not [to] pursue such claims to judgment," MLA is precluded from

asserting claims that "require a strong showing of fraudulent or felonious intent," like

embezzlement and larceny, "having already deliberately waived its right to obtain [] such a

---

[5]      Mahn supports her motion with a statement of undisputed material facts (ECF Doc. # 48).

judgment." (*Id.* at 10–11.)  Mahn takes it one step further and argues that the Court should

"apply principles of collateral estoppel and the related 'entire controversy' doctrine to show that

there is not, and cannot be, any basis in the adjudicative records to support a claim that the debt

was the result of the causes of action detailed in Section 523(a)(4) and (a)(6)." (*Id.* at 3; *see also*

*id.* at 10–11.)

Mahn also argues that MLA already litigated the question whether she acted maliciously,

by asking for punitive damages, which the arbitrator denied because "[n]o persuasive basis had"

been established for granting of any punitive damages award" to MLA and "consequential

damages awarded are sufficient." (*Id.* at 19–20.)  Mahn argues that MLA had the opportunity to

ask for consequential and other forms of damages based on an argument that her behavior was

willful and malicious, but did not, and thereby waived that right. (*Id.* at 20.)

Mahn pushes back on MLA's factual narrative in her brief and accompanying

declaration, claiming that her "unorthodox" sales methods were nevertheless "highly successful"

and that the "entire point of Mahn seeking to develop a relationship with competitors was to

increase MLA's client base and revenue." (*Id.*)

Finally, Mahn claims that all the damages awarded by the arbitrator are "based solely on

contract and employment law for a disloyal employee," not on "a fiduciary duty, embezzlement,

larceny or malicious and willful injury." (*Id.*at 24.)

MLA filed an opposition ("MLA Opp." ECF Doc. # 54[6]) in which it argues that Mahn

misstates the law on multiple bases.  Collateral estoppel applies to both legal and factual

findings, regardless of whether the legal standards in the two actions are identical; and the case

law is clear (or so MLA argues) that whether a debt is "for" embezzlement or willful and

---

[6]    MLA accompanied this brief with a counterstatement of material facts and a statement of additional
material facts. (ECF Doc. # 55.)

malicious injury depends on the debtor's underlying conduct, not on the claims or legal theories presented in a prior action.  (*Id.* at 1.)

MLA starts with Mahn's argument that MLA's claims are barred by *res judicata*.  MLA points out that there is no "entire controversy" doctrine under New York or federal common law—it is "a unique creature of New Jersey state law" and is thus irrelevant.  (*Id.* at 4.)  It also points to Supreme Court precedent (*Brown v. Felsen*, 442 U.S. 127 (1979)) which MLA claims held that a bankruptcy court is not confined to a review of the judgment and record when considering the dischargeability of a debt, and entry of a prior judgment "should not bar further inquiry into the true nature of the debt."  (*Id.* at 5.)  Moreover, *res judicata* only bars claims that were or could have been brought in the prior litigation, and under New York law, embezzlement is not a civil cause of action.  Because MLA had no ability to bring such a claim during the arbitration, it cannot be barred by *res judicata*.  (*Id.*)

Next, MLA argues that the legal elements of sections 523(a)(4) and 523(a)(6) do not need to mirror the elements of the claims on which MLA succeeded in the arbitration for its debt to be found nondischargeable.  (*Id.*)  Since it seeks to apply the arbitrator's factual, not legal, findings, the applicable standards need not be identical.  (*Id.* at 6.)  Moreover, courts look to the underlying conduct to determine the nature of the debt, regardless of the nature of the legal claim.  (*Id.* at 7.)  So regardless of whether collateral estoppel applies, this Court still may consider the specific facts that gave rise to MLA's judgment in determining whether MLA's debt is non-dischargeable.  (*Id.* at 8.)  MLA doubles down on its argument that the arbitral award is a debt for embezzlement because Mahn acted with fraudulent intent., pointing to the factual findings the arbitrator made in ruling in MLA's favor on the breach of duty of loyalty and unfair competition claims.  (*Id.* at 9.)

16

MLA also argues that the arbitrator's decision not to award punitive damages is not preclusive on the question of Mahn's mental state. (*Id.* at 12.) In assessing whether to award punitive damages, the arbitrator did not address the merits of MLA's argument that Mahn acted maliciously and with intent to harm but, instead, denied punitive damages because: (1) the $2+ million in damages awarded to MLA served to make MLA whole and was more than sufficient to punish Mahn; and (2) given the confidentiality of the arbitration, punitive damages would have no deterrent effect on third parties. (*Id.*) Moreover, where punitive damages are discretionary, the failure to award them has no preclusive effect and cannot be a basis for an adverse finding. (*Id.*) The arbitrator did, however, award MLA consequential damages, and MLA maintains that these were "for Mahn's willful and malicious injury to MLA." (*Id.* at 13.)

Finally, MLA argues that, because the Code's "debt for" language encompasses all damages arising from the debtor's underlying non-dischargeable conduct and is not limited to the specific legal theory on which the damages are based. (*Id.* at 15.)

MLA also highlights procedural deficiencies in Mahn's papers. (*Id.* at 16–17.)

## II.    LEGAL STANDARD

### A.  Summary Judgment

Federal Rule of Civil Procedure 56 applies in adversary proceedings pending in bankruptcy court. FED. R. BANKR. P. 7056. A court should only grant summary judgment under Rule 56 when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). Issues of non-material fact, however, will not prevent a court from awarding a party summary judgment. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).  Facts are material if they "might affect the outcome of the suit under the governing law."  *Overton v. New York State Div. of Military and Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted).

On a motion for summary judgment, the movant bears an initial burden to come forward with evidence that satisfies "each material element of his claim or defense, demonstrating that he is entitled to relief."  *Isaac v. City of New York*, 701 F. Supp. 2d 477, 485 (S.D.N.Y. 2010) (internal citation omitted).  Once the movant has made this initial showing, the nonmoving party must provide evidence of a genuine issue of fact to successfully oppose the motion.  *Id.*  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson*, 477 U.S. at 248, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, *Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks and Recreation*, 311 F.3d 534, 543 (2d Cir. 2002).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Ning Yen Yao v. Karen Kao (In re Kao)*, 612 B.R. 272, 280 (Bankr. S.D.N.Y. 2020) (internal citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Alternatively, the opposing party may also make "showing that the materials cited do not establish the absence or presence of a genuine dispute."

18

FED. R. CIV. P. 56(c)(1)(B).  While a court need only consider the cited materials, "it may

consider other materials in the record."  FED. R. CIV. P. 56(c)(3).  If the nonmoving party is

unable to provide evidence of a genuine issue of material fact, "the movant is entitled to

judgment as a matter of law."  FED. R. CIV. P. 56(c).

Courts apply the same standards when considering cross-motions for summary judgment

as are used for individual motions for summary judgment.  *In re Worldcom, Inc.*, 361 B.R. 675,

681 (Bankr. S.D.N.Y. 2007) (citing *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.

1993)).  Each motion must be considered independently of the other and the court must consider

the facts in the light most favorable to the non-moving party for each.  *Id.*  In such a situation, the

court is not required to grant judgment as a matter of law for one side or the other.  *Id.*

Parties moving for or responding to a motion for summary judgment are required to file

statements of material undisputed facts in compliance with Local Bankruptcy Rule 7056–1.

### B.  Collateral Estoppel

This Court already set out the legal standard for collateral estoppel in its previous written

decision in this case, *see In re Mahn*, 666 B.R. at 892, but restates it here for the sake of

convenience.

Collateral estoppel, or issue preclusion, forecloses relitigation of factual matters that have

previously been litigated and decided.  *Parklane Hosiery Co. Inc. v. Shore,* 439 U.S. 322, 337

(1979).  The Supreme Court held that the doctrine applies in nondischargeability proceedings in

*Grogan v. Garner*, 498 U.S. 279, 285 n.11 (1991) ("We now clarify that collateral estoppel

principles do indeed apply in discharge exception proceedings pursuant to § 523(a).").  However,

"[b]ecause a judgment of non-dischargeability undermines a debtor's fresh start," *In re*

*Gucciardo*, 577 B.R. 23, 32 (Bankr. E.D.N.Y. 2017),

> [i]n giving collateral estoppel effect to a pre-petition judgment in a non-dischargeability action, the bankruptcy court must be able, based upon the findings made in the pre-petition judgment, to make an independent determination that the elements of § 523(a) have been satisfied.  In other words, the bankruptcy court must be able to identify clear and specific findings in the pre-petition judgment which correlate to, and are decisive as to, the elements to be proven in the § 523(a) cause of action.

*In re Wisell*, 494 B.R. 23, 35 (Bankr. E.D.N.Y. 2011).

Collateral estoppel is also applicable to factual findings made in arbitration proceedings. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985) (acknowledging that courts may give preclusive effect to arbitration proceedings to protect federal interests); *see also Munoz v. Boyard (In re Boyard)*, 538 B.R. 645, 653 (Bankr. E.D.N.Y. 2015) (confirmation of an arbitration award is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court") (internal citation omitted).

Since the final judgment confirming the arbitral award in this case was issued by a New York court, the full faith and credit statute, 28 U.S.C. § 1738, requires that the Court adopt New York's rules for collateral estoppel in this case because the earlier forum was a state court.  *See Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 93 (2d Cir. 2005) ("Because the Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to accord state judgments the same preclusive effect those judgments would have in the courts of the rendering state, New York preclusion law applies."); *In re Boyard*, 538 B.R. 645, 652 (Bankr. E.D.N.Y. 2015) (applying Florida's law of preclusion when arbitral award was confirmed by Floridian court); *Wharton v, Shiver (In re Shiver)*, 396 B.R. 110, 119 (Bankr. S.D.N.Y. 2008) (concluding that state law determines preclusive effect of state court judgment).

New York uses a two-step analysis in applying collateral estoppel.  First, there must be an identity of issue which has necessarily been decided in the prior action and is determinative in

the present action; and second, there must have been a full and fair opportunity to litigate in the

prior action. *See Schwartz v. Public Administrator*, 24 N.Y.2d 65, 71 (1969); *see also Denton v.

Hyman (In re Hyman)*, 502 F.3d 61, 65 (2d Cir. 2007) (setting out two-step test for collateral

estoppel, requiring that "(1) the identical issue necessarily was decided in the prior action and is

decisive of the present action, and (2) the party to be precluded from relitigating the issue had a

full and fair opportunity to litigate the issue in the prior action").  "[F]or a question to have been

actually litigated so as to satisfy the identity requirement, it must have been properly raised by

the pleadings or otherwise placed in issue and actually determined in the prior proceeding."

*Evans v. Ottimo*, 469 F.3d 278, 282 (2d Cir. 2006) (internal citation omitted).  Considering the

difficulty in determining the identity of issues between prior judgments and subsequent

dischargeability actions, "[a]ny reasonable doubt as to what was decided by a prior judgment . . .

should be resolved against using it as an estoppel." *Sarasota CCM, Inc. v. Kuncman (In re

Kuncman)*, 454 B.R. 276, 284 (Bankr. E.D.N.Y. 2011) (internal citation omitted).

### C.  Nondisccchargeability: Section 523(a)(4)

Section 523(a)(4) of the Code provides that a discharge under section 727 of the

Bankruptcy Code does not discharge an individual debtor from any debt accrued "for fraud or

defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  This Court

previously dismissed MLA's action for fraud or defalcation while acting in a fiduciary capacity

due to the lack of proper fiduciary relationship between Mahn and MLA but allowed MLA's

claims for embezzlement and larceny to go forward; they proceeded primarily on an

embezzlement theory.  *In re Mahn*, 666 B.R. at 893-98.

"The question of what constitutes embezzlement or larceny within the meaning of §

523(a)(4) is a question of federal law." *In re Scheller*, 265 B.R. 39, 53 (Bankr. S.D.N.Y. 2001).

21

"Federal common law defines embezzlement as the 'fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'"  *In re Sesum*, 662 B.R. 840, 847 (Bankr. S.D.N.Y. 2024) (citing *In re Bevilacqua*, 53 B.R. 331, 333 (Bankr. S.D.N.Y. 1985)).  "To successfully plead that a claim is non-dischargeable under section 523(a)(4) due to embezzlement, a creditor must prove: (1) that the creditor entrusted his property to the debtor; (2) that the debtor appropriated the property for a purpose other than that for which it was entrusted; and (3) the circumstances indicate that the debtor acted with fraudulent intent or deceit."  *Id.* (cleaned up).  Courts in the Second Circuit look to state law when determining what constitutes property for purposes of an embezzlement claim.  *See Gasson v. Premier Cap., LLC*, 43 F.4th 37, 41–42 (2d Cir. 2022).  New York law on treating intangibles as "property" is discussed further *infra*.

Under federal law in this Circuit, "[l]arceny is the (1) wrongful taking of (2) property (3) of another (4) without the owner's consent (5) with intent to convert the property."  *In re Scheller*, 265 B.R. at 53.

### D.  Nondischargeability: Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code provides that a discharge under section 727 of the Bankruptcy Code does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"  11 U.S.C. § 523(a)(6).  Injuries inflicted negligently or recklessly are an insufficient basis to deny a debtor a discharge under the statute.  *See Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).  While sections 523(a)(2)(A) and 523(a)(6) are distinct, the Supreme Court has recognized that "overlap appears inevitable" between the two sections, and the Court has declined to create an "artificial definition of actual fraud merely to avoid narrow redundancies in § 523 that appear unavoidable."  *Husky*

22

*Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 363–64 (2016) (internal citations and quotation marks omitted).

"The terms willful and malicious are separate elements, and both elements must be satisfied." *Soliman v. Vyshedsky (In re Soliman),* 539 B.R. 692, 698 (Bankr. S.D.N.Y. 2015) (internal citation and quotation marks omitted).  "To establish that a debtor acted willfully under section 523(a)(6), the plaintiff must demonstrate that the injury in question was a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Geiger*, 523 U.S. at 61–62.  Negligence and recklessness are insufficient under section 523(a)(6). *See In re Soliman*, 539 B.R. at 699.  Rather, this section incorporates the common law meaning of "willful," which is established when "[an] actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." RESTATEMENT (SECOND) OF TORTS § 8A (1965); *see also In re Soliman*, 539 B.R. at 699. Thus, the debtor must engage in conduct where he actually intends to injure the party or engages in conduct where the consequences are "substantially certain" to result therefrom. *See In re Soliman*, 539 B.R. at 699.

To establish that a debtor acted maliciously, the plaintiff must prove that the debtor's act was "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir. 1996); *see also Ball v. A.O. Smith Corp*., 451 F.3d 66, 69 (2d Cir. 2006) ("The injury caused by the debtor must also be malicious, meaning wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will.") (internal citation and quotation marks omitted).  In determining whether a debtor acted maliciously, courts will consider the totality of the circumstances. *In re Stelluti*, 94 F.3d at 88 (stating that "[i]mplied malice may be demonstrated 'by the acts and conduct of the debtor in the context of [the] surrounding circumstances'"

23

(quoting *First Nat'l Bank of Md. v. Stanley (In re Stanley)*, 66 F.3d 664, 668 (4th Cir. 1995))).

Malice is implied when "anyone of reasonable intelligence knows that the act in question is

contrary to commonly accepted duties in the ordinary relationships among people, and injurious

to another." *Aldus Green Co. v. Mitchell (In re Mitchell)*, 227 B.R. 45, 51 (Bankr. S.D.N.Y.

1998) (citations and quotation marks omitted). "[T]he statutory element of maliciousness will be

found by imputation where the debtor has breached a duty to the plaintiff founded in contract,

statute or tort law, willfully in the sense of acting with deliberate intent, in circumstances where

it is evident that the conduct will cause injury to the plaintiff, and, most important, [ ] under

some aggravating circumstance such as to warrant denial of discharge." *Bundy American Corp.

v. Blankfort (In re Blankfort)*, 217 B.R. 138, 144 (Bankr. S.D.N.Y. 1998). "Typically[,] implied

malice is found where the behavior is of a type that the court cannot justify on any level . . . .

Where the debtor is motivated by some potential profit or gain, however, malice will only be

implied where there is additional, aggravating conduct on the part of the debtor to warrant an

inference of actual malice." *Whitaker Securities, LLC v. Evan Rosenfeld (In re Rosenfeld)*, 543

B.R. 60, 76 (Bankr. S.D.N.Y. 2015) (internal citations omitted); *see also In re Orly*, No. 15-

11650(JLG), 2016 WL 4376947, at *6 (Bankr. S.D.N.Y. Aug. 10, 2016) ("As a general rule, an

intentional breach of statutory duties by a debtor, whose conduct is clearly motivated by the

prospect of financial gain, is not sufficient alone to imply malice . . . . Plaintiffs must also allege

that there was some aggravating circumstances evidencing conduct by the Debtor so

reprehensible as to warrant denial of the 'fresh start' to which the 'honest but unfortunate' debtor

would normally be entitled under the Bankruptcy Code.") (cleaned up). That additional,

aggravating conduct in the presence of a profit motive can look like "conduct which is certain or

almost certain to cause financial harm to the creditor," so long as the debtor also knows "that he

or she is violating the creditor['s] legal rights," *In re Orly*, 2016 WL 4376947, at *7 (internal

citation omitted).

### III.    <u>DISCUSSION</u>

Several of Mahn's arguments can be quickly struck down as a preliminary matter.  First,

she argues that the statutory language "debt for" means that, "if the debt" MLA is pursuing "is

not based on a cause of action that incorporates the recited Section 523 exception, the exception

does not apply"; in other words, she claims that "for section 523 to apply[,] the federal common

law cause of action" (here, larceny or embezzlement) "must have been the legal cause of action

that is the legal basis for the debt."  (Mahn MSJ at 9.)  This is not true.  The case Mahn cites for

this proposition, *Cohen v. de la Cruz*, 523 U.S. 213, 220 (1998), found the opposite:

> Petitioner submits that § 523(a)(2)(A) excepts from discharge only the portion of
> the damages award in a fraud action corresponding to the value of the "money,
> property, services, or . . . credit" the debtor obtained by fraud.  The essential premise
> of petitioner's argument is that a "debt for" money, property, or services obtained
> by fraud is necessarily limited to the value of the money, property, or services
> received by the debtor.   Petitioner, in this sense, interprets "debt for"—or
> alternatively, "liability on a claim for"—in § 523(a)(2)(A) to mean "liability on a
> claim to obtain," i.e., "liability on a claim to obtain the money, property, services,
> or credit obtained by fraud," thus imposing a restitutionary ceiling on the extent to
> which a debtor's liability for fraud is nondischargeable.  Petitioner's reading of
> "debt for" in § 523(a)(2)(A), however, is at odds with the meaning of the same
> phrase in parallel provisions.  Section 523(a) defines several categories of liabilities
> that are excepted from discharge, and the words "debt for" introduce many of them,
> viz., "debt . . . for a tax or a customs duty . . . with respect to which a return . . . was
> not filed," § 523(a)(1)(B)(i), "debt . . . for fraud or defalcation while acting in a
> fiduciary capacity, embezzlement, or larceny," § 523(a)(4), "debt . . . for willful
> and malicious injury by the debtor to another entity," § 523(a)(6), and "debt . . . for
> death or personal injury caused by the debtor's operation of a motor vehicle if such
> operation was unlawful because the debtor was intoxicated," § 523(a)(9).  None of
> these use "debt for" in the restitutionary sense of "liability on a claim to obtain"; <u>it
> makes little sense to speak of "liability on a claim to obtain willful and malicious
> injury" or "liability on a claim to obtain fraud or defalcation."  Instead, "debt for"
> is used throughout to mean "debt as a result of," "debt with respect to," "debt by
> reason of," and the like,</u> . . . <u>connoting broadly any liability arising from the
> specified object</u>[.]

*Id.* at 219–20 (emphasis added). *Cohen* is better read as imbuing "debt for" with a broad

meaning, rather than a narrow one. Another case Mahn relies heavily on, *In re Wisell*, expressly

stated that a court determining dischargeability can point to either "clear and unequivocal *factual*

*and/or legal findings*" in the underlying proceeding "which would satisfy the requisite elements

of Section 523(A)." *In re Wisell*, 494 B.R. at 29 (emphasis added). Elsewhere, the *Wisell* court

expressly held that, even if fraud was not alleged in the underlying action, "a finding of fraud

under Section 523(a)(2)(A) can still be established if the findings by the State Court very clearly

and explicitly show all of the elements required to make such a finding." *Id.* at 37. This Court is

not limited, as Mahn claims it is, to "comparing the elements of embezzlement" (or any of the

other discharge exceptions) "to the elements of the prior award." (Mahn Opp. at 3.)

Second, Mahn has not cited caselaw for a New York version of the "entire controversy"

doctrine, and the cases cited by MLA show that it is a New Jersey law concept. *See Techno-*

*Comp., Inc. v. Arcabascio*, 130 F. Supp. 3d 734, 740 (E.D.N.Y. 2015) ("New Jersey applies the

so-called 'entire controversy doctrine,' which 'is essentially New Jersey's specific, and

idiosyncratic, application of traditional *res judicata* principles."). The case Mahn cited for the

supposed "New York version," *Giannone v. York Tape & Label, Inc.*, 548 F.3d 191,193 (2d Cir.

2008), discusses *res judicata*, which does *not* apply in dischargeability proceedings. *See In re*

*Grover*, 667 B.R. 243, 256 (Bankr. S.D.N.Y. 2025) ("Due to the unique nature of a

dischargeability proceeding, the United States Supreme Court has held that *res judicata* is

inapplicable in a denial of discharge proceeding . . . . This is because under 11 U.S.C. §

523(c)(1) bankruptcy courts have 'exclusive' jurisdiction over issues regarding section 523(a)(2),

(a)(4), (a)(6) and (a)(15)." (cleaned up)). Therefore, Mahn's arguments that MLA's failures to

26

bring fraud-based claims in the arbitration have a binding effect on the current proceeding (and her related waiver argument) fail.

Third, MLA is not barred by collateral estoppel from arguing that Mahn's actions constituted willful and malicious behavior just because the arbitrator denied MLA's request for punitive damages. As discussed above, the denial was not based on any finding of Mahn's behavior, but rather was due to the fact that: (1) punitive damages are discretionary, not mandatory; (2) the rest of the award was sufficient to compensate MLA; and (3) as the arbitration was confidential, a punitive damages award would not have had a deterrent effect. *See also In re Peterson*, 332 B.R. 678, 684 (Bankr. D. Del. 2005) ("[B]ecause punitive damages are discretionary, a failure to award such damages cannot have preclusive effect under § 523(a)(6).")

### A. Nondischargeability of Debt Under Section 523(a)(4)

Mahn argues that the data in the Recruit database which she stole and disseminated to MLA's competitors is not "property" under relevant state law. MLA argues that Mahn is collaterally estopped from so arguing because the arbitrator awarded MLA an equitable accounting, an element of which rests on a finding of a property interest. (MLA MSJ at 7, citing Partial Final Award at 23–24 (". . . the misappropriation of property commenced at the beginning of employment . . .").) MLA is correct. "Under New York law, there are four elements to a claim for equitable accounting: '(1) a fiduciary relationship (2) entrustment of money or property (3) no other remedy and (4) a demand and refusal of an accounting.'" *Romain v. Seabrook*, No. 16 Civ. 8470, 2017 WL 6453326, at *6 n.8 (S.D.N.Y. Dec. 15, 2017) (quoting *In re Guardianship of Kent*, 729 N.Y.S.2d 352, 353 (N.Y. Sup. Ct. 2001)); *see also Soley v. Wasserman*, No. 08 Civ. 9262, 2013 WL 6388401, at *5 (S.D.N.Y. Dec. 6, 2013). MLA did not

entrust money to Mahn, so the arbitrator must have found that MLA's property, as defined by

New York law, was at issue.  (*See also* Partial Final Award at 34 ("Mahn cannot argue

persuasively that she was never entrusted with MLA's 'property' as the information in the

Recruit database constitutes its property or assets.  She was entrusted with MLA's confidential

information and trade secrets, had full access to, then divulged volumes of MLA's confidential

data concerning its candidates.").).

Moreover, while another judge on this Court did find at least once that, "for intangible

property to constitute property [under New York law] for a claim of embezzlement, the

intangible property must have some tangible form," *In re Sesum*, 662 B.R. at 849, New York

caselaw does not strictly require that the intangible property be reduced to an actual, tangible

object for it to count as "property" capable of being converted, despite Mahn's argument to the

contrary (*see* Mahn Opp. at 20–21).  The Second Circuit certified to the New York Court of

Appeals the question whether the "common-law cause of action of conversion applies to certain

electronic computer records and data," even when those "intangible property interests" did not

"strictly satisfy the merger test," *i.e.*, when those intangible property interests were "merged"

with a tangible object (such as shares which "merged" with stock certificates).  *Thyroff v.

Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 284, 290 (2007).  The New York Court of Appeals

decided in the affirmative, finding that an intangible object (such as a computer document) need

not be "merged" with a physical object (such as a print-out of that document) to constitute

"property" capable of being converted under New York law.  Finding that "the tort of conversion

must keep pace with the contemporary realities of widespread computer use," the court

"answer[ed] the certified question in the affirmative" and held that "electronic records that were

stored on a computer and were indistinguishable from printed documents" are "subject to a claim

of conversion in New York." *Id.* at 292–93. This is in part because "it generally is not the physical nature of a document that determines its worth, it is the information memorialized in the document that has intrinsic value . . . regardless of whether the format in which the information was stored was tangible or intangible. In the absence of a significant difference in the value of information, the protections of the law should apply equally to both forms—physical and virtual." *Id.* at 292. As of 2007, then, under New York law, "intangible property can be the subject of a conversion claim," *Springtex USA, LLC v. SPSC Design, LLC*, 83 Misc. 3d 1244(A) (N.Y. Sup. Ct. 2024), and hence can form the basis of an embezzlement claim under section 524(a)(4) of the Code. *See also Salonclick LLC v. SuperEgo Mgmt. LLC*, No. 16-CV-2555, 2017 WL 239379, at *4-5 (S.D.N.Y. Jan. 18, 2017) (denying dismissal of conversion claim based on intangible domain and social media account names); *Kraus USA, Inc. v. Magarik*, No. 17-CV-6541 (ER), 2020 WL 2415670, at *10–11 (S.D.N.Y. May 12, 2020) (denying motion for judgment on the pleadings on conversion claim under New York law when the property at issue was trade secrets, specifically "technical product specifications, information on upcoming designs, sales data, e-commerce know-how and data, customer lists, vendor relationships, the identity of contractual counterparties, and internal cost structure and operating expenses" stored on a computer "but likely shared in some tangible, documentary form," relying on *Thyroff*); *In re Tashlitsky*, 492 B.R. at 649 ("It is clear that intangible property subject to conversion law in New York is limited to items that bear a substantial similarity to tangible property, like electronically stored data and other information . . .").

The arbitrator's other factual findings suffice to show that the data on the Recruit database constitutes "property" under New York law and thus can form the basis of an embezzlement claim under the Code. This information included:

the names of hundreds of MLA's active candidates . . . including detailed, non-public information . . . .  This information included personal email addresses and cell phone numbers; their interest in named law firms; their past interviews with named law firms and results; their estimated books of portable billables/hourly billables; their named clients; family member information; details about their specialty . . . the personal reasons why a candidate might wish to leave a firm; the history of the candidate's law firm employment; the personal contact information of active candidates; the names of family members and similar private information; the size of a candidate's practice/amount of support staff; the estimated book of portable and hourly billables; the candidate's major clients; conflicts presented with law firm clients; the actual practice specialty of a candidate, as opposed to that listed on a law firm website; and a long-term *business plan developed* by a candidate for potential law firms, stating candidate goals; areas of intended development; and personal information . . . .  MLA had expanded [sic] millions of dollars over a long period of time, as well as employing over 100 recruiters to develop leads on candidates and clients, in order to maintain the Recruit database information.

(Partial Final Award at 7–10.)  These highly sensitive, nonpublic trade secrets fall squarely within the category of intrinsically valuable, if intangible, electronic records which the New York Court of Appeals sought to protect in *Thyroff* by deeming them to be "property" capable of being converted.

Mahn cannot credibly contest the first two elements of embezzlement under federal law—that MLA entrusted its property to Mahn and that Mahn appropriated this property for a purpose other than that for which it was entrusted to her.  She does not try to in either of her briefs, nor could she: the arbitrator expressly found that Mahn "was entrusted with MLA's confidential information and trade secrets," and ruled in MLA's favor on its misappropriation and unfair competition, both of which require a finding that Mahn used MLA's confidential information for an improper and unauthorized purpose—in other words, appropriated MLA's property "for a purpose other than for which it was entrusted."  (Partial Final Award at 24.)

MLA has shown that the arbitrator found that Mahn "acted with fraudulent intent or deceit" as required by federal law on embezzlement.  *In re Sesum*, 662 B.R. at 847.  "In general,

30

a partner or employee who intentionally diverts or misappropriates the funds of his company

may satisfy the element of embezzlement within the meaning of Section 523(a)(4)." *In re*

*Wisell*, 494 B.R. at 40; *see also Long Island Minimally Invasive Surgery, P.C. v. Orslini (In re*

*Orslini)*, 649 B.R. 427, 439 (Bankr. E.D.N.Y. 2023) (finding sufficient indicia of fraudulent

intent when debtor, who had previously forwarded insurance checks to plaintiff as she was

required to, kept several insurance checks and did not turn over the proceeds, with full

knowledge of her obligations to the plaintiff; finding that the "evidence presented does not

support a finding that the Debtor here was honest but unfortunate.  Rather, the Debtor obtained

medical services from the Plaintiff, received reimbursement from her insurance to pay for those

services and kept the money for herself thus profiting from the transaction . . . .  [T]he Debtor

obtained services from the Plaintiff and did not intend to pay for those services.  Therefore, the

Court finds fraudulent intent."); *Village Mortgage Co. v. Veneziano (In re Veneziano)*, 615 B.R.

666, 678 (Bankr. D. Conn. 2020) (holding that the facts underlying a finding of embezzlement

under relevant state law demonstrated the requisite intent for the wrongful taking of property

from its rightful owners where defendant, as financial head of the plaintiff, had been entrusted

with corporate funds, wrongfully converted a substantial amount of corporate funds for his own

use, and had demonstrated a record of looting the corporate treasury in substantial amounts for

his own benefit over a period of at least ten years); *Marriott Int'l Inc. Employee Profit Sharing,*

*Savings and Retirement Plan and Trust v. Suarez (In re Suarez)*, No. 95 CV 5038, 1996 WL

480809, at *3–4 (E.D.N.Y. Aug. 9, 1996) (holding that fraudulent intent could be inferred from

circumstantial evidence where the debtor testified that, despite receiving regular statements

indicating the balance of his retirement account, he did not know the balance of his retirement

account after depositing a check from a retirement plan and trust of his former employer that

constituted an overpayment of over \$87,000, and subsequently failed to return the overpayment

upon the request of said trust); *Moonan v. Bevilacqua (In re Bevilacqua)*, 53 B.R. 331, 334

(Bankr. S.D.N.Y. 1985) (finding that circumstantial evidence supported a finding of fraudulent

intent when the debtor, as agent of a check-holder, misappropriated funds by depositing a check

in an account he controlled and then, after waiting a month, mailed the principal a bad check that

was then drawn on a closed corporate account).

      The factual findings the arbitrator made support the conclusion that Mahn intended to

deceive and defraud MLA.  In support of her finding that Mahn breached her duty of loyalty, the

arbitrator found that Mahn "was stealing her employer's assets or property consisting of

confidential information and trade secrets, as well as its business goodwill, while secretly

divulging the same to MLA's competitors, and receiving financial 'kickbacks' after placements

by these competitors," used a pseudonym to place candidates with competitors, and "coached the

competitors on how to sever the candidate's relationship with MLA."  (Partial Final Award at

7.)[7]  These facts, which the arbitrator had to find to conclude that Mahn breached her duty of

loyalty, provide sufficient circumstantial evidence of Mahn's intent to deceive/defraud MLA and

the arbitrator's findings collaterally estop Mahn from arguing otherwise.

      The Court therefore **GRANTS** MLA's motion for summary judgment on Count I of its

complaint.  (This Opinion addresses and dismisses Mahn's affirmative defenses *infra*.)  As MLA

only presses a larceny argument in the alternative to its embezzlement argument, the Court need

not address larceny.

---

[7]    While the Court does not at present rely on facts not found by the arbitrator in supporting one of her legal conclusions, it notes that the record before the Court also shows that Mahn acknowledged repeatedly in emails to competitors that she needed to be secretive and hide her activities from MLA, and was aware that she could "get thrown out of [her] firm as a turncoat."  When caught, she lied and denied disseminating MLA's trade secrets.

### B. Nondischargeability of Debt Under Section 523(a)(6)

The Court need not address Count II as the nondischargeable portion of Mahn's debt is covered by section 523(a)(4) of the Code but addresses it briefly for the sake of completeness.  In the alternative, the portion of the debt which did not arise from mere contract rights (addressed *infra*) is also nondischargeable under section 523(a)(6).

Section 523(a)(6) of the Bankruptcy Code provides that a discharge under section 727 of the Bankruptcy Code does not discharge an individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"  MLA argues that the arbitrator's finding in its favor on the unfair competition ground sufficed to show willful behavior on Mahn's part because the "gravamen of an unfair competition claim . . . is the bad faith misappropriation of" a commercial advantage.  (MLA SJ at 17.)  (Though the arbitrator did not explicitly state that Mahn acted in bad faith, the case she cited for the standard for unfair competition under New York law, *The New York Racing Ass'n, Inc. v. Nassau Regional off-track Betting Corp*., No. 021993/09, 2010 WL 2517241 (N.Y. Sup. Ct. June 10, 2010), includes bad faith as an element of unfair competition, and bad faith is firmly established as an element of unfair competition, *see, e.g.*, *Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 510 (S.D.N.Y. 2018) (collecting cases).)  Under New York law on unfair competition, "[m]ere negligence or recklessness is insufficient," and the plaintiff has to show that the defendant acted "out of a dishonest purpose . . . .  It must be shown that [defendant] intentionally acted with a dishonest purpose to injure [plaintiff]."  *Barbagallo v. Marcum LLP*, No. 11-CV-1358, 2012 WL 1664238, at *8 (E.D.N.Y. May 11, 2012) (internal citations omitted).  The elements of a New York unfair competition claim are substantially similar to the willfulness requirement under section 523(a)(6) – both require a showing of an intentional and deliberate injury.  The arbitrator must have found

that Mahn met this requirement at the arbitration in order to rule in MLA's favor on the unfair

competition claim; therefore, Mahn is collaterally estopped from arguing that she did *not* behave

willfully.

"[T]he non-bankruptcy court need not have made a finding of malice *per se*. Rather, the

bankruptcy court can infer from the prior factual findings whether a debtor's pre-bankruptcy

conduct was 'malicious' sufficient to satisfy Section 523(a)(6)." *Wisell*, 494 B.R. at 42 (citation

omitted). The Second Circuit has interpreted "malicious" to mean "wrongful and without just

cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v.

Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir. 1996) (citations omitted). "Malice may be

implied based on the surrounding circumstances, or found constructively." *Burberry Ltd. V.

Horowitz (In re Horowitz)*, No. 14-36884 (CGM), 2016 WL 1039581, at *5 (Bankr. S.D.N.Y.

Mar. 15, 2016). As discussed *supra*, "the debtor's conduct giving rise to liability is clearly

motivated by profit or gain or other benefit to the debtor, . . . the underlying conduct, however

deplorable, would not give rise to liability under § 523(a)(6) in the absence of some additional,

aggravating conduct on the part of the debtor of sufficient gravity to warrant an inference of

actual malice." *Kerin Enters. Holding Co., Ltd. v. Marklin (In re Marklin)*, No. 8-21-71030-

REG, 2023 WL 6306786, at *9 (Bankr. E.D.N.Y. Sept. 27, 2023) (cleaned up). The "knowing

exploitation of [a debtor's] employer's assets for [the debtor's] benefit . . . gives rise to a finding

of malice," including actual malice when the debtor was motivated by profit or gain. *Id.*; *see

also Guggenheim Cap. LLC v. Birnbaum (In re Birnbaum)*, 513 B.R. 788, 807 (Bankr. E.D.N.Y.

2014) (finding that court in underlying proceeding established facts sufficient to support a

finding of malice on a collateral estoppel basis under section 523(a)(6) because the issue of the

debtor's "intent and state of mind" were "actually litigated and determined in the prior

34

proceeding," even though malice was not at issue in the underlying case; finding malice where the debtor deliberately used counterfeit marks in violation of court orders); *Yash Raj Films v. Ahmed (In re Ahmed)*, 359 B.R. 34, 42 (Bankr. E.D.N.Y. 2005) (similar). In sum, "decisions within the Second Circuit have been consistent about the type of behavior that will lead to section 523(a)(6) non-dischargeability. Behavior that the court cannot justify on any level will lead to non-dischargeability." *Bundy American Corp. v. Blankfort (In re Blankfort)*, 217 B.R. 138, 143 (Bankr. S.D.N.Y. 1998). Mahn's behavior, as established in the arbitration, fits this definition, and the factual findings underpinning the arbitrator's finding on MLA's unfair competition claim establish that Mahn acted with malice. Mahn's intent was actually litigated in the arbitration, since the arbitrator had to make a finding of her bad faith to conclude she engaged in unfair competition. The arbitrator stated clearly that "the unfair competition claim is based not only on Mahn's theft, but also her efforts to drive MLA's candidates away to competitors, and otherwise harm MLA." (Partial Final Award at 15.) Moreover, the arbitrator found that Mahn knowingly violated her fiduciary duties towards MLA and so, like the debtor-defendants in *Birnbaum* and *Ahmed*, deliberately violated MLA's legal rights and acted contrary to the duties imposed upon her by her relationship with MLA. Partial Final Award at 7–9; *In re Orly*, 2016 WL 4376947, at *7. Since the record in the arbitration provides "compelling evidence that" Mahn appropriated MLA's property "through subterfuge and without any cause or excuse," the Court finds that Mahn's debt is nondischargeable under section 523(a)(6). *Forest Diamonds Inc. v. Aminov Diamonds LLC*, No. 06 CIV. 5982(GEL), 2010 WL 148615, at *14 (S.D.N.Y. Jan. 14, 2010).

### C. Mahn's Affirmative Defenses Fail

In brief, all of Mahn's affirmative defenses fail for the reasons articulated by MLA in its

motion for summary judgment.  The arbitrator already ruled against Mahn on her identical

unclean hands and ratification defenses which she asserted in the arbitration; laches is

inapplicable in this action, as is equitable estoppel (and Mahn does not attempt to further

articulate these defenses in her briefing); the arbitrator already found that Mahn acted in bad

faith; and the mitigation defense does not affect the determination of dischargeability.  *In re*

*Maldonado*, 228 B.R. 735, 740 (B.A.P. 9th Cir. 1999) ("While mitigation of damages impacts

the amount of the claim, it does not affect the determination of dischargeability.").

### D. The Award of Attorney's Fees For Breach of Contract Is Dischargeable

The one point on which Mahn succeeds is her argument that the attorneys' fees awarded

to MLA by the arbitrator *are* dischargeable.  The arbitrator awarded MLA attorneys' fees and

costs "given the controlling language found in the Employment Agreement that provides, in sum

and substance, that the prevailing party may be entitled to such fees and costs."  (Final Award at

12.)  She did *not* award attorneys' fees pursuant to New York law on unfair competition, breach

of fiduciary duty, breach of contract, or misappropriation of trade secrets.  *Compare Cohen v. de*

*la Cruz*, 523 U.S. 213, 219–20 (1998) (finding attorneys' fees to be nondischargeable when

award of attorney fees was available under statute, violation of which was found to result in a

nondischargeable debt).  Because the attorneys' fees were awarded on a contractual basis, they

are dischargeable.  *See Glenn v. Hrim (In re Hrim)*, 196 B.R. 237, 243 (Bankr. N.D.N.Y. 1993)

(holding that damages arising from "a simple breach of contract" are dischargeable).  The

attorneys' fees and litigation costs (and any interest accrued thereon) are the only portion of the

state court judgment (arising from the arbitral award) which is dischargeable.

36

## IV.    <u>CONCLUSION</u>

The Court finds in favor of MLA's motion for summary judgment and denies Mahn's

motion.  The parties are **ORDERED** to recalculate the total nondischargeable amount Mahn

owes to MLA in light of the above opinion (including the post-judgment interest).  They shall

submit the new calculation to the Court within fourteen (14) days from the date of this Opinion.

**IT IS SO ORDERED.**

Dated:    August 18, 2025
          New York, New York

*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge