1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-11466-mg

4   Adv. Case No. 24-02822-mg

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   SHARON MAHN,

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  MAJOR, LINDSEY & AFRICA, LLC,

13                  Plaintiff,

14          v.

15  MAHN,

16                  Defendant.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19                  United States Bankruptcy Court

20                  One Bowling Green

21                  New York, NY 10004-1408

22

23                  Monday, August 11, 2025

24                  9:01 AM

25

1  B E F O R E :

2  HON MARTIN GLENN

3  U.S. BANKRUPTCY JUDGE

4

5  ECRO: KS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   HEARING re Adversary proceeding: 24-02822-mg MAJOR, LINDSEY

2   & AFRICA, LLC v. Mahn IN COURTROOM EVIDENTIARY HEARING re:

3   Motion for Summary Judgment filed by Brian Moriarty on

4   behalf of Sharon Mahn (Doc ## 47 to 49, 54, 55, 58)

5

6   HEARING re Adversary proceeding: 24-02822-mg MAJOR, LINDSEY

7   & AFRICA, LLC v. Mahn IN COURTROOM EVIDENTIARY HEARING re:

8   Motion for Summary Judgment filed by Elizabeth L. Janczak on

9   behalf of MAJOR, LINDSEY & AFRICA, LLC (Doc## 44, 45, 46,

10   56, 57, 59)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    HAMILTON BROOK SMITH & REYNOLDS, PC

4         Attorney for Debtor / Defendant

5         129 Greenwood Avenue

6         Madison, NJ 07940

7

8    BY:  BRIAN THOMAS MORIARTY

9

10   SMITH, GAMBRELL & RUSSELL, LLP

11        Attorneys for Major Lindsay & Africa LLC

12        311 South Wacker Drive, Suite 3000

13        Chicago, IL 60606

14

15   BY:  ELIZABETH L. JANCZAK

16        DAVID JAMES DOYLE

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  All right.  Good

4     morning, everyone.  We're here in the adversary proceeding,

5     Major, Lindsey & Africa LLC v. Mahn, for the summary

6     judgment motions.

7              MR. MORIARTY:  Your Honor, could I shut this door?

8     Would that be possible?

9              THE COURT:  Yeah.  Is anybody else coming in?

10             MR. MORIARTY:  No.  Just the echo makes it hard to

11    hear.

12             THE COURT:  Yeah, go ahead.  That's fine.

13             MR. MORIARTY:  Thank you.

14             THE COURT:  So it's Adversary Proceeding Number

15    24-02822.  Let's begin with the Major Lindsey motion for

16    summary judgment.

17             MS. JANCZAK:  Thank you, Your Honor.  Elizabeth

18    Janczak and David Doyle, on behalf of plaintiff, Major,

19    Lindsey & Africa.  Are we just putting our appearances in

20    for now or --

21             THE COURT:  I'm sorry?  Keep your voice up so I

22    can --

23             MS. JANCZAK:  Sure.  Are we just putting our

24    appearances in for now or --

25             THE COURT:  No, go ahead.  Go ahead and argue.

1      MS. JANCZAK:  Okay, great.  Your Honor, we are

2  here on MLA's motion for summary judgment on both counts of

3  its nondischargeability complaints under 11 USC 523(a)(4),

4  asserting a claim for embezzlement, and 1123 -- I'm sorry,

5  11 USC 523(a)(6), willful or malicious injury.  In October

6  2005, MLA hired Sharon Mahn --

7      MR. MORIARTY:  May I present (indiscernible) the

8  court, Your Honor, this is Sharon Mahn.

9      THE COURT:  Okay.  Good morning.

10      MS. MAHN:  Good morning.

11      THE COURT:  You can sit up with counsel.

12      Please, go ahead.

13      MS. JANCZAK:  Thank you, Your Honor.  In October

14  2005, MLA hired Ms. Mahn as a legal recruiter in the partner

15  practice group of its New York office.  Within weeks of

16  hiring Ms. Mahn, she began funneling MLA's confidential

17  candidate information to competitors of MLA who were also

18  Ms. Mahn's friends.  This information consisted not just of

19  candidate names, but information that was gathered by MLA

20  recruiters tirelessly through their relationships with these

21  candidates over weeks, months and sometimes even years.  It

22  included their private information, such as their email

23  addresses, their personal phone numbers, information about

24  their family members, their books of business, the names of

25  their clients, their annual billable hours, all information

1    that's not public, that is only gathered through

2    conversations with that candidate.

3            Ms. Mahn funneled that information to competitors

4    for the express purpose of those competitors placing those

5    candidates instead, and Ms. Mahn sharing part of the

6    placement fee if those candidates were, in fact, placed by a

7    competitor.

8            MLA didn't discover this betrayal for four years.

9    So this went on for four years.  Ms. Mahn initially denied

10   having done this when confronted, but eventually it came out

11   that she had in fact done this, that it involved

12   specifically partner candidates of her fellow MLA

13   recruiters.  But the full scope of her faithlessness took

14   months to discover.  This eventually went to arbitration.

15   There was a -- it took four years to come to a conclusion.

16           You look like you have a question, Your Honor.

17           THE COURT:  Yeah.  I did.  You know, I've been on

18   the bench for almost 19 years, and I used to do -- you know,

19   I was a commercial litigator before and I did both

20   litigation and arbitration, and the four years was

21   extraordinary even by standards of how long it takes to

22   resolve things.

23           MS. JANCZAK:  I agree with you, Your Honor.  As

24   you know, the arbitrator noted in her final award how

25   extraordinary that was as well.

1                    THE COURT:  Single arbitrator?

2                    MS. JANCZAK:  Single arbitrator.  And although the

3      arbitration hearing itself occurred approximately two years

4      after the arbitration was commenced, but then there was

5      another two-year period before it finally reached a

6      conclusion.

7                    THE COURT:  Well, so how long before -- because

8      there was an initial partial award?

9                    MS. JANCZAK:  Sure.

10                   THE COURT:  How long was that?

11                   MS. JANCZAK:  I believe that was issued --

12                   THE COURT:  Did you handle the arbitration?

13                   MS. JANCZAK:  I did not, Your Honor.  I believe it

14     was issued in either 2012 or 2013.  I don't have it in front

15     of me.

16                   THE COURT:  Okay.

17                   MS. JANCZAK:  But the final award was issued in

18     2014, and that was based on a four-day-long arbitration

19     hearing where seven witnesses testified, hundreds of

20     exhibits were entered into evidence, and after voluminous

21     post-hearing briefing by both sides, which were dozens of

22     pages each, and the arbitrator found Ms. Mahn's conduct so

23     appalling and disloyal that the arbitrator ordered that as a

24     remedy, she had to disgorge every penny that she had ever

25     made at MLA, as well as the hundreds of thousands of dollars

1     of kickbacks that she had been paid by the competitors as

2     part of --

3              THE COURT:  He applied the faithless servant

4     doctrine, which is a New York state court doctrine

5     recognized by the Second Circuit and applied by the Second

6     Circuit as well; am I correct?  That was for whatever

7     compensation she had received in the time she was employed

8     by MLA.

9              MS. JANCZAK:  Among other things.  The faithless

10    servant doctrine was one of the claims on which MLA was

11    successful.  Unfair competition, breach of contract, breach

12    of duty of loyalty, those claims were also successful.  It's

13    just that the disgorgement was the specific remedy in

14    addition to an equitable accounting.

15             And to be clear, Your Honor, Ms. Mahn was not just

16    funneling candidate information to competitors and leaving

17    it at that.  As evidenced by the arbitration exhibits and

18    found by the arbitrator and shown in the emails that we

19    attached to our motion for summary judgment, Ms. Mahn

20    gleefully sabotaged MLA and her fellow competitors.

21             THE COURT:  Let me do this --

22             MS. JANCZAK:  Or, I'm sorry, her co-workers.

23             THE COURT:  I should have -- just so we're clear

24    on what the record will be, it included -- today's hearing

25    included sealing motions from both sides.  From Major

1    Lindsey, it's ECF 44, and for Ms. Mahn, it's ECF 47.

2           I won't -- and essentially, as I understand it,

3    everything was sealed during the arbitration.  I've

4    certainly commented in some of our preliminary hearings in

5    this matter that this court, as a long-standing principle,

6    does not believe in sealed trials, the evidence.  So the

7    unredacted documents don't find their way on ECF exhibits.

8    But nevertheless, with respect to the sealing motions under

9    Section 107(b) of the Bankruptcy Code, those motions are

10   denied.

11          In the court's view, the information is quite

12   stale at this point.  And I understand MLA's arguments that

13   its client's confidential information I reject with respect

14   to the exhibits regarding very old matters.  But with that

15   said, Section 107(c) of the Bankruptcy Code -- give me a

16   moment -- is a broader principle.  I won't quote it in its

17   entirety, but the 107(c)(10 provides that the bankruptcy

18   court, for cause, may protect an individual with respect to

19   the following types of information.  To the extent the court

20   finds that disclosure of such information would create undue

21   risk of identity theft or other unlawful injury to the

22   individual or the individual's property.

23          The motion is focused primarily on 107(b).  I

24   am -- certainly in any opinion I write, I will be mindful of

25   the importance of the arguments that have been made in

1    support of confidentiality.  I'm not going to rule today,

2    but I don't expect that I will be revealing information --

3    that I will specifically address information that either

4    party believes should be redacted, which I'm denying.

5            But under 107(c), I am going to grant the motion

6    to redact individual names.  And that would include names of

7    employees, other employees of Major, Lindsay & Africa or

8    candidates whose information was disclosed.

9            So I just -- I wanted to -- so that both of you

10   understand what the court's ruling is as you're going on

11   with your argument.

12           MR. MORIARTY:  Your Honor, may I comment?

13           THE COURT:  Briefly.  I don't allow

14   second-guessing of any decisions that I render.

15           MR. MORIARTY:  I certainly am not doing that, Your

16   Honor.  I'm just clarifying.  We only filed a motion when

17   they called (indiscernible) they said they were fearful of

18   confidential -- we did not assert that (indiscernible) was

19   confidential.  We just didn't want to upset the apple cart.

20           THE COURT:  And I understand that.

21           MR. MORIARTY:  Okay.

22           THE COURT:  And I do understand that.

23           MR. MORIARTY:  And so I understand, Your Honor, we

24   would be able to file these exhibits because some of them

25   will be filed on ECF.  But there'll be in redacted form?

1           THE COURT:  No, you can file them as long as I

2    have the unredacted documents.  Exhibits typically are not

3    filed on ECF.  The summary judgment motion is a little

4    different than evidence at trial.  I don't -- you have my

5    permission to file, if you file documents, to file the

6    redacted documents on ECF as long as I have the unredacted

7    documents.  But I reserve the right in any decision to refer

8    to the information that otherwise is unredacted.

9           MR. MORIARTY:  Your Honor, I'm very confident you

10   do have all the unredacted versions.

11          THE COURT:  Okay.

12          MS. JANCZAK:  So, Your Honor, just for clarity, in

13   terms of the motions to seal, and we weren't trying to seal

14   the documents in their entirety.  We (indiscernible) --

15          THE COURT:  And I know you redacted.  I think in a

16   prior conversation that we had at some point in this case,

17   I've indicated in a number of decisions it's rare that

18   documents are sealed in their entirety.  Redactions -- and I

19   understand that you've tried to comply with that.  I'm just

20   -- I'm reserving the right to be able -- and I want you both

21   to understand that I may, to the extent I conclude it's

22   important to my decision, which I'm not rendering today, to

23   be able to refer to unredacted information.

24          MS. JANCZAK:  Of course, Your Honor.  I'm just

25   wondering, for the sake of a clear docket, since technically

1    the documents that were partially redacted haven't been

2    filed as exhibits yet, since those motions are still

3    pending, will Your Honor --

4              THE COURT:  You can go ahead and file the redacted

5    documents.

6              MS. JANCZAK:  Okay.  File them as (indiscernible)

7    --

8              THE COURT:  Yeah, you can file them as redacted,

9    and I will just decide when I'm rendering a decision whether

10   I need to refer it to unredacted language.

11             MS. JANCZAK:  So then should we submit proposed

12   orders on those motions to seal (indiscernible) --

13             THE COURT:  No, I'm so ordering on the record.

14             MS. JANCZAK:  Okay.  Thank you, Your Honor.

15             THE COURT:  Okay, and I didn't mean to interrupt

16   you.  But I think, you know, to the extent that it's

17   relevant to what we're talking about today.

18             MS. JANCZAK:  No, Your Honor, that was on my list

19   to bring up today anyway, so I'm glad we were able to get

20   that one taken care of.

21             THE COURT:  Okay.  Go ahead.  Go ahead.

22             MS. JANCZAK:  So, Your Honor, back to the

23   arbitration and what the arbitrator found and what evidence

24   was entered and what evidence was submitted --

25             MR. MORIARTY:  Your Honor, I'm sorry to interrupt.

1   It's just a point of order --

2          THE COURT:  Could you not interrupt?

3          MR. MORIARTY:  But it's something that pertains to

4   right now.  The proffers of fact are simply proffers of

5   fact.  We don't need to object to them on an evidentiary

6   basis here because --

7          THE COURT:  Well, I'm considering, you know -- the

8   time to object -- you didn't file any written objections.

9          MR. MORIARTY:  We did to all (indiscernible)

10  undisputed facts.  We did object to all those.

11         MS. JANCZAK:  Your Honor, this is argument --

12         MR. MORIARTY:  But --

13         THE COURT:  Go ahead.  Sit down.

14         MR. MORIARTY:  Okay.

15         THE COURT:  You can make your argument.  Go ahead.

16         MS. JANCZAK:  To be clear, Your Honor, I am not

17  making a proffer today.  I don't have a witness here for

18  whom to make a proffer.

19         THE COURT:  We're not -- we're not -- yeah.  We

20  don't have any witnesses testifying.  I have a summary

21  judgment record.  Both sides have filed summary judgment

22  motions.

23         MS. JANCZAK:  Correct, Your Honor.  Again, based

24  on the arbitrator's findings, the evidence that was

25  presented to the arbitrator and the evidence that was

1    attached to our motion for summary judgment, you'll see that

2    Ms. Mahn was not just funneling this confidential candidate

3    information to competitors.  She was gleefully sabotaging

4    her MLA colleagues in MLA.

5            For example, MLA and its -- the MLA recruiters

6    were on their way to a conference in Dallas where they would

7    be busy attending conference activities.  And Ms. Mahn sent

8    an email to a competitor encouraging him to contact

9    candidates of MLA while the recruiters were at the

10   conference in Dallas because they wouldn't be able to reach

11   those candidates first.  That was the same conference where

12   Ms. Mahn was ironically receiving the MLA Team Player Award.

13           Ms. Mahn also sent an email to a competitor

14   encouraging him to contact the candidate while the MLA

15   recruiter with whom that candidate was working was in the

16   hospital, knowing that since he was in the hospital, he

17   couldn't be in contact with that client and the competitor

18   could reach the candidate first.  Ms. Mahn may offer some

19   excuses, some explanations for why she said and did the

20   things that she did.  But for one --

21           THE COURT:  Well, her deposition was rather

22   revealing.

23           MS. JANCZAK:  I will comment on that, Your Honor.

24           THE COURT:  Go ahead.

25           MS. JANCZAK:  But the time for explanations and

1    excuses for her actions was the arbitration.  And the

2    arbitrator found her explanations, first, not credible and

3    second, contrary to the evidence, as we are asking this

4    court to do.

5              Ms. Mahn knew what she was doing was wrong.  She

6    admitted that she knew she had fiduciary duties to MLA.  She

7    knew what she was doing was wrong because she attempted to

8    conceal it.  She used a personal email address instead of

9    her company email address.  She told competitors, friends to

10   whom she was sending this information not to email her on

11   her MLA email account.  And when confronted initially with

12   this evidence, she denied that she'd done it.  She claimed,

13   oh, it was a one-off.  It was just an associate candidate.

14   It was a partner candidate.  Eventually though, the evidence

15   came out and hundreds of emails.  She produced hundreds of

16   emails where she sent this information to competitors.

17             The undisputed evidence and clear and unequivocal

18   factual findings from the arbitrator demonstrate that this

19   is a textbook claim of both embezzlement as that is defined

20   under 523(a)(4), and vocal and malicious injury under

21   523(a)(6).  In terms of embezzlement, there's really only

22   two elements in dispute: whether it was property as defined

23   under New York law --

24             THE COURT:  And New York has -- you know, I'm not

25   issuing any ruling today, but New York law is pretty clear

1  that intangible property is property.

2        MS. JANCZAK:  I agree with you.

3        THE COURT:  There may be disputed issues, but

4  that's not one of them in my opinion.

5        MS. JANCZAK:  I tend to agree, Your Honor.  Well,

6  I don't agree that there's material -- genuine disputes of

7  material issues, but I agree on property.  But in terms of

8  the arguments that Ms. Mahn has raised, she disputes that it

9  was property, and she disputes that she had fraudulent

10  intent, or at least she disputes that there's sufficient

11  evidence at this point of fraudulent intent.  But there is,

12  on the elements of embezzlement --

13        THE COURT:  Take the issue of intent.  What is the

14  decision of the arbitrator that you believe bears on the

15  issue of intent?

16        MS. JANCZAK:  Sure.  That, Your Honor, was at

17  issue and necessarily decided in both the unfair competition

18  claim and the duty of loyalty claim.  For the unfair

19  competition claim, the definition or the text to meet for

20  unfair competition is the taking and use of an employer's

21  property to compete against that employer's use of the

22  property.  That's exactly what Ms. Mahn did here.

23        But if you look at the Bullock case, Supreme

24  Court, what's interesting is Bullock actually wasn't an

25  embezzlement case, but it was a defalcation and fiduciary

1    capacity case.  But it did sort of, as an aside, address,

2    you know, the fraudulent intent aspect of embezzlement.  And

3    that was defined as wrongful intent.

4            THE COURT:  Wrongful what?  I'm sorry.  Your voice

5    dropped.

6            MS. JANCZAK:  I'm sorry.  Wrongful purpose.

7            THE COURT:  Okay.

8            MS. JANCZAK:  What was interesting is there were a

9    couple of other examples that it cited of what wrongful

10   purpose means.  It's true, one of those examples was

11   felonious intent, such as, you know, if state prosecutor

12   brings a claim for embezzlement, brings -- because it's a

13   crime, felonious intent.

14           But one of the other examples that it cites, which

15   have recently was an article or a treatise by Wayne LaFave

16   was intent to deprive the owner of that property.  That's

17   fraudulent intent.  Intent to deprive the owner of the use

18   of that property.  That is the very definition of an unfair

19   competition claim.

20           So stated differently, we have an unfair

21   competition claim, which is the taking and use of another's

22   property to compete against that owner's same use.  And then

23   under Bullock and the other cases that we cited, fraudulent

24   intent is the taking and use of another's property with a

25   wrongful purpose or with intent to deprive that owner of the

1    use of the property.  That's exactly what happened here.

2    That's exactly what the arbitrator found.

3           And if you look at the partial final award at Page

4    15, this is a quote, the arbitrator found that "MLA's unfair

5    competition claim is based not only on Mahn's theft but her

6    efforts to drive MLAs' candidates away to competitors and

7    otherwise harm MLA."  The arbitrator further found that Ms.

8    Mahn misappropriated MLAs property and aided the competitors

9    in placing candidates instead of MLA.  Specifically, that

10   theft and efforts to drive candidates to competitors meets

11   the very definition of intent to steal or deprive MLA of its

12   property.  So that was at issue in the arbitration.  It was

13   found by the arbitrator to have occurred.  The definition

14   that we're looking here, intent to deprive of property,

15   which is the fraudulent intent standard, that's fact.  That

16   is exactly what the arbitrator found occurred here.

17          As to duty of loyalty, the standard that the

18   arbitrator considered is the failure to exercise good faith.

19   The example in the partial final award that the arbitrator

20   cited is one taking for himself a commission on the side

21   which might have gone to the employer and that's the Lamdin

22   v. Broadway Surface case.  Again, that standard that the

23   arbitrator cited and considered and found to have happened

24   meets the very definition of intent to steal under Bullock

25   and under the other case law.

1          With respect to the duty of loyalty claim, the

2     arbitrator made specific findings that Ms. Mahn openly and

3     surreptitiously encouraged competitors to place MLA

4     candidates before MLA could do so, that she diverted

5     business away from MLA with respect to at least six

6     candidates for which she received kickbacks of I think it

7     was approximately $236,000.

8          The arbitrator found that Ms. Mahn was stealing

9     MLA's property while secretly divulging it to competitors

10    who were friends of hers in exchange for those kickbacks and

11    specifically that Ms. Mahn took care to ensure she was not

12    discovered.  She covered her tracks.  She denied it when

13    confronted.  These are all facts that were presented to the

14    arbitrator and found to have occurred by the arbitrator.

15    These were necessary to finding that Ms. Mahn did not act in

16    good faith and breached her duty of loyalty to MLA.  Again,

17    the Lamdin case on which the arbitrator cited and relied

18    fits the very definition of intent to steal.

19          What's interesting is in Ms. Mahn's response to

20    MLA's motion for summary judgment, she addresses only the

21    misappropriation of trade secrets claim as the basis for

22    collateral estoppel.  But that's not what we argue.  We

23    aren't relying on a misappropriation of trade secrets for

24    this element to establish collateral estoppel.  We relied on

25    unfair competition and we relied on duty of loyalty.  That

1    Ms. Mahn didn't address those arguments or those issues

2    results in abandonment.  Those arguments have been

3    abandoned.  So it's only for this court then to decide --

4              THE COURT:  Just so I'm clear, you say which

5    argument is abandoned?

6              MS. JANCZAK:  The dispute as to unfair competition

7    and duty of loyalty serving as the basis for collateral

8    estoppel for the fraudulent intent element.

9              THE COURT:  Okay.

10             MS. JANCZAK:  Then Your Honor, with respect to the

11   merits of the fraudulent intent element, there is undisputed

12   or certainly not subject to (indiscernible) --

13             THE COURT:  Well, what I care about is what the

14   arbitrator found because this is a motion for summary

15   judgment based on the arbitrator's determinations.

16             MS. JANCZAK:  Your Honor, it's a motion for

17   summary judgment based on the arbitrator's determinations,

18   but it's also based on the undisputed evidence.

19             THE COURT:  Okay.

20             MS. JANCZAK:  And we made that clear in our

21   motion.  We separated them into different paragraphs.  This

22   is the collateral estoppel basis and these are the

23   undisputed facts which further establish that.

24             THE COURT:  Okay.

25             MS. JANCZAK:  The best evidence of Ms. Mahn's

1   intent are her contemporaneous statements to the competitors

2   themselves because, remember, this was anywhere from 15 to

3   20 years ago at this point.  What's the best evidence of

4   what she intended to do?  What she said.  What she said in

5   those emails to the competitors.

6           THE COURT:  Were any of the competitors called as

7   witnesses during the arbitration?

8           MS. JANCZAK:  None of them testified at the

9   arbitration hearing.  I believe one of them was deposed, but

10  I think maybe some of his transcript was designated for the

11  -- you know, for the hearing exhibits.  But I don't think

12  either party, either Ms. Mahn or MLA, really cited to it or

13  relied on it for anything.

14          THE COURT:  Okay.

15          MS. JANCZAK:  So, Your Honor, I'm just going to

16  read you a few examples.

17          THE COURT:  Go ahead.

18          MS. JANCZAK:  This is -- Ms. Mahn has stipulated

19  to the authenticity and admissibility of these emails.  She

20  sent them.  She doesn't deny that she sent them.  She

21  doesn't deny that she made these statements.  She might deny

22  or claim that they're out of context or, you know, that

23  they're a mischaracterization.  These are quotes.  These are

24  direct quotes of what she said:

25          "Carlo," that's one of the competitors.  "I have

1          so many leads for you.  I don't know if I can keep up.

2          I will keep you extremely busy for the next month!!

3          :)."

4               Ms. Mahn also encouraged competitors to contact

5     MLA recruits, contact candidates, like I said, while the

6     recruiters work away at a conference:

7          "Good scoop for candidate though, right?  And no

8          one can call you from MLA because we're all going to

9          Dallas tomorrow! :)".

10              And again, that's the same conference where she

11    received the Team Player award.  Another quote:

12         "He said he wanted to meet with MLA.  Just don't

13         mention me.  We're smooth operations on the fly."

14              Later, in that same email:

15         "Just don't mention my name.  I love you, but I

16         don't want to get thrown out of my firm as a turncoat.

17         Haha.  :)".

18              Again, Your Honor, Ms. Mahn may -- if you look at

19    the response to the statement of undisputed facts that we

20    submitted to Ms. Mahn's response, there is no evidence cited

21    to dispute these facts, the fact of these emails being sent.

22    She may cite to her deposition transcript and say, well,

23    there's some context there.  You have to understand I was

24    upset with MLA, or I was generally upset at things that were

25    going on in my life.  But that's not an excuse for what she

1  did.  It's not even an explanation for what she did.  These

2  emails, on their own, just taking exactly what she said to

3  these competitors, paint the unmistakable picture of her

4  intent to steal from MLA.  That's the standard on fraudulent

5  intent.

6         These facts are similar and even, in many ways,

7  worse than those that were at issue in the Armstrong case.

8  That's 498 B.R. 229.  That case affirmed summary judgment in

9  favor of the plaintiff creditor where a fire had destroyed

10  the debtor's property.  It was actually the debtor's

11  company's property.  That property was subject to a

12  mortgage.   The creditor plaintiff in that case was the

13  mortgage lender.  And despite requirements in the loan

14  documents, the debtor never disclosed the fire to the

15  lender, didn't disclose the insurance claim or receipt of

16  insurance proceeds to the lender, deposited proceeds without

17  the lender's approval, spent those proceeds for personal

18  use, never actually made repairs to the property that would

19  result in the fire.  And the court in that case acknowledged

20  that intent can be difficult to rule on, on summary

21  judgment, but it is appropriate where the evidence paints an

22  unmistakable picture of the fraudulent intent element.

23         And here we have Ms. Mahn's own emails that paint

24  that unmistakable picture.  She funneled the information to

25  competitors who were friends of hers.  So (indiscernible)

1  encouraged those competitors to place those candidates first

2  before MLA could do so.  And she did that in exchange for

3  sharing part of the fee when those placements were made.

4  That fee --

5           THE COURT:  What was your proof that she shared

6  part of the commission?

7           MS. JANCZAK:  Oh, she admitted to that, and

8  there's a stipulation in the arbitration.  I believe she

9  also admitted to that in the deposition itself, on those six

10 candidates that we talked about, the $236,000.  There was a

11 stipulation prior to the arbitration hearing where she said,

12 yes, I received these payments on account of these

13 candidates.  And that was admitted to in the deposition as

14 well.

15          So again, Ms. Mahn doesn't deny sending a single

16 one of these emails.  She stipulated to their authenticity

17 and admissibility.  She just disputes them in the response

18 to the statement of facts as incomplete, not material or

19 vague.  I can't imagine a world where these statements

20 aren't material.  That's why we're here.  She also seeks to

21 downplay her own statements as sassy or is venting to

22 friends of hers.  Venting, I imagine, Your Honor, would be

23 to send an email to a competitor, a friend of hers, saying,

24 hey, I'm upset at my competitor.  I'm upset with MLA.

25          THE COURT:  Had she worked as a recruiter before

1    she was hired by Major, Lindsey?

2             MS. JANCZAK:  I believe that she did.  She was at,

3    I think it was called Cromwell, and I think that was for a

4    year prior to working at MLA.  Roughly a year, maybe two.

5    So there' -- you know, this wasn't her first time at a

6    recruiting firm.

7             But to describe these emails as venting to a

8    friend, venting to a friend is, I'm upset with my co-worker.

9    Let's meet for drinks afterwards, or I'm upset with my

10   co-workers or my employer, I'm thinking of quitting.  Not

11   I'm upset with my co-worker.  Let's place all his candidates

12   where he can and make a ton of money.  That's what she said

13   in these emails.  That's exactly what she said.

14            So again, Your Honor, on the fraudulent intent

15   issue, the standard is whether her intent was to take MLAs

16   property and deprive MLA of it.  That's it.  That's what the

17   arbitrator found.  That's what the undisputed evidence

18   shows.  There's not a single shred of evidence that she

19   presents in the response to the motion or in her own motion

20   that disputes this.

21            For that reason, Your Honor, we're asking for

22   summary judgment on Fount 1, which is the 523(a)(4)

23   embezzlement claim.

24            Count 2 is willful and malicious injury.  Again,

25   Your Honor, we believe that we are entitled to judgment on

1    the basis of collateral estoppel based on the arbitrator's

2    factual findings.  And further, again, as to the undisputed

3    evidence, as presented in our motion for summary judgment,

4    the standard for willful is deliberate and intentional

5    wrongdoing.  Now, that doesn't have to be an intentional --

6    it's not an intentional act.  It's an intentional and act

7    which is intended to harm.  That's what the Supreme Court

8    has said, or substantially (indiscernible).

9         Again, Your Honor, on the basis of collateral

10   estoppel, we submit that that element, that willful element,

11   was determined in connection with the unfair competition

12   claim.  That's the bad faith misappropriation for commercial

13   advantage.  But necessarily, the standard is whether Ms.

14   Mahn acted out of a dishonest purpose.  It's also an

15   intentional tort.  Under New York law, unfair competition is

16   an intentional tort.  The arbitrator's factual findings

17   support that determination.

18        THE COURT:  Which factual finding?

19        MS. JANCZAK:  The arbitrator expressly found that

20   the unfair competition claim was, quote -- well, the quote

21   doesn't start here yet, but based on "Mahn's efforts to

22   drive MLAs' candidates away to competitors and otherwise

23   harm MLA."

24        THE COURT:  And the citation for that?

25        MS. JANCZAK:  I believe that's Page 15.  Page 15,

1    the arbitrator also found --

2              THE COURT:  Is this the partial or the final?

3              MS. JANCZAK:  Partial.  Nearly all of it -- the

4    final award itself doesn't really rehash the actual findings

5    of the partial final award.  It provides some procedural

6    background and context and ultimately rules on the equitable

7    accounting issue.

8              But the arbitrator, again, in connection with that

9    same unfair competition claim, found that Ms. Mahn knew that

10   her actions were wrong.  Express finding of the arbitrator.

11   Ms. Mahn knew what she was doing wrong and that she took

12   steps to avoid detection.  The arbitrator found that she

13   would change her password on her account regularly to

14   maintain some level of confidentiality or secrecy, I

15   suppose, that Ms. Mahn encouraged those competitors to place

16   candidates before MLA and specifically that she made efforts

17   to facilitate those competitors' efforts to make a placemen.

18             Based on that, Your Honor, willfulness, which is

19   the intent to harm or substantially certain to harm, that is

20   clearly what the arbitrator found, that Ms. Mahn, in the

21   unfair competition claim, specifically took action intended

22   to harm MLA.

23             The evidence that we've submitted supports that

24   same thing.  Again, intent to injure.  Ms. Mahn's own

25   statements in her emails, irrefutable, show that that was

1   her exact intent.  Let's place these candidates before MLA

2   can.  Let's just use this platform and make a ton of money

3   off of it.  What does that mean?  What does that mean?

4   Let's just use it and make a ton of money off it.  Use it

5   means the hundreds, thousands of candidate names, candidate

6   relationships that MLA have developed, that the MLA

7   recruiters have spent their efforts, their time to develop

8   and earn the trust of these candidates, only for Ms. Mahn to

9   then send all that information to competitors to try to

10  undercut MLA, to get there first, undercut her colleagues,

11  and then to share in part of the proceeds, and certainly not

12  share those proceeds with MLA or her colleagues.

13          As to the malicious element, Your Honor, again, we

14  believe that collateral estoppel is also appropriate based

15  on the unfair competition claim and based on the duty of

16  loyalty claim.  Again, the unfair competition claim is the

17  bad faith misappropriation, commercial advantage acted out

18  of a dishonest purpose.  Compare that to the malice

19  standard, the knowing exploitation of an employer's

20  assets --

21          THE COURT:  Do you cite any case law in which a

22  discharge was denied because of unfair competition?

23          MS. JANCZAK:  I do.  Thank you for asking.  In re

24  Markland, 2023 WL 63067886 is an unfair competition.  I

25  think there was another one, but I'll have to find it.

1    There are certainly other ones.  There were other cases

2    where (a)(6) was found to have met the standard for breach

3    of duty of loyalty and breach of fiduciary duty.  I believe

4    that was in the Wisell case.

5            In the Wisell case, the court considered whether

6    the creditor was entitled to summary judgment on a

7    nondischargeability basis based on the preclusive effect of

8    the state court's judgment for claims such as breach of

9    fiduciary duty, breach of contract.  And while the court

10   denied it on the embezzlement claim, they did grant it on

11   summary judgment on the 523(a)(6) claim,, finding that as a

12   matter of collateral estoppel principles, the findings

13   showed that the debtor intentionally took advantage of his

14   position as president of the creditor by misusing funds and

15   assets to his own personal advantage and that he knew or

16   should have known he was failing to carry out his duties and

17   that he knew his behavior would be injurious to his

18   employer.

19           It's the Wisell case.  It's 494 B.R. 23 out of the

20   Bankruptcy Court for the Eastern District of Illinois -- or

21   I'm sorry, not Illinois, that's where I'm from.  Eastern

22   District of New York 2011.  So again, Your Honor, the

23   standard, when you're looking at unfair competition versus

24   the standard, you know, one of the many standards where

25   malice is found, the standard is essentially the same.

1           THE COURT:  So the Wisell case, the Eastern

2     District case, the court, in addressing collateral estoppel

3     and only collateral estoppel, the court "must be able to

4     identify clear and specific findings which correlate to and

5     are decisive as to the elements to be proven."

6           MS. JANCZAK:  Correct.

7           THE COURT:  And what were the findings of the

8     arbitrator that identified clear -- which are clear and

9     specific findings which correlate to and are decisive of the

10    elements to be proven?

11          MS. JANCZAK:  Those findings, Your Honor, for the

12    523(a)(6) claim starts on Page 41 of the opinion, carries

13    through to 42 and 43.  And again, one of the standards that

14    the court cites here for malice is when anyone of reasonable

15    intelligence knows that the act in question is contrary to

16    commonly accepted duties in ordinary relationships among

17    people and injurious to another.  That sounds a whole lot

18    like a breach of fiduciary duty, breach of duty of loyalty.

19    In fact, that's what the court found here.

20          The bankruptcy court here said the debtor

21    exhibited malice under the standard applied within this

22    circuit.  While the debtor did not exhibit actual malice,

23    his behavior implies malice given the circumstances.  The

24    debtor intentionally took advantage of his position as

25    president of the company by misusing funds and assets of the

1    company to his own personal advantage.  The debtor knew or

2    should have known that he was failing to uphold his duties

3    as president and joint venturer in the company and that his

4    behavior would be injurious to the plan.

5           And again, Your Honor, the underlying claim there,

6    or claims were breach of fiduciary duty, breach of contract

7    and violations of New York general business (indiscernible).

8           THE COURT:  Well, breach of contract doesn't

9    support --

10          MS. JANCZAK:  It doesn't --

11          THE COURT:  -- denial of discharge.

12          MS. JANCZAK:  Just describing the various claims

13   upon which they succeeded.  But that collateral estoppel

14   basis primarily found on that breach of fiduciary committee,

15   which again is what we have here, when anyone of reasonable

16   intelligence would know that their actions are contrary to

17   ordinary -- commonly accepted duties in the ordinary

18   relationships among people.

19          Again, the arbitrator found that Ms. Mahn

20   acknowledged she had a fiduciary duty.  The arbitrator found

21   that.  The arbitrator found that knowing she had that

22   fiduciary duty, she violated it anyway.  That directly meets

23   the standard for malice here.  And again, unfair

24   competition, same thing.  Bad faith misappropriation of a

25   commercial advantage.  That's the standard for unfair

1   competition.  Malice has been found to exist for the knowing

2   exploitation of an employer's assets for his own benefit.

3   Again, that's exactly what the arbitrator found here.  The

4   arbitrator found that Ms. Mahn knowingly divulged MLA's

5   candidate client information in exchange for financial

6   kickbacks, purposely drove those candidates away and that

7   her conduct "would shock the conscience of any reasonable

8   person."  That's the standard we're talking about here, Your

9   Honor.

10          With the duty of loyalty, again, going back to

11  specifically the arbitrator's findings, factual findings,

12  again, that Ms. Mahn acknowledged her fiduciary duty to MLA.

13  The arbitrator found that she clearly understood that duty

14  and that she breached it by sending dozens of emails to

15  MLA's competitors that were "shocking in their scope,

16  duration and tone," that she secretly divulged confidential

17  information to competitors in exchange for the kickbacks.

18          THE COURT:  Did anyone file a disciplinary

19  complaint with the state bar?

20          MS. JANCZAK:  Did MLA?

21          THE COURT:  Yes.

22          MS. JANCZAK:  I'm not aware, Your Honor.

23          MR. MORIARTY:  Your Honor, I couldn't hear what

24  you said.  I'm sorry.

25          THE COURT:  I asked if MLA had filed a

1    disciplinary complaint with the state bar.

2         MR. MORIARTY:  Okay.  Thank you.  I appreciate it.

3         MS. JANCZAK:  And again, Your Honor, with respect

4    to the factual findings of support that breach of fiduciary

5    duty claim, that Ms. Mahn took actions to divert business

6    away from her employer, the arbitrator cited numerous emails

7    in support of those findings, emails in which Ms. Mahn

8    encouraged competitors to "out candidates," an email in

9    which she was excited about the opportunity to "screw over

10   one of her jerky colleagues".  Again, these facts are

11   similar to the Wisell case.  The debtor intentionally took

12   advantage of his position as president by misusing funds and

13   knew, or should have known --

14        THE COURT:  Just a little slower.

15        MS. JANCZAK:  In that case, Your Honor, I've

16   already read this part in, but in that case, the court found

17   the debtor intentionally took advantage of his position as

18   president by misusing funds and assets of the company to his

19   personal advantage, that he knew or should have known he was

20   failing to uphold those duties and that his behavior would

21   be injurious to the plaintiff.

22        In terms of Ms. Mahn's arguments, counterarguments

23   on this, they seem to rely primarily on the fact that

24   punitive damages ultimately were not --

25        THE COURT:  That's a loser.  You know, I'm not

1    ruling other than I reject the argument that the failure of

2    the arbitrator to award punitive damages is determinative of

3    anything.  I think you've adequately covered that in the

4    briefing.

5              MS. JANCZAK:  Thank you, Your Honor.

6              MR. MORIARTY:  Your Honor --

7              THE COURT:  Sit down.

8              MR. MORIARTY:  Okay.

9              MS. JANCZAK:  In addressing the collateral

10   estoppel effect of the unfair competition claim, Ms. Mahn

11   cites only the arbitrator's ultimate conclusion, the summary

12   sentence that says for the following -- I don't remember

13   exactly what it says, but something to the effect of for the

14   following reasons, you know, MLA succeeds on its unfair

15   competition claim.  That's a legal conclusion.  It's a

16   summary sentence.  It's not the factual findings on which

17   that finding was based.

18              Ms. Mahn also seems to rely on the fact that the

19   specific words willful and malicious don't appear in the

20   unfair competition claim means we can't succeed on a

21   collateral estoppel basis.  That's clearly not the standard,

22   Your Honor.  We cited half a dozen cases saying that the

23   standard is the conduct.  The standard is whether the same

24   factual findings that support the underpinnings of

25   conclusion are what's required to be found here.

1            And as you noted, Your Honor, I think it was the

2    Markland case, judgment based on unfair competition, a claim

3    based on unfair competition, judgment granted in favor of

4    the plaintiff.

5            Ms. Mahn also doesn't address any of the arguments

6    of collateral estoppel effect on the duty of loyalty.

7    Again, those counterarguments are abandoned at this point.

8            Finally, Your Honor, I know I've been up here for

9    a while, so I've probably repeated myself more than I would

10   have liked to, but I'd like to finish this up with the

11   merits of the malicious claim.  The indisputable evidence,

12   and if this were to go to trial, it's the same evidence you

13   would hear.  We're just trying to avoid spending a bunch of

14   time and money and the court's efforts on an unnecessary

15   trial for something that's already been litigated in the

16   course of four years.  The indisputable evidence shows that

17   Ms. Mahn --

18            THE COURT:  How many days, actual days of

19   arbitration were there?

20            MS. JANCZAK:  Four.  Four days of the arbitration

21   hearing.  Ms. Mahn established a four-year practice.  Four

22   years of funneling confidential candidate and client

23   information from MLA's candidate database to competitors in

24   exchange for that fee.  She didn't stop until she was caught

25   in November 2009.  That's because she took steps to avoid

1    getting caught using her personal email address, telling

2    competitors not to use a work email, telling competitors not

3    to mention her name when contacting candidates.  Concealment

4    of conversion.  I know there's been a lot of briefing about,

5    well, conversion isn't embezzlement, conversion isn't

6    malice.  But concealment of conversion is enough for malice.

7    We've cited that in our brief as well.

8              Sometimes, Your Honor, the cover-up is worse than

9    the crime.  I don't know if I would say that here because

10   I'm not saying this is -- tat's just a phrase.  I'm not

11   accusing Ms. Mahn of a crime.  I don't know if I would say

12   the cover-up here is worse than the actions because the

13   actions were pretty egregious.  But the cover-up was pretty

14   bad too.

15             Despite the loathing that the emails show Ms. Mahn

16   directed at MLA and her colleagues shows exactly the kind of

17   malice that 523(a)(6) was directed to address.  I'm going to

18   quote some emails:

19             "He hasn't met Larry yet, but he wants to move and

20        call back Larry's cold caller.  Ask him to work with

21        you exclusively."

22             Later in that same email chain in all caps:

23             "CONTACT HIM NOW WHILE LARRY IS STILL IN THE

24        HOSPITAL!!!!"

25             She also emailed competitors saying she hated MLA

1    on multiple occasions.  One email:

2         "I HATE this place.  Let's just use it and make a

3         ton of money!!!!!"

4         Ms. Mahn also encouraged competitors to speak ill

5    of MLA recruiters to their candidates:

6         "Keep pushing.  Call on their cell.  Tell them

7         Jeff Liester is a scumbag.  He is."

8         The case law says that to find malice, there need

9    not be actual malice.  It can be applied.  I don't know that

10   we need to find applied malice here, Your Honor.  I think

11   the evidence quite clearly shows actual malice.  This is

12   behavior that cannot be justified on any level.  That's the

13   standard for malice.  Ms. Mahn has made no apologies for the

14   actions that she's taken to undercut her colleagues and

15   deprive MLA of the candidates that it had developed.

16        THE COURT:  Was MLA successful in recovering any

17   portion of the judgment?

18        MS. JANCZAK:  Not a penny.  Your Honor, in terms

19   of whether there's truly a factual dispute here on summary

20   judgment, the factual merits are addressed in Ms. Mahn's

21   brief in a very conclusory manner.  It's a single paragraph

22   of less than a page, a generalized dispute of MLAs and

23   proposed undisputed facts.  There's no discussion of

24   specific disputed facts, not a shred of evidence from which

25   a trier of fact could enter judgment in Ms. Mahn's favor.

1          I want to be clear about that.  That's the

2     standard for a genuine dispute on summary judgment.  The

3     standard for a genuine dispute is whether the non-moving

4     party has put forth evidence which would be admissible at

5     trial from which a trier of fact could find in Ms. Mahn's

6     favor.  I haven't seen it.

7          Ms. Mahn cannot avoid summary judgment with broad,

8     generalized denials.  She has to come forward with facts of

9     her own.  There's simply no dispute that she sent the email

10    as we talked about, that she received the kickbacks or that

11    she caused MLA harm, and the entirety of MLA's judgment

12    arises from that specific conduct.

13          Finally, Your Honor, I'll just very briefly

14    address the affirmative defenses issue.  MLA sought summary

15    judgment on Ms. Mahn's affirmative defenses.  Looking at the

16    response that we received, we do not -- we submit there's

17    been no sufficient showing any element of a single

18    affirmative defense.  In fact, the only affirmative defense

19    that she mentions in response is the unclean hands defense.

20    In her brief, she mistakenly puts the burden of proof on an

21    unclean hands defense on MLA.  That's not correct.  We

22    didn't get a reply, so I didn't have a chance to cite this

23    to you.  But In re Murphy, 331 B.R. 107 (Bankr. S.D.N.Y.

24    2005), "The party invoking the doctrine of unclean hands has

25    the burden of proof."  The Pledger case that Ms. Mahn cited

1   is not on point.  That was a completely different context.

2   There was a 523(a)(4) complaint, a breach of fiduciary duty

3   for misapplying trust funds under the Texas Construction

4   Trust Fund statute.  So that's general contractor receives

5   funds for the project, has a fiduciary duty to distribute

6   those funds to their subcontractors.  And the issue there is

7   within the Texas Construction Trust Fund statute, there are

8   exceptions to that.  So for example, an exception for the

9   fiduciary can use those trust funds to pay the trustee's

10  actual expenses.  So within the statute, there's the

11  exception that you don't have to deliver all of the funds.

12  You can pay your expenses first.  And that court, the

13  Pledger court, simply said, well, since it's an exception

14  within the Texas trust fund statute, you have the burden of

15  proof that that exception does not apply.  That's not the

16  same thing as an unclean hands affirmative defense.

17          Again, the only affirmative defense that Ms. Mahn

18  mentions is an unclean hands defense.  So any of the other

19  defenses we're entitled to summary judgment on as they

20  haven't been disputed in any way, and we're entitled to

21  summary judgment on a factual basis and on a res judicata

22  basis.  Ms. Mahn raised the unclean hands defense in the

23  arbitration.  She asserted counterclaims and she asserted

24  the unclean hands affirmative defense.  The arbitrator ruled

25  against her.  That's on Pages 21 and 22 of partial final

```
 1   award.  That defense is addressed.  And further, in terms of

 2   the merits, there's been no evidence of any such defense

 3   exists.

 4           THE COURT:  So let me bring you back to the

 5   faithless servant doctrine.

 6           MS. JANCZAK:  Sure.

 7           THE COURT:  What are the elements of a claim under

 8   that New York doctrine?  Because a substantial portion of

 9   the award related to the compensation she received in

10   working for MLA.

11           MS. JANCZAK:  So Page 25, Your Honor, for

12   disgorgement of compensation and commissions, damages for

13   breach of an employee's duty of loyalty include the

14   compensation and expenses that the plaintiff paid the

15   defendant during the period of the disloyalty, as well as

16   profits that the defendant obtained.  This is known as the

17   faithless doctrine --

18           THE COURT:  What page is that?

19           MS. JANCZAK:  This is Page 25 of the partial final

20   award.  And that allows an employer to recover his

21   consequential damages for disloyalty all compensation

22   including salaries and commissions.  And the arbitrator

23   stated:

24           "The evidence clearly proves that Mahn was

25       repeatedly disloyal throughout her four-year tenure at
```

1       MLA by repeatedly divulging to MLAs' competitors the

2       confidential information and trade secrets found in the

3       recruit database and enjoying the receipt of payments

4       from those competitors.  As noted by MLA, hardly a day

5       went by without her releasing confidential information

6       or otherwise assisting competitors in placing MLAs'

7       candidates.  As this case is a textbook example of the

8       reason for which New York courts developed the

9       faithless servant doctrine, Ms. Mahn must be ordered to

10      disgorge herself of all of the commissions and salary

11      MLA paid her."

12           THE COURT:  Okay.  I don't have any other

13  questions.

14           MS. JANCZAK:  I've been up here long enough, Your

15  Honor.

16           THE COURT:  Okay.

17           MS. JANCZAK:  I think the briefs adequately state

18  our position.  I hope I've answered any questions that you

19  have, and you'll certainly let me know if you have any

20  others.  Thank you.

21           THE COURT:  We'll see if I have some more

22  questions.

23           Go ahead.  You need to learn not to interrupt

24  opposing counsel when they're arguing.

25           MR. MORIARTY:  My apologies, Your Honor.  I'm

1    aware of your practice now, and I won't do that again.  Some

2    courts allow you to clarify, and you don't, and I know that

3    now.  So my apologies for not following your procedures.

4            THE COURT:  I'm not alone in following that

5    practice.

6            MR. MORIARTY:  No, you're not.  You're not.  I

7    overstepped my bounds there.  I understand what you're

8    saying.

9            THE COURT:  Okay.  First, you have to put your

10   name into the record.

11           MR. MORIARTY:  Okay.  Brian Moriarty, Hamilton

12   Brooks Smith Reynolds.  I'm from Madison, New Jersey, and

13   those are my offices in Princeton.

14           Your Honor, I'm going to discuss the law.  This is

15   a court of law.  But I want to say, first of all, I want to

16   introduce my client, Sharon Mahn, on the record.  This is a

17   matter of great importance to Ms. Mahn.  It is her life and

18   --

19           THE COURT:  It may be, but without ruling, and

20   you've asserted certain defenses, but like the arbitrator, I

21   found her conduct shocking to the conscience.  That's

22   different than denying a discharge, which is the basis that

23   I will rule on.  Were there any disciplinary complaints to

24   the state bar?

25           MR. MORIARTY:  No, Your Honor, there weren't.

1    There was no criminal action brought.  There was nothing of

2    that sort of.  And, Your Honor, I would just -- I will

3    present an argument about the factual --

4            THE COURT:  You can, but I read those emails.

5    They're shocking to the conscience.

6            MR. MORIARTY:  Right, and they're also not

7    relevant, Your Honor.

8            THE COURT:  Nice try.

9            MR. MORIARTY:  Well, I mean, we're trying to make

10   an argument here that is based on the law, and I'll go

11   through that here.  You know, most of those emails were not

12   even part of the findings of the arbitrator.  You can't use

13   them anyway, and they're all designed to just malign Ms.

14   Mahn --

15           THE COURT:  Are you denying the authenticity of

16   the documents?

17           MR. MORIARTY:  Your Honor, we --

18           THE COURT:  Are you denying the authenticity of

19   her emails when she repeatedly recited her intent for doing

20   the various acts that she was doing?  Do you deny the

21   authenticity of the documents?

22           MR. MORIARTY:  Your Honor, we understand

23   (indiscernible) --

24           THE COURT:  Do you -- answer my question, do you

25   deny the authenticity of the documents?

1          MR. MORIARTY:  I'm not presently here denying it,

2   but it's a very broad question.  There's 100,000 emails

3   here, and you have talked about three or four of them.  So I

4   don't know which ones you're talking about, but --

5          THE COURT:  Okay.  Go ahead.

6          MR. MORIARTY:  There is a record.  So what I

7   really want to talk about is what the law requires here, not

8   what the maligning conduct that they put forth.  You know,

9   what they tend to do -- we have actually a counter statement

10  of facts.  They'll take one line from a deposition and say,

11  oh, Mahn, says it was all for herself.  But then you go to

12  the next line of the deposition, and she said, well, it also

13  brought back millions for my colleagues, and I got an award

14  because I helped everyone.  So almost everything they say,

15  it's almost like politicians, they take a sound bite.  They

16  malign Mahn.  She's a bad person.  She said evil.  These are

17  the emails she wrote when she was in her mid-30s, 20 years

18  ago.  Who of us, when we're in our mid-30s, got a high on

19  working at work maybe to said some things --

20         THE COURT:  Is there an exception to the rules on

21  discharge, an exception because she was young when she wrote

22  those emails?

23         MR. MORIARTY:  I'm trying to give you some

24  context.  These are 20 years ago.  She was younger.  She

25  does say she regrets saying them, over the top things that

1    young (indiscernible) --

2            THE COURT:  Did she disclose Major Lindsey

3    confidential information to friends of hers who were at

4    other search firms, yes or no?

5            MR. MORIARTY:  It was part of the strategy to

6    gather business.  That was very successful

7    (indiscernible) --

8            THE COURT:  Could you answer my question?

9            MR. MORIARTY:  Well, Your Honor, I'm not a witness

10   here --

11           THE COURT:  I would like a direct answer to my

12   question.

13           MR. MORIARTY:  I'm an advocate and I don't --

14           THE COURT:  No.  I don't care whether you're an

15   advocate or not.  But you are required to give a direct

16   answer to my questions.

17           MR. MORIARTY:  Can you tell me the question again?

18   I just -- she did say --

19           THE COURT:  If you do this again, you're going to

20   sit down.

21           MR. MORIARTY:  Okay.

22           THE COURT:  Do you understand?

23           MR. MORIARTY:  Yes, Your Honor.

24           THE COURT:  My question is, do you agree that she

25   sent emails to people at other search firms referring

1    contacts to them, yes or no?

2              MR. MORIARTY:  I've looked at what the record

3    says, and it appears that she has done that.

4              THE COURT:  Okay.

5              MR. MORIARTY:  I don't have personal knowledge of

6    it.

7              THE COURT:  Oh, well, I wouldn't expect you to

8    have personal knowledge from when she was, you know,

9    considerably younger.

10             MR. MORIARTY:  Exactly (indiscernible) --

11             THE COURT:  But you don't dispute that she

12   referred contacts to her friends at other firms?

13             MR. MORIARTY:  As part of a plan to generate

14   business that her bosses were aware of.  You'll see that the

15   arbitration award has said they gave her a second chance

16   because they knew about it and they wanted her to correct

17   things.  So it's right in the record that they knew about it

18   because they gave her a second chance.  It's not this

19   furtive activity that, you know, unfortunately, we're

20   getting one-sided, but I'm going to get to that in a minute.

21   What I'd like to say is we really have to return this

22   litigation to first principles, and that first principle

23   that all of us --

24             THE COURT:  The time to return it to first

25   principles was during the arbitration.

1          MR. MORIARTY:  Your Honor, if I could be allowed

2     to present my argument on this point.

3          THE COURT:  Go ahead.

4          MR. MORIARTY:  The first principle that we really

5     have to observe, which is not mentioned by anyone, is due

6     process.  And due process is the first thing you learn in

7     law school.

8          THE COURT:  Are you saying that the arbitrator

9     denied Ms. Mahn due process, yes or no?

10         MR. MORIARTY:  We're not making that argument.

11    Your Honor.

12         THE COURT:  I guess your answer is no to that,

13    isn't it?  You're not contending that the arbitrator denied

14    Ms. Mahn due process?

15         MR. MORIARTY:  What I'm saying --

16         THE COURT:  Correct, yes or no?

17         MR. MORIARTY:  We're not making that argument.

18         THE COURT:  Are you incapable of answering a

19    question yes or no?

20         MR. MORIARTY:  I am capable of answering you.  I'm

21    trying to the best of my ability.

22         THE COURT:  Answer my question, yes or no.

23         MR. MORIARTY:  We're not making that argument.  So

24    we're not making (indiscernible) --

25         THE COURT:  I have not heard a yes or a no.  Are

 1    you incapable of answering a question yes or no?

 2            MR. MORIARTY:  Okay.  Do we say that the

 3    arbitrator denied due process?

 4            THE COURT:  Yes.

 5            MR. MORIARTY:  No, and that's not the argument I'm

 6    making.  The argument --

 7            THE COURT:  Okay.  If you're going to stand there

 8    at the podium arguing in my court, you're going to answer

 9    when I ask a direct question.

10            MR. MORIARTY:  So the due process point is --

11            THE COURT:  Do you understand that?

12            MR. MORIARTY:  I understand that, Your Honor.

13            THE COURT:  We'll see whether you do or not.  I'm

14    telling you, I'm going to get you to sit down if you don't.

15            MR. MORIARTY:  Okay.  Well, I'm doing my best.

16    I'm trying to present for my client so she doesn't have a

17    debt of $5 million and the risk of her license.  And the

18    basic principle I'm trying to say is --

19            THE COURT:  What is she doing now?  What is her

20    employment now?

21            MR. MORIARTY:  She's a recruiter.  She's a very

22    successful recruiter.

23            THE COURT:  With whom?  Who does she work for?

24            MR. MORIARTY:  I think she works for her own

25    company.

1           THE COURT:  What is the name of her company?

2           MS. MAHN:  Mahn Consulting.

3           MR. MORIARTY:  Mahn Consulting.

4           THE COURT:  Go ahead.

5           MR. MORIARTY:  And she was a recruiter before MLA,

6  and she's very successful.  That's why they hired her.

7           THE COURT:  Go ahead.

8           MR. MORIARTY:  She's very (indiscernible).

9           THE COURT:  She was just disloyal from day one.

10          MR. MORIARTY:  We don't think that's accurate,

11  Your Honor.  We think management knew about it.  So due

12  process is notice and an opportunity to be heard.  In order

13  for there to be collateral estoppel or res judicata, which I

14  know doesn't apply strictly to this matter, MLA would have

15  to have had pleadings that said you engaged in embezzlement

16  or something like fraud.  You engaged in fraud.  They would

17  have to litigate the fraud claim.  And then they would have

18  to ask the judge for a judgment that sounded in fraud, and

19  the judge, the arbitrator, would have to rule in fraud.

20         So the first thing we have to think about is due

21  process here, and I'm going to talk about that in a couple

22  minutes.  Due process limits the ability of the arbitrator,

23  it limits the ability of this court and it limits the

24  ability of the award to be changed in nature.  But let's

25  talk about what is the award here.  What is the debt?  So in

1   this case, we did have a full trial.  It was fully

2   litigated.  We got a judgment, and that judgment was then

3   called an award.  That award was brought to a court of New

4   York state, and they confirmed the award and made it a

5   judgment.  So that debt that we're talking about is based on

6   original record.  That's in the partial final awards and the

7   final award.  There's a couple of other subsidiary awards

8   that I mentioned (indiscernible) that it's part of it.  But

9   that written record is the award.

10          And the Wisell case, which Your Honor cited

11   favorably in your last opinion and was discussed today,

12   really sets it out quite clearly.  Do you find findings in

13   that award that support the 523 findings?  Not that Ms. Mahn

14   sent some juvenile email at 2:00 in the morning for a

15   friend, but did the arbitrator -- we want to know what the

16   arbitrator did and what the arbitrator found.  We don't want

17   to know what we think of Ms. Mahn.  That's not the standard.

18   And so there's a case, Miner and Miner v. Mines, I think it

19   may be the same judge that wrote the Wisell case.  I'm sure

20   you know who he is.  I forget his name.  But a very sharp

21   guy.  He says the court must give full faith and credit to

22   the finding of liability and the amount and the judgment and

23   the conclusion of the arbitrator.

24          So what Your Honor is doing is not saying, let's

25   look at all the facts that maybe were in the record, maybe

1    were part of the record, maybe weren't, and let's see what

2    appropriate judgment would be.  No, what we're trying to

3    find out is what judgment did the arbitrator give?  And that

4    is an important issue.

5              This issue of due process, we cited this case,

6    Denson v. Trump, First Department 2020.  The scope of the

7    arbitration award is limited to what issues were presented

8    to the arbitrator.  So what our argument is, at least on the

9    embezzlement point, is that there was never notice of a

10   claim based in fraud that was litigated and there was never

11   judgment sought based on fraud by the court and the court --

12   I call it the court, I mean the arbitrator -- the court

13   arbitrator never issued an award that sounded in any aspect

14   of fraud.

15             So as a result, there can't be a judgment based in

16   fraud if it was never -- there was no notice given of the

17   claim.  And this is very important, Ms. Mahn was never given

18   the opportunity to defend the fraud claim because no claim

19   had ever been made.  There was no briefing on a fraud claim

20   that she could respond to, and the arbitrator found no

21   fraud.  So that's four strikes.  You didn't give notice, you

22   didn't litigate it, you didn't give her a chance to defend

23   and the arbitrator made no findings.

24             So based on that, for both the embezzlement and

25   the malicious prosecution, the malicious injury claim, it's

1    not malicious harm, by the way, it's malicious injury.  That

2    award cannot sound in those things.

3            Now, this debt that we're talking about, there's

4    something very, very interesting about it that makes it

5    actually very different.  I know there's case law that Your

6    Honor talked about or you implicitly were mentioning that

7    denying an award for maliciousness isn't the same as finding

8    there is no maliciousness.  Courts say that.  I'm sure

9    you'll know the case.  You probably wrote some of the cases.

10           But in this case, that's different because we have

11   this very important Section 8 of the final award.  And my

12   adversary here doesn't even mention that point.  It's a big

13   point that in our brief, and what Section 8 of the

14   arbitration award says is that any matter submitted to this

15   court that I, the arbitrator, decide, expressly decide, is

16   denied.

17           So here, for example, with the claim for malicious

18   prosecution or willfulness -- not malicious prosecution,

19   malicious injury, not only did the court reject it as the

20   basis for the award, it denied it outright because of

21   Section 8 of the arbitration.  As that says, if it's

22   submitted at any point in the arbitration, and I didn't rule

23   on it, it is denied.

24           So what we have here, Your Honor, is think of

25   three possibilities with every fact issue or every legal

1    issue you hear or hear today.  Issue one is the arbitrator

2    considered the argument and granted it, made finding.  Issue

3    two is the arbitrator saw that the issue was raised, didn't

4    decide, and therefore it's denied.  Or the third possibility

5    is nobody ever raised the issue.  Nobody ever argued the

6    issue, nobody ever discussed the issue.  So in all three

7    circumstances, the court, as court of law, can interpret the

8    judgment.  When looking at a trial, you can look at the

9    judgment and say, well, were there findings supporting

10   embezzlement?  Were there findings supporting 526, just like

11   what --

12            THE COURT:  In my prior decision on the

13   embezzlement count, I denied it because of the fiduciary

14   relationship point and not because she didn't steal property

15   belonging to Major Lindsey.

16            MR. MORIARTY:  Right.  But the exercise here is

17   did the arbitrator make findings?  That's really all the

18   court should be doing.  Did the arbitrator make findings for

19   was there a basis for findings that were made by the

20   arbitrator that equaled embezzlement?  And the answer is no.

21   And because the answer is no, you should deny any claim or

22   lack of discharge under embezzlement because that arbitrator

23   didn't make those findings.  Those issues were never raised

24   by MLA in their pleadings.  They were never litigated by MLA

25   in their pleadings.  They were never briefed by MLA in their

1    pleadings.  So under any universe of due process and

2    collateral estoppel, that judgment can't sound an

3    investment.  The same argument goes for the (a)(6) argument.

4    So that is it's very important to understand Paragraph 8 of

5    the final judgment, which is on the second to last page,

6    which again says -- the arbitrary says, if an issue is

7    submitted and I didn't grant it, it is denied.  That's just

8    like -- right, it's not simply I don't grant the award.  I

9    don't grant the award for punitive damages.  Maybe I have

10   discretion and I don't want to do it, but I deny it.  And so

11   that's the ruling Your Honor should look at.  And of course,

12   there's no findings at all of any maliciousness at all.

13   There's not a word of it.

14          By the way, my adversary is a little looser with

15   arguments than I would be.  They keep saying I abandoned

16   arguments.  This is really -- it's ridiculous.  If you look

17   at Page 23 of our opening brief, we lay out each cause of

18   action that the arbitrator found liability on, and we made

19   specific arguments that they don't have findings that

20   support either of the charges.  We didn't abandon any

21   argument, and we made the arguments.  And this is, you know,

22   maybe it's different style, but so there's that.

23          Now, the other thing I want to talk to you about

24   briefly here is back to the scope of authority.  And the

25   Wisell court, which I like that opinion, used the language

1  that this court -- you know, (indiscernible) follow that

2  court, that you must be able to point to clear and

3  unequivocal factual claims, and unequivocal is really

4  important because, as you know, in the rule of collateral

5  estoppel, how that's applied, there's a whole body of Law

6  about how does the court deal with ambiguity.  How does the

7  court deal with a prior ruling that's ambiguous?

8          So say the court were to look at a finding that

9  was largely based on breach of contract.  But then maybe

10  there was an aspect of a breach of fiduciary duty.  Under

11  the law of collateral estoppel and really the analysis under

12  523, I view mentally as really a subset of the law of

13  collateral estoppel.  The way Wisell analyzed the law, it's

14  very similar sort of thinking, is that finding that the

15  court is looking for has to be clear and unequivocal.  It

16  can't be waffling between, well, maybe it's -- it's really

17  misfortunate based on (indiscernible) because you're

18  faithless, and, oh, is there a hint of fraud in there?  I

19  don't know.  Maybe there is.  That's not good enough.  It

20  has to unequivocally be a finding based on embezzlement or

21  it's cousin fraud or it has to be an unequivocal finding

22  based on maliciousness and willfulness, together, injury.

23  Willful and malicious injury.

24          THE COURT:  You don't think that the arbitrator

25  found willful and malicious?

1          MR. MORIARTY:  No.  Absolutely not.  It's not --

2     and again, go back to first principles.  Nobody argued the

3     point.  Nobody argued that we have to find these willfulness

4     arguments.  When they asked for consequential damages,

5     there's just two types of damages.  And I'm going to try to

6     go with what you're interested in both of my script here.

7     I'm going off script a little bit.

8          When they asked for consequential damages, they

9     haven't said any -- they didn't say the words malicious or

10    willful.  You can go back and look at their briefs, and

11    that's why we submitted them.  You look at their briefs.  We

12    put their briefs in because it's a due process

13    consideration.  As a matter of due process, did they ask our

14    arbitrator to make a finding of willfulness?  No.  Did they

15    make them on consequential damages?  They just rely on the

16    law of faithless employee, which my colleague, when she

17    read, there's no element of fraud in that.  There's no

18    element of maliciousness in a faithless employee.  You were

19    supposed to work for us and you work for us and you didn't.

20    You're faithless.  We want our money back.  That's the law

21    on that.  It's really just common sense.

22          And so back to this, to Wisell, it has to be clear

23    and unequivocal findings.  And so when you combine the rule

24    of unequivocal findings and ambiguity and you look at

25    Section 8, you get a much different picture.

1           The other thing to mention, and I think this is

2    very important, Your Honor, is that you have made some

3    comments which, you know, I understand your point of view

4    about Ms. Mahn, but there is a rule in this discharge that,

5    you know, basically, if there's some doubt, you should grant

6    some leniency towards her.  This is a woman who tried her

7    best and we're going to talk about that.  And she did it in

8    a very unorthodox way.

9           THE COURT:  You've got to be kidding me.

10          MR. MORIARTY:  I'm not kidding, Your Honor.

11   Because the thing to keep in mind is like people in my law

12   firm, I say, you know, Ms. Mahn, even though she's a lawyer,

13   she's not working in a law firm.  This isn't Wachtell

14   Lipton, you know, this isn't a very high-end law firm.  I'm

15   just using that as an example of a fabulous law firm.  But

16   she's a salesperson.  They're making sales.  They're trying

17   to sell things.  They're trying to create relationships.

18   They're doing what they can to make a sale and that's what

19   they needed to do.  It's very --

20          THE COURT:  And you think giving the leads to

21   competitors is a normal part of the business?

22          MR. MORIARTY:  It was, and people gave the leads

23   back.  The two people she gave leads to, Kagan and

24   Picarelli, I think --

25          THE COURT:  And she received some portion of the

1    compensation?

2         MR. MORIARTY:  She got -- MLA received millions

3    from it.  They made her the employee of the year

4    (indiscernible) --

5         THE COURT:  In connection with the referrals that

6    she made --

7         MR. MORIARTY:  Yes.

8         THE COURT:  -- she received part of the

9    compensation, correct?

10        MR. MORIARTY:  I don't know how that was split up.

11   I'm not aware of that part of the record.  But the strategy

12   worked.  That's why they gave her not employee of the year,

13   the team player of the year because what happened, Josh

14   Kagan and the other guy, Picarelli, they sent business back.

15        THE COURT:  Argue from the record.

16        MR. MORIARTY:  I am arguing for the record, that

17   they sent -- this is all on the record.  They sent millions

18   back.  And Ms. Mahn submitted two declarations, Your Honor.

19   And we had an extensive statement of counter-facts that we

20   submitted that's like 60 pages long where we go into all

21   this in detail.  It was a very successful strategy.  It

22   helped (indiscernible) Ms. Mahn.  That's why they gave her

23   an award.  That's why it says in the opinion, well, we gave

24   Mahn a second chance because they knew what she was doing.

25   At a minimum, this is a disputed fact issue.  I just urge

1    the court not to assume that what they're saying is true

2    about it.

3              THE COURT:  The arbitrator didn't find it

4    persuasive, correct?

5              MR. MORIARTY:  The arbitrator didn't find many

6    points unpersuasive.

7              THE COURT:  Okay, and what I am looking for is

8    what the arbitrator in his decision --

9              MR. MORIARTY:  That's right.  Her.

10             THE COURT:  Her.

11             MR. MORIARTY:  Rosemary Townsend, I think is her

12   name.  Is that her name?  And she was an arbitrator, is

13   longstanding, did a lot of work for the NFL.  So let's just

14   talk about the statement of undisputed facts.  Here's the

15   bottom line, that you can't rely on what they tell you.

16   They did not play fair here.  First of all, they cited Your

17   Honor's statements as evidence that's admissible against Ms.

18   Mahn.  This is not the law.  We can't cite the court's

19   comments on the bench as evidence against the person before

20   the court.  And that's what they did.  I scratch my head and

21   think --

22             THE COURT:  I mean, while I share the arbitrator's

23   conclusion that Ms. Mahn's conduct was shocking to the

24   conscience, I'm not basing a denial of discharge on that

25   conclusion.

1          MR. MORIARTY:  Great.  That's great.  But --

2          THE COURT:  It is shocking to the conscience.

3          MR. MORIARTY:  Do you know the Wisell judge, the

4     judge who wrote --

5          THE COURT:  I don't know who wrote Wisell.

6          MR. MORIARTY:  He wrote a few opinions.  There's

7     sometimes you start doing research, you're like, oh, Judge

8     Smith.  I kind of like his thinking.  Anyway, Wisell, in

9     that court, what he said was, you know what?  The arbitrator

10    or the prior court found the conduct to be outrageous.  And

11    he found it to be deliberate.  And he said -- essentially

12    what he said, I'm paraphrasing, I'm not going to focus on

13    that chatter.  I'm going to look at what the findings are.

14    Are there unequivocal and clear findings?  I'm just going to

15    be a lawyer judge, and look at the test I have.  I'm not

16    going to, you know -- so in Wisell, the court found that the

17    conduct that amounted to embezzlement was outrageous and

18    deliberate.  They're really bad things.  And he denied the

19    motion for allowing the discharge to take place because he

20    said, I can't find unequivocal clear findings that support

21    this.  Yeah, he doesn't like her.  She's outrageous.  She's

22    all bad.

23          And I'd ask Your Honor to follow the same

24    approach.  I mean, at a personal level, maybe Ms. Mahhn's

25    conduct is unappealing to the court, which seems fairly

1    clear.  But as a legal matter, what did the arbitrator do?

2    Let's focus on the arbitrator's behavior as opposed to Ms.

3    Mahn's behavior.  That's already been judged by one court.

4    We're trying to understand what that judgment is.

5          So what they do with their statements of material

6    fact is they mislead every single time.  So if there's a

7    quote in the deposition or a quote in the email that has two

8    parts, they take the first part and they tell you that

9    that's the fact.  And they leave out the second part.  They

10   don't tell you.  And that changes the fact completely.

11         For example, they keep wanting to say, Mahn did

12   this for herself and nobody else knew about it.  Well, as I

13   said, the arbitrator herself said her bosses gave her a

14   second chance because they knew about it.  In her

15   declarations we submitted, she talked about how she met with

16   her boss and complained every day, and they knew what she

17   was doing.  This was a strategy to get business.  These are

18   salespeople hustling, hustling to make a buck.  They're not

19   lawyers in a law firm pondering the law.  They're trying to

20   make money.

21         Likewise, this stuff that Ms. Mahn used an alias,

22   you know, that very nefarious stuff, out of 100,000 emails,

23   we did the math.  It was 100th of 1 percent, two or three

24   emails that she used, and it was a joke.  She didn't use any

25   alias.

1          Now, the other one they talk about all the time,

2     she used Hotmail.  She used a nonstandard account.  And this

3     again, they throw her into the fire and say, this is a

4     nefarious person who is deep and dark and intense.  No, it's

5     much simpler.  In the world before COVID, in the world of

6     2008, I was a lawyer then.  Many of us were lawyers there.

7     There was no remote working.  If you wanted to work, you had

8     to go to your law firm, because that's what the server is.

9     And so if you wanted to work at home, and I've done this

10    myself many times, you forward your work to your Hotmail

11    account, and you sat on your desk on a Saturday afternoon

12    watching the Giants typing a brief.

13         So Ms. Mahn was working at home, and the easiest

14    way to work at home was to work through the Hotmail

15    accounts.  And she says that in her declaration.  It wasn't

16    some kind of sneaky, sneaky thing.  So, you know, what MLA

17    does here is they're very reminiscent of today's modern

18    politician.  They find some crappy sound bite --

19         THE COURT:  Move on to your argument.

20         MR. MORIARTY:  I will.  So with all the law, Your

21    Honor, really, the answer comes down to what method are you

22    going to use to find the truth.  What method should Your

23    Honor use?  And that's what I want to address right now for

24    a moment.  There's two different approaches at play here.

25    One of them is called the Wisell approach, and that is this

1    court should find unequivocal, clear findings of fact that

2    support the exact elements in 523, the elements of fraud,

3    that's present in embezzlement and that can be felonious

4    fraud, any kind of fraud, and then the elements that are

5    required or malicious conduct.

6            That's the approach the law requires in my view,

7    and I submit that's the approach Your Honor should follow.

8    What MLA is doing is the opposite.  They're kind of giving

9    you this big ball of wax and saying, see, look at this, she

10   did this, she did that, she did that.  There's nothing

11   principled about their approach at all.  They were not able

12   to point to findings.  They're not able to point the

13   findings.  So Your Honor asked counsel, where is your

14   findings of fraud?  She said, well, they're in duty of

15   loyalty and they're in fiduciary duty.  But if you go back

16   and read the opinion, there's nothing in there about fraud.

17   And the word never appears and the concept never appears.

18           And again, Your Honor, let's go back to first

19   principles.  Did they raise the issue of fraud?  Did they

20   litigate the issue of fraud?  No.  That ends the inquiry

21   there.  If they ever raised fraud and litigated it before

22   the judge and asked for judgment on it, it can't possibly be

23   part of this award.  So this idea, what they're really doing

24   is they're trying to have the trial all over again.  And you

25   pointed us earlier, and I think it was originally directed

1    to me, don't try to relitigate the case from Ms. Mahn by

2    putting in all the evidence to make it better for her.

3            But what they're trying to do is the opposite.

4    They're trying to relitigate the case to make it worse for

5    her.  They're trying to make it look like it was a fraud

6    case when it wasn't.  It was a breach of contract case.  And

7    lawyers are expedient people.  If I can get a judgment

8    against my former employee by showing what is conversion.

9    We've discussed this in a brief.  Their claim against Mahn

10   is really (indiscernible) conversion, which is you would

11   access the confidential information and you misused it.  No

12   element of fraud whatsoever.  So if you're a lawyer thinking

13   I can get a full judgment by proving access and misuse and I

14   don't have to prove fraud, well, that's what you would do.

15   And that's exactly what they did do.

16           And Your Honor, we've cited numerous cases all

17   across the country that were all saying the same thing.  If

18   your case for use of these embezzlement exception to

19   discharge is based on conversion, you lose.  Conversion does

20   not equal embezzlement.  It doesn't have a fraud element.

21   There's no fraud element in this case.  It wasn't pled.  It

22   wasn't sought for argument.  There's no fundamental.

23           So the methods that MLA offers to (indiscernible),

24   which is look at every email, see if you really seize on the

25   word outrageous, look at things that go to her character.

1   That's not the method.  The method is to look at the

2   arbitrator's findings as a lawyer, what could he find and

3   what could he not find.  So that's that.  Now, getting to

4   this last point about malicious prosecution.

5           THE COURT:  It's not malicious prosecution.

6           MR. MORIARTY:  Thank you.  I'm getting worse over

7   the years, Your Honor.  I'm only a young 64.  But malicious

8   injury and willful injury, there's, broadly speaking, two

9   parts of the judgment here (indiscernible).  There's the

10  attorney's fees part (indiscernible).  Then there's this

11  disgorgement part.  And then there's their last attempt to

12  get punitive damages.  They made extensive briefs where they

13  did talk about wrongful and malicious conduct and they said

14  --

15          THE COURT:  The arbitrator did not award punitive

16  damages, but was very clear about why.

17          MR. MORIARTY:  Right.  Right, because --

18          THE COURT:  Did not make any findings that the

19  conduct did not merit punitive damages.  The arbitrator

20  determined that it was in light of the size of the judgment

21  that she was entering.  She exercised her discretion not to

22  award punitive damages.  That's not the same thing as

23  determining that the basis for punitive damages wasn't

24  established.

25          MR. MORIARTY:  You're right, and you're not right

1    and I'll tell you why.  First of all, back to Wisell, case

2    of the hour.  That court found there was -- it denied

3    permission to use the embezzlement exception.  It granted

4    the exception to use the willfulness exception.  Why did it

5    do that?  Because it noted that the arbitrator found that

6    there was malicious activity.  The arbitrator actually -- I

7    think actually might have been a trial in that case, but

8    found there were punitive damages because it was malicious

9    conduct.  Malicious conduct is essentially what is requiring

10   punitive damages.  Horrible conduct, right?

11          So Wisell said, I'm going to go with my method.

12   I'm going to say, did the lower court make a finding about

13   maliciousness as part of the judgment?  Yes, they did.  So

14   I'm going to allow the malicious exception to apply here.

15          Now, Your Honor has the exact opposite can of

16   worms.  What you have is a judgment that's devoid of any

17   concept of maliciousness because it was denied.  She didn't

18   make negative findings.  She doesn't have to.  But what you

19   have to ask yourself, is there a finding that this judgment,

20   this debt that was confirmed by the appellate division, does

21   that debt have maliciousness and willful conflict in it?

22   And the answer is no, it doesn't.  Because they tried to put

23   it in as punitive damages.  They wanted an extra $5 million

24   for themselves, and she didn't give it to them.  And so she

25   didn't make any finding that said, yeah, there really was

1    maliciousness, but I'm not granting it.  But so she said --

2            THE COURT:  She decided that in the exercise of

3    her discretion, she would not award punitive damages.

4            MR. MORIARTY:  So I would say to Your Honor, the

5    question maybe should be asked is, okay, I'm aware of this

6    ruling, and the court had an opportunity to put it in the

7    judgment, but didn't.  Is there anything in the judgment

8    that says this judgment is based on malicious and willful

9    injury?  No, there isn't anything in the judgment there.

10   It's devoid of that because it was rejected.  That's the

11   analysis.  Did Arbitrator Townley (indiscernible) into her

12   award a component of malicious injury?  The answer is no.

13   Did Arbitrator Townley point into the consequential aspect,

14   some aspect of maliciousness?  The answer is no.

15           And then you have the second point with the

16   consequential damages.  Is the award clear or unequivocal,

17   or is it ambiguous?  And I think counsel essentially

18   conceded it is ambiguous because there's New York -- it's

19   based on New York employment law.  It's not based on

20   maliciousness at all.  In fact, MLA never showed

21   consequential damages at all.  They never said, you know,

22   that email he sent to Josh?  We didn't get that work.  So

23   they won -- lost $100.  We lost $1,000.  In fact, they made

24   billions from what Sharon was doing, what Ms. Mahn was

25   doing.  So again, we likewise think you should follow it.

1          Now, the other aspect which I just wanted to touch

2   on briefly was this attorney's fees award, which is about a

3   million dollars.  That's not based on embezzlement.  That's

4   not based on malicious conduct.  It's right out of contract.

5   And so what happened in this case is the arbitrator had two

6   awards.

7          First she ruled, you know what, I don't think the

8   contract allows you to get attorney's fees.  So I'm going to

9   deny it.  That might have been the first partial award.

10  Then she had a second or third partial award that says, no,

11  I've rethought about this, and actually you are, as a matter

12  of contract law, entitled to attorney's fees.  So send me a

13  bill and tell me what they are.  So that got to around a

14  million dollars.  Plus, you know, we had this horrible idea

15  from Ms. Mahn, every year she's got to pay 9 percent.  You

16  go to the bank, you get 2 percent interest.  And so --

17          THE COURT:  Thank the state for that.

18          MR. MORIARTY:  What's that?

19          THE COURT:  Thank the state for that.

20          MR. MORIARTY:  Yeah, that's -- it's a tough

21  argument to make, hence the statute, right?  That is what

22  the statute says.  But it's hard for her.  It's very hard to

23  live with that over your head.  So there's that aspect too,

24  Your Honor.

25          THE COURT:  What is the judgment -- with 9 percent

1    post-judgment interest, would the judgment be today?

2          MR. MORIARTY:  Well, it's about 5 -- it's close to

3    $5 million.  I think it's maybe $4.7, $4.8 million.  I think

4    when they filed (indiscernible) I think the filing a year

5    ago was $4.7 million.  So if 9 percent kind of looks like 10

6    percent, 10 percent of $4.7 million is $470,000.  So we're

7    probably up well over $5 million at this point, which, you

8    know, I hate to get emotional, but it's tough to live with

9    (indiscernible).

10          THE COURT:  Yes, it is.

11          MR. MORIARTY:  So that's the argument, Your Honor,

12   following Wisell, and I think you'll get the right result.

13          THE COURT:  It's Judge Grossman, by the way.

14          MR. MORIARTY:  I take it he enjoys a good

15   reputation.

16          THE COURT:  He's just recently retired.

17          MR. MORIARTY:  He did.  He's certainly a solid

18   jurist and I'm sure (indiscernible) --

19          THE COURT:  Thank you.

20          MR. MORIARTY:  But thank you, Your Honor.  I'm

21   sorry if my kind of New York style or my U.S. attorney style

22   is not in keeping with Your Honor.  I do try --

23          THE COURT:  I dare say a U.S. attorney wouldn't

24   dare argue the way you have.

25          MR. MORIARTY:  Yeah.  Okay.  Well --

1          THE COURT:  At least in this district.

2          MR. MORIARTY:  Okay.  Well, I hope you've

3    understood my points and give them due consideration.

4          THE COURT:  (Indiscernible)

5          MR. MORIARTY:  Thank you.  Judge, did you have

6    anything for me?

7          THE COURT:  I've asked whatever I'm going to ask.

8          MR. MORIARTY:  All right.  Thank you.

9          THE COURT:  Let me ask you first, since the Last

10   point that Mr. Moriarty discussed is the issue of attorney's

11   fees.

12          MS. JANCZAK:  I'm sorry.  What's the question,

13   Your Honor?

14          THE COURT:  The issue -- I want you to discuss the

15   issue of attorney's fees recovery.

16          MS. JANCZAK:  Sure.  So on the attorney's fees, so

17   there's a couple parts to the award.  There's the

18   disgorgement.  There's the -- disgorgement of the $1.5

19   million --

20          THE COURT:  Do you agree that if attorney's fees

21   were awarded on the basis of breach of contract, they would

22   not be part of any judgment by this court on denying a

23   discharge?

24          MS. JANCZAK:  I absolutely disagree with it.  So

25   does the Supreme Court.  So Your Honor, something that I

1  want to make clear is the issue before this court on

2  nondischargeability isn't whether we succeeded on a breach

3  of contract claim.  It's not determined based on whether we

4  succeeded on a breach of contract claim or breach of

5  fiduciary --

6          THE COURT:  Well, I don't deny a discharge for

7  breach of contract.  Do you agree with that?

8          MS. JANCZAK:  It depends on the underlying facts,

9  Your Honor.  It depends on whether you willfully and

10 maliciously --

11          THE COURT:  I certainly don't do so on the basis

12 of collateral estoppel.

13          MS. JANCZAK:  And Your Honor --

14          THE COURT:  Yes or no?

15          MS. JANCZAK:  Not on the basis of collateral

16 estoppel certainly.

17          THE COURT:  Okay, and if attorney's fees, were

18 they awarded on the basis of breach of contract or some

19 other risks?

20          MS. JANCZAK:  I believe -- I don't have that award

21 in front of me.  But I understand that MLA didn't have a

22 contractual right to the attorney's fees, in fact, was --

23          THE COURT:  Did or didn't?

24          MS. JANCZAK:  Did.  Yes.

25          THE COURT:  So was the award based on contract or

1    otherwise?

2              MS. JANCZAK:  The award -- I would have to look at

3    the -- I think this would have been the second interim

4    award.  I'd have to look at that.

5              THE COURT:  Do you have it with you?

6              MS. JANCZAK:  I don't know if I do.

7              THE COURT:  Could you do that?  It's a lot of

8    money.

9              MS. JANCZAK:  I can find that, the answer to that

10   question, Your Honor.  But what I would say is if you look

11   at the case law on what is within the scope of

12   nondischargeability under (a)(4), (a)(6), it's the conduct.

13   It's --

14             THE COURT:  You've argued for now.  We'll deal

15   just with the collateral estoppel issue.  The arbitrator

16   awarded attorney's fees as part of the judgment.

17             MS. JANCZAK:  Correct.

18             THE COURT:  Was that based on breach of contract?

19             MS. JANCZAK:  I think the --

20             THE COURT:  Yes or no?

21             MS. JANCZAK:  I would have to double-check the

22   award.

23             THE COURT:  Go ahead.  Do you have it with -- do

24   you have those papers with you?

25             MS. JANCZAK:  I think I have it on my computer.  I

1    just don't have it printed out in front of me.  But let's

2    say hypothetically, for the sake of this argument, let's say

3    that the basis of those attorney's fees was granted as a

4    contractual right, not based on breach of contract to be

5    fair, but as a contractual right to attorney's fees.  The

6    reason that we have the contractual right to attorney's fees

7    is because of Ms. Mahn's conduct which is --

8           THE COURT:  I come back to my question.  Do you or

9    your colleague have the award that you can determine whether

10   the award of attorney's fees was based on breach of

11   contract?

12          MS. JANCZAK:  I don't have the second interim

13   award in front of me right now, Your Honor.  I would have to

14   check on that.  But again what I would say is if you look at

15   the Cohen case, it's all damages arising from the conduct

16   that is the basis of the 523.

17          THE COURT:  If the basis for the award was breach

18   of contract, I do not deny a discharge on the basis of a

19   breach of contract.  And I'm asking a very direct question.

20   I certainly asked questions of your opposing counsel.  Do

21   you have your computer with you?

22          MS. JANCZAK:  I do.

23          THE COURT:  Could you look at -- I would like an

24   answer to that question.

25          MS. JANCZAK:  It's not the fastest computer in the

1    world, Your Honor.

2              THE COURT:  That's okay.

3              MS. JANCZAK:  Would you like me to address some of

4    the other issues?

5              THE COURT:  No, I want an answer to this question

6    so we don't lost it.

7              MS. JANCZAK:  So Your Honor, looking at the

8    partial final award which is Exhibit G to Exhibit 1 for

9    motion for summary judgment, and it looks like Pages 9 and

10   10, MLA is given its attorney's fees and costs with the

11   prevailing party attorney (indiscernible) in the employment

12   area.  That's the answer to your question.

13             Again though, Your Honor, I think reading the

14   Cohen case, I understand Your Honor may disagree with me on

15   this point, but I think reading the Cohen case, the debt

16   that's ultimately found to be nondischargeable is all

17   damages flowing from the underlying conduct --

18             THE COURT:  If the basis of the award was breach

19   of contract, there are parts of the judgment that are not

20   based on breach of contract that may be subject to denial of

21   discharge.  But the attorney's fees would not be among them.

22   How much was the attorney's fees that were awarded?

23             MS. JANCZAK:  I want to say -- I don't want to

24   guess.  Let me look.  I think that would be in the final

25   award, Your Honor, and that's $945,765.39.

1          THE COURT:  As to which the 9 percent

2     post-judgment would increase that amount.

3          MS. JANCZAK:  Correct.

4          THE COURT:  Okay.  All right.  Go on with your

5     argument.

6          MS. JANCZAK:  So Your Honor, Mr. Moriarty opened

7     his argument by noting that this is a court of law and I

8     agree this is a court of law.  But we also know that is

9     bankruptcy court and bankruptcy court (indiscernible) --

10          THE COURT:  You know, go on with your argument.

11     Not making the court that we're a court of equity.  Okay.  I

12     follow the law.

13          MS. JANCZAK:  Understood.  My only point in saying

14     that, Your Honor, is that's why we have nondischargeability

15     exceptions because sometimes the facts underlying the debt

16     itself warrant nondischargeability.  That's an equitable

17     basis.  To me (indiscernible) so is the law.  But that's why

18     we look at these things.

19          I'm going to directly answer the question that

20     Your Honor asked Mr. Moriarty earlier.  Both parties have

21     stipulated the authenticity of the emails that we're talking

22     about today.  There's a stipulation.  The court has entered

23     an order approving that stipulation.  That's of record.

24          Ms. Mahn -- I'm sorry, Mr. Moriarty argued -- I

25     think it was with respect to the unclean hands defense,

1    which again was rejected by the arbitrator, but basically,

2    well, Ms. Mahn's boss knew what she was doing and in some

3    way or somehow condoned it.  I'm going to point to the

4    specific part of the arbitrator's partial final award that

5    addresses this argument because it's an argument Ms. Mahn

6    has raised before.  This is with respect to the unclean

7    hands, addressing the unclean hands defense.  It's on Page

8    22 of the partial final award:

9         "This arbitrator notes however that the most

10       significant of these individual claims that

11       (indiscernible) claimed," that was Ms. Mahn's boss, "

12       condoned her conduct because she first became aware of

13       her actions in 2008 is misplaced.  The emails in

14       question in 2008 had been sent to respondent's home

15       address and respondent strongly denied any wrongdoing.

16       The fact that (indiscernible) gave her a warning and a

17       second chance to prove that it was an isolated incident

18       cannot be regarded as in condoning his misconduct.

19       Rather it is similar to a form of progressive

20       discipline whereby the first infringement of a rule

21       does not warrant the termination because the employee

22       strongly disavows any wrongdoing and there is no hard

23       evidence to support (indiscernible)."

24       So two things I'll note about this, Your Honor.

25       THE COURT:  Okay.

1          MS. JANCZAK:  First, that a couple of emails that

2    Ms. Mahn forwarded to her personal address, her personal

3    home address in 2008, that's three years after she started

4    at MLA.  So she had been doing this for three years before

5    there was any indication that she might be doing something

6    untoward.

7          Second of all, it was just a couple of emails

8    showing that she had forwarded information to her personal

9    email address, not that they were being forwarded to

10   competitors.  That's not what was known.  It was that

11   confidential candidates information in being sent to a home

12   address which was against company policy.  So I just wanted

13   to clarify that for the record, Your Honor.

14          THE COURT:  Okay.  Go ahead.

15          MS. JANCZAK:  One other point of disagreement

16   between Ms. Mahn (indiscernible) MLA, is collateral

17   estoppel.  Ms. Mahn's position seems to be that if it's not

18   in the four corners of the partial final award, then that's

19   the end of it.  There's nothing.  You know, if we can't win

20   on collateral estoppel, then we lose.  That is not the

21   standard, Your Honor.  We cited a number of case on Pages 7

22   and 8 of our own motion -- or I'm sorry, this is Pages 7 and

23   8 of our response to Ms. Mahn's motion for summary judgment

24   that says --

25          THE COURT:  Well, the issue is whether I have to

1    have a trial.

2              MS. JANCZAK:  Sure, I agree with you.  That's

3    exactly the point, Your Honor.

4              THE COURT:  Yeah.

5              MS. JANCZAK:  If collateral estoppel does not

6    apply, and we've argued that -- you know, we've argued that

7    issue.

8              THE COURT:  Correct.

9              MS. JANCZAK:  If collateral estoppel doesn't

10   apply, that doesn't mean Ms. Mahn wins.  That just means we

11   have a trial.

12             THE COURT:  Yeah, that's correct.

13             MS. JANCZAK:  This court has exclusive

14   jurisdiction over whether --

15             THE COURT:  That's really, as far as I'm

16   concerned, that is a proposition of law that can't be

17   disputed.  Okay.  The issue is whether we have to have a

18   trial or not.

19             MS. JANCZAK:  Yes, I agree, Your Honor.  I just

20   wanted to make sure that that's clear for the record, Your

21   Honor.  And the other issue is that a claim -- the

22   successful cause of action, if you will, whether it's unfair

23   compensation, breach of conduct, whatever it is, the

24   elements of that claim don't need to have the same words,

25   embezzlement, the buzzwords, embezzlement, willful and

1    malicious injury in order to qualify.  It's the conduct that

2    is --

3              THE COURT:  Well, for purposes of collateral

4    estoppel, it is the findings of the arbitrator.

5              MS. JANCZAK:  The findings.  The factual findings.

6    Right.

7              THE COURT:  The factual findings of the

8    arbitrator.

9              MS. JANCZAK:  The factual findings that support

10   the ultimate legal claim --

11             THE COURT:  Correct.

12             MS. JANCZAK:  -- that is successful.  But that

13   doesn't mean that if we didn't bring an embezzlement claim,

14   we can't succeed on an embezzlement claim in the future

15   because, again, this court (indiscernible) --

16             THE COURT:  The findings of the arbitrator have to

17   have been relevant to one of the causes of action on which

18   you did proceed.

19             MS. JANCZAK:  That's exactly right.

20             THE COURT:  Not you.  I realized you didn't do the

21   arbitration.

22             MS. JANCZAK:  Yes, yes, Your Honor.  And again,

23   I'm not going to rehash everything that I argued initially,

24   and in our briefs we've established that.  But I just wanted

25   to be clear.  You don't have to have brought a claim for

1    embezzlement (indiscernible) --

2              THE COURT:  I'm in sync with that.

3              MS. JANCZAK:  -- to proceed on a

4    nondischargeability claim.

5              THE COURT:  But the arbitrator's findings have to

6    be relevant to one of the causes of action on which MLA did

7    proceed --

8              MS. JANCZAK:  Correct.

9              THE COURT:  -- to the arbitration.

10             MS. JANCZAK:  That's correct, Your Honor.  And you

11   know, again, we think that we established that.  So, you

12   know, the issues about where there was no notice, no

13   briefing, no findings, we believe that there was.  The fact

14   that it wasn't called embezzlement, we believe that the

15   facts at issue were tried.  But there is no due process

16   issue here because if we don't win on collateral estoppel,

17   there's still a trial.

18             THE COURT:  Right.

19             MS. JANCZAK:  That's your opportunity.  That's

20   your evidence.  I want to talk about the Wisell case for a

21   second.  Mr. Moriarty has asked you to follow the Wisell

22   case and that's (indiscernible).  And you know, I think our

23   facts are quite a bit different than they were -- more

24   favorable, I will say, than they were in Wisell.  I think

25   our findings and (indiscernible) final awards were explicit,

1   unequivocal and established the basis that we need to

2   establish.  But what kind of gets thrown aside, Your Honor,

3   is even though collateral estoppel wasn't applied to the

4   523(a)(4) embezzlement, it was applied to the 523(a)(6) for

5   willful and malicious injury, and again that was on an

6   underlying claim of breach of fiduciary duty.  We've got

7   that here.  And Mr. Moriarty said, well, you know, that's

8   because they had -- there was also an award for punitive

9   damages.  Let's revisit the opinion on that.

10          THE COURT:  I have the opinion open on the screen

11  so if there's a page that you would like to refer to.

12          MS. JANCZAK:  Sure.  Yes, Your Honor.  It is the

13  last day -- well, depending the page you're looking at, on

14  the printed page, it's the last page of the opinion.  But

15  it's on Page 42 of the opinion (indiscernible) Westlaw ed

16  notes, it's at ed note 39, that starts, "In this case the

17  debtor exhibited malice under the standard of the Fifth

18  Circuit.  While the debtor did not exhibit," -- I think I've

19  read this part before.  So I'll skip to the end of that.

20          That's the sentence where the judge says, "We find

21  malice here based on the factual findings of the

22  arbitrator," or maybe it was a state court judge.

23          In addition the state court's award of punitive

24  supports the finding that the behavior constitutes both

25  (indiscernible) malicious injury.  So there are two

1    independent bases on which to find, on a collateral estoppel

2    basis, willful and malicious injury (indiscernible) damages.

3    It was based on the factual findings underpinning the breach

4    of fiduciary duty claim and also separately punitive damages

5    and the court makes that clear in the paragraph right before

6    the conclusion:

7          "Because of the state court's award of punitive

8        damages together with the findings of the state court

9        identifying the debtor's deliberate and intentional

10       misbehavior, the court finds that the requirements of

11       Section 523(a)(6)," (indiscernible) --

12       THE COURT:  So did the arbitrator in this case

13    find deliberate and intentional misbehavior?

14       MS. JANCZAK:  They did.  She absolutely did, that

15    Mahn "knowingly exploited MLAs' candidate client information

16    in exchange for financial kickbacks, purposefully drove

17    candidates away from MLA."

18       THE COURT:  Okay.

19       MS. JANCZAK:  And again conduct that would shock

20    the conscience.  That may be a commentary on the facts as

21    (indiscernible) --

22       THE COURT:  So shocking to the conscience is a

23    commentary.

24       MS. JANCZAK:  It is a commentary.  But it

25    certainly gives some color to the extraordinary weight of

1    the evidence on which those findings were based.  And again

2    duty of loyalty, same claim as at issue in Wisell, found

3    that Mahn acknowledged her fiduciary duty to MLA, clearly

4    understood that duty and breached it by sending dozens of

5    emails, nearly -- I think I read this into the record

6    before, not a day -- nearly a day did not go by she was not

7    sending this information to competitors.  Emails that were

8    shocking in scope, duration and tone in exchange for

9    kickbacks, diverting business away from her employer and

10   from her colleagues.  These were her colleagues' candidates.

11   They weren't hers.

12          And then again, the arbitrator cited specific

13   evidence in support of these factual findings, encouraging

14   the competitors to out candidates and make it look like MLA

15   was the one outing them so that they wouldn't work with MLA

16   anymore.  Excited about the opportunity to screw over jerky

17   colleagues.

18          Your Honor, in looking at this, these facts as

19   found by the arbitrator, even without getting into the

20   disputed/undisputed facts, whatever, these facts are far

21   more compelling than any of the facts on which summary

22   judgment was granted (indiscernible) in our briefs.  They're

23   as compelling, if not more, than cases in which

24   (indiscernible).  If you look at the Markman, which that was

25   actually an embezzlement case -- I'm sorry, no.  It was an

1    (a)(6) case, willful and malicious injury.  That's another

2    Judge Grossman opinion.  Let's go with what Judge Grossman

3    found.  Aiding and abetting breach of fiduciary.  Not even

4    breaching one's own fiduciary.  Aiding and abetting

5    another's fiduciary duty (indiscernible) unfair competition.

6    Basically, before he left his employer's employment, he

7    started copying the customer list information before he went

8    to a new employer, sent it to the new employer, used that

9    information to steal clients.

10           Thus, without the dozens of emails illustrating

11   exactly why he did it, which we have here with Ms. Mahn

12   saying the intent was to screw over jerky colleagues and

13   undercut them so that they wouldn't get the candidate, these

14   facts, even more compelling than Markman, even more

15   compelling than Wisell.  The Gappier case, where all the

16   debtor did was accept funds belonging to her employer used

17   for (indiscernible) and concealed it.  We have that and more

18   here.

19           So, Your Honor, I'll leave you with this.

20   Concealment.  This idea of she only forwarded it to a person

21   (indiscernible).  Then why tell competitors not to email you

22   on your MLA email address?  Why tell competitors not to use

23   your name when they talk to candidates?  That doesn't make

24   sense.  And that was presented to the arbitrator.  She

25   didn't think it made sense either.  In fact, she found with

1   respect to Mahn's counterclaims, she lacked credibility.  We

2   cite that in our briefs.  The arbitrator expressly found

3   multiple occasions that Ms. Mahn's testimony and position

4   lacked credibility.

5           So Your Honor, the last point I'll just mention

6   here is what I didn't hear in Mr. Moriarty's presentation

7   was the standard.  He talked about willful.  He talked about

8   malicious.  He talked about fraud.  But what does that mean?

9   What does that mean as interpreted by the Bankruptcy Code?

10  Intent to deprive an owner of their property.  Well, that's

11  fraudulent intent.  We didn't hear that standard.  We didn't

12  hear it discussed.  It was just a vague, generalized, well,

13  you don't see fraud mentioned in the opinion.

14          Okay.  But what about the standard?  That's what

15  we're here to talk about.  And the standard is for willful

16  and malicious injury.  Well, you don't see the word

17  malicious in any of his briefing or you don't see the word

18  malicious in the partial final award.

19          But what is malice?  Malice, as interpreted by

20  these courts, is when anyone of reasonable intelligence

21  violates a duty commonly accepted among ordinary people.

22  That's exactly what we have here with the breach of

23  fiduciary duty case.  That's what we have with unfair

24  competition.  So I would ask -- I know Your Honor will go

25  back and take this under advisement.  I would ask the court

1    consider the standard that is relevant here (indiscernible)

2    arbitrator's specific factual findings, and you'll see that

3    that case law that we cite (indiscernible).

4              THE COURT:  All right.  Thank you very much.

5              MS. JANCZAK:  Thank you, Your Honor.

6              THE COURT:  Very, very briefly, Mr. Moriarty.

7              MR. MORIARTY:  I have nine points that she raised

8    that I want to briefly address.  One is her -- Ms. Mahn's

9    boss knew what she was doing (indiscernible) --

10             THE COURT:  I'm sorry.  I didn't hear --

11             MR. MORIARTY:  Ms. Mahn's boss knew what she was

12   doing and it's nothing secretive.

13             THE COURT:  I'm sorry.  That was rejected by the

14   arbitrators.  Arbitrator.

15             MR. MORIARTY:  But we're still trying to put

16   evidence in that we --

17             THE COURT:  You're not.  You're not.  If we go to

18   trial, you may be able to, but you can't -- there is an

19   express finding of the arbitrator.

20             MR. MORIARTY:  All the arbitrator said is, I don't

21   think her boss condoned her.  It doesn't say, I don't think

22   the boss knew about what she was doing.  Our point is the

23   boss knew about what she was doing.  Did we say she condoned

24   it?  No, we never said that.  We said she knew about it and

25   that's --

1        THE COURT:  All right.  What's your next point?
2   Go on to your next point.
3        MR. MORIARTY:  Okay, and that is --
4        THE COURT:  Go on to your next point.
5        MR. MORIARTY:  Okay.
6        THE COURT:  This is an issue that was litigated
7   during the arbitration.
8        MR. MORIARTY:  Right, and we --
9        THE COURT:  Go on.  What's your next point?
10        MR. MORIARTY:  We have this issue of the emails.
11  We have a stipulation that -- I don't have it memorized and
12  I could be wrong on this, but I believe it says we stipulate
13  to the authenticity to the emails that were part of the
14  record of the decision.  They admitted in the brief that
15  many of the emails they submitted were not part of the
16  decision.  So I don't think all of the things they're
17  throwing at the court for their campaign to malign Ms. Mahn
18  are part of our agreement.
19        THE COURT:  Okay.
20        MR. MORIARTY:  So that is why we have to return to
21  --
22        THE COURT:  What's your next point?
23        MR. MORIARTY:  The point is they said --
24        THE COURT:  What's your next point?
25        MR. MORIARTY:  I'm telling you.  They said in

1    their argument that we have to go by standard.  And the

2    standard is not to relitigate the trial.  The standard is to

3    say what did Arbitrator Townley find unequivocally and

4    clearly.  That's the only standard that applies here.  The

5    other thing that shocked me that they said, and I believe

6    it's completely false, is she said, well, as to this issue

7    of whether we gave notice of our claims, I think because

8    they did not give notice of a fraud claim that they wanted

9    the arbitrator to rule on it.  That never happens --

10             THE COURT:  For purposes of this summary judgment

11   motion, I'm going on the basis of what the arbitrator did

12   rule.

13             MR. MORIARTY:  Exactly.  And there's no ruling

14   about fraud whatsoever because it was never raised, and

15   that's part --

16             THE COURT:  No, I'm sorry.  The elements of fraud,

17   to the extent that they were found with the other causes of

18   action that were asserted, could provide a basis for my

19   denying a discharge on the basis of fraud.

20             MR. MORIARTY:  Right.  But there are no fraud

21   elements of any of the other claims.  It's not in the

22   opinion.  It's not there.  You can look at it.  But there's

23   no fraud with respect to any -- we made that in Page 23 of

24   our first brief.  We discuss that in detail.  There is no

25   fraud.  Even if the arbitrator found fraud and if it was

1  never raised in a pleading and never given notice and Ms.

2  Mahn was never given a chance to defend, that was a

3  fundamental violation of due process.  And the court can't

4  go there and say that's fraud.  It has to be given notice

5  and a ruling.

6            THE COURT:  Next point.

7            MR. MORIARTY:  MLA's counsel makes the point of we

8  want to stick to the four corners of ruling.  We do.  But

9  that doesn't mean only the words.  You can look at things

10 like -- and there's case law that says this.  Your Honor can

11 look at briefs that were submitted to get the award --

12           THE COURT:  I don't consider this a proper

13 rebuttal argument after listening to --

14           MR. MORIARTY:  I'm responding to what she just

15 said.

16           THE COURT:  What other new points do you have to

17 raise?

18           MR. MORIARTY:  Counsel again tried to repeat the

19 standards for embezzlement as an intent to deprive someone

20 of property.  That is an intent to steal.  That is not

21 fraud.  And they rely on the Colorado case which we

22 discussed in our case.  They miscite it.  Intent to deceive

23 is not a substitute for intent to defraud.  It doesn't fly.

24 It goes against all case law.  So their argument that

25 there's embezzlement is based on this idea that they've said

1    repeatedly, an intent to deprive someone of their property.

2    They covered that a little bit.  Intent to deprive someone

3    of their the property is an intent to steal.   It's not an

4    intent to commit fraud.  And courts have found that is the

5    case.  So that they're using the wrong standard and --

6              THE COURT:  Intent to steal is not fraud?

7              MR. MORIARTY:  No.

8              THE COURT:  Okay.

9              MR. MORIARTY:  And I gave an example in our brief.

10   The hungry man sees a loaf of bread at the bakery.  He runs

11   over it and he takes it and he runs away.  Did he commit

12   fraud?  No.  That's not fraud.  That's --

13             THE COURT:  What's your next point?

14             MR. MORIARTY:  The last point is a big point.  You

15   don't need a trial because the judgment itself is complete.

16   If the court didn't grant the relief they sought and it

17   didn't make findings, a trial's not going to improve that or

18   change anything.  As a matter of law --

19             THE COURT:  I'm sorry, I disagree with you.  The

20   issue is whether I'm going to grant summary judgment on the

21   basis of collateral estoppel.

22             MR. MORIARTY:  Right.

23             THE COURT:  On the basis of what the arbitrator

24   did find, and that doesn't determine this matter as a final

25   matter.  I may conclude that there has to be a trial.

1          MR. MORIARTY:  Okay.  Your Honor, I would

2     respectfully suggest that --

3          THE COURT:  That is not today's argument.

4          MR. MORIARTY:  Okay.  What I --

5          THE COURT:  I'm just telling you right now it's

6     not today's argument.  Argue with respect to the

7     cross-motions for summary judgment.

8          MR. MORIARTY:  When Your Honor reviews the

9     arguments, you'll see only if there's support for their

10    claim.  And if there's not support for the claim, we should

11    win the motion and (indiscernible) our motion.

12    (Indiscernible) the judgment itself does provide a complete

13    record that the court can interpret as a matter of law.  So

14    we do have an email that shows the false (indiscernible) --

15         THE COURT:  Okay.  The arbitrator rejected your

16    argument.  Okay.

17         MR. MORIARTY:  Well --

18         THE COURT:  We are dealing only with what the

19    arbitrator determined.  We are dealing with a summary

20    judgment motion on the basis of the findings made by the

21    arbitrator.

22         MR. MORIARTY:  Respectfully, Your Honor, I don't

23    think the arbitrator (indiscernible) --

24         THE COURT:  Sit down.  I've heard enough from you.

25         MR. MORIARTY:  Okay.  Thank you.

1          THE COURT:  All right.  We're adjourned.

2          (Whereupon, at 11:08 a.m., these proceedings were

3    concluded)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    [signature: Sonya M. Ledanski Hyde]

7

8

9

     Sonya Ledanski Hyde

10

11

12

13

14

15

16

17

18

19

     Veritext Legal Solutions

20

     330 Old Country Road

21

     Suite 300

22

     Mineola, NY 11501

23

24

     Date:  September 10, 2025

25